511 S.E.2d 720

John Woodruff KESSEL and Ray Miller Kessel, Plaintiffs Below, Appellees,

v.

David Keene LEAVITT, Anne Gilmore Conaty, Eleanor Wolfe Conaty, Thomas J. Conaty, and Brian P. Conaty, Defendants Below,

Anne Gilmore Conaty, Eleanor Wolfe Conaty, Thomas J. Conaty and Brian P. Conaty, Defendants Below, Appellants.

No. 23557.

Supreme Court of Appeals of
West Virginia.

Submitted Jan. 28, 1997.

Decided July 22, 1998.

Workman, J., filed separate opinion concurring in part, and dissenting in part.

Marvin W. Masters, Paula L. Wilson, Masters & Taylor, Charleston, West Virginia, Attorneys for the Appellees.

Lonnie C. Simmons, DiTrapano & Jackson, Charleston, West Virginia, Attorney for the Appellants.

Janis K. Stocks, San Diego, California, Attorney for Amicus Curiae, Academy of California Adoption Lawyers.

Brendon C. O'Shea, Gleason, Dunn, Walsh & O'Shea, Albany, New York, Attorney for Amicus Curiae, The National Council for Adoption.

Mitchell Wendell, The American Public Welfare Association, Washington, DC, Legal Consultant for Office of Secretariat of Amicus Curiae, Association of Administrators of the Interstate Compact on the Placement of Children.

Jon R. Ryan, Punta Gorda, Florida, President of Amicus Curiae, National Organization for Birthfathers and Adoption Reform.

DAVIS, Chief Justice: [1]

The appellants herein, and defendants below, David Keene Leavitt, Anne Gilmore Conaty, Eleanor Wolfe Conaty, Thomas J. Conaty, and Brian P. Conaty,[2] appeal from a December 4, 1995, jury verdict in the Circuit Court of Cabell County returned in favor of the appellee herein, and plaintiff below, John Woodruff Kessel. Claiming that the defendants had acted fraudulently in placing the child of Anne Conaty and John Kessel for adoption and that they had tortiously interfered with John Kessel's parental rights in his son, the jury awarded John compensatory damages of $2 million and punitive damages of $5.85 million. The defendants appeal these verdicts citing, among other errors, the circuit court's lack of personal jurisdiction over defendant Leavitt; the failure of the

plaintiff to state a claim for fraud or tortious interference upon which relief can be granted; the inappropriateness of certain jury instructions; and the excessiveness of the damages awards. In addition, the appellee herein, and plaintiff below, Ray Miller Kessel cross-appeals the circuit court's decision to direct a verdict in favor of the defendants with respect to his claims alleging that the defendants interfered with his grandparental relationship with the child of Anne Conaty and John Kessel. Upon a review of the parties' arguments, the record evidence, and the relevant authorities, we affirm the decision of the Circuit Court of Cabell County.

## I.

### FACTUAL AND PROCEDURAL HISTORY

The evidence presented to the jury reveals the following facts. Defendant Anne Gilmore Conaty [hereinafter Anne] and plaintiff John Woodruff Kessel [hereinafter John] were romantically involved for a number of years. In November, 1990, they broke off their tumultuous romance. Shortly after the breakup, Anne discovered she was pregnant, with an approximate date of conception of October 12, 1990. She informed John of the pregnancy in December, 1990.[3] They were briefly engaged in January, 1991. While John opposed any adoption of their unborn child, Anne wanted either to raise their unborn child, by herself or with John's help, or to place their unborn child for adoption.

Anne testified that, in January, 1991, she became afraid of John and feared for her safety after the deterioration of their relationship. She decided to leave her residence in Huntington, West Virginia, and take a leave of absence from her job.[4] Anne visited

---

1. By administrative order entered January 5, 1998, this Court recalled to active service retired Justice Thomas E. McHugh to continue his participation in the consideration and decision of this appeal.

2. David Keene Leavitt, who was named as a defendant to the underlying action, unsuccessfully attempted to appeal the adverse jury verdict rendered against him. This Court dismissed his appeal when he refused to post the requested

appeal bond. For further discussion of the dismissal of Leavitt's appeal, see *infra* note 20 and Section II.A.

3. Neither Anne nor John dispute that Anne's pregnancy resulted from their relationship or that they are the biological parents of this child.

4. At the time of her pregnancy, Anne was an elementary school teacher. During this same period of time, John was fulfilling his residency

with a friend in Iowa for approximately two weeks, stayed with her brothers in Tennessee for about six weeks, and traveled to her relatives' home in North Carolina, where she remained for approximately five weeks. Anne's parents, defendant Eleanor Wolfe Conaty [hereinafter Mrs. Conaty] and defendant Thomas J. Conaty [hereinafter Dr. Conaty] visited her in North Carolina, and discussed the possibility of placing the unborn child for adoption. While the Conatys were in North Carolina in April, 1991, Mrs. Conaty saw a newspaper advertisement for a California adoption attorney. Upon contacting this attorney's office, Mrs. Conaty was referred to another California adoption attorney, defendant David Keene Leavitt [hereinafter Leavitt]. Mrs. Conaty then telephoned Leavitt and either Leavitt, himself, or his wife, informed Mrs. Conaty that an adoption of Anne's unborn child could be accomplished in California without having to notify John or obtain his signature. Shortly thereafter, Anne spoke with Leavitt regarding the possibility of placing her unborn child for adoption.[5]

In May, 1991, Anne journeyed to Minnesota to stay with her aunt. On May 20, 1991, Anne informed Leavitt that she wished to place her unborn child for adoption. Leavitt informed Anne she could deliver her child in any place of her choosing. Anne decided to travel to California, where her attorney was located, and to deliver her child in that state. In early June, 1991, Anne traveled to West Hollywood, California, where she and her mother, Mrs. Conaty, remained until the birth of Anne's child in July, 1991.

During Anne's absence from West Virginia, John sought legal advice regarding his parental rights as the biological father of Anne's unborn child. On May 1, 1991, John's attorney sent a letter to David Lockwood [hereinafter Lockwood], a Huntington, West Virginia, attorney who John's counsel believed represented Anne. This letter indicated John's desire to reconcile with Anne and his intention to withhold his consent from, or otherwise oppose, any attempt by Anne to place their unborn child for adoption. Lockwood, who claimed that he was not representing Anne at this time, gave the letter to defendant Brian P. Conaty [hereinafter Brian], Anne's brother, who is also a Huntington, West Virginia, attorney. Brian then forwarded this letter to Leavitt.

On June 3, 1991, John filed an inverse paternity action[6] in the Circuit Court of Cabell County, West Virginia [hereinafter "West Virginia case 1"], in which he requested a court determination of paternity and an injunction order to prohibit Anne from placing their unborn child for adoption until paternity had been established. John attempted to serve Anne with a copy of this petition at Brian's home, her last residence in West Virginia; her parents' home; and Lockwood's office. Finally, on June 21, 1991, Lockwood faxed a copy of John's inverse paternity petition to Leavitt.

The circuit court held an *ex parte* hearing on June 26, 1991, to consider John's request for injunctive relief. Lockwood attended the hearing to inform the circuit judge that he did not represent Anne. The circuit judge excused Lockwood from the proceedings, leaving only John and his counsel present at the hearing. Following John's testimony, the circuit judge entered an *ex parte* temporary injunction order, dated June 26, 1991, "prohibiting [Anne] from placing her unborn

---

requirements for the completion of his specialized medical training.

5. Anne testified that she first spoke with Leavitt while she was in North Carolina.

6. The atypical phrase "inverse paternity action" refers to a paternity proceeding initiated by a putative father to determine whether he is, in fact, the biological father of a nonmarital child. In such a proceeding, the biological mother of the child is generally named as a defendant to the action. *See, e.g., In re Adoption of Pierce*, 15 Cal.App.3d 244, 247, 93 Cal.Rptr. 171, 172

(1971); *In re Adoption of Pierce*, 5 Cal.App.3d 316, 318, 85 Cal.Rptr. 104, 104–05 (1970). *See also Hixon v. Buchberger*, 306 Md. 72, 73–74, 507 A.2d 607, 607 (1986) (describing lawsuit initiated by putative father to establish paternity of child as "reverse paternity action"). The unusual arrangement of the parties to an inverse paternity action is in contrast to the more common scenario in which a biological mother, a nonmarital child, or a representative of a state agency initiates a proceeding against a putative biological father, thereby naming him as a defendant to the action.

child for adoption by anyone through any agency, church, group, attorney, or private household until the paternity of [John] can be established or refuted." The judge also decreed that Anne should be served with the inverse paternity petition and temporary injunction order by publication. Brian was personally served with the inverse paternity petition and temporary injunction order on June 28, 1991. However, on July 16, 1991, Brian filed an affidavit rejecting service on behalf of Anne because she no longer lived at his residence and because he was not her attorney.

At approximately the same time as John was pursuing his inverse paternity action in West Virginia, Anne was continuing with her plans to place her unborn child for adoption. In June, 1991, Leavitt informed Anne that he had located an Oregon couple who wished to adopt her child at birth.[7] Anne executed numerous documents requisite to the contemplated interstate placement, including an interstate compact placement request. On June 10, 1991, Leavitt sent these papers to the state placement coordinator for the state of California who then forwarded the documents to the state of Oregon requesting permission to consummate the placement.

After receiving a copy of John's inverse paternity petition, Leavitt, on approximately July 1, 1991, faxed a copy of the petition to counsel for the prospective adoptive parents in Oregon. Upon learning of the West Virginia litigation, the Oregon couple's attorney suggested that pursuit of this adoption may be risky based upon laws in the state of

Oregon concerning adoptions and the registration of biological fathers.[8] Consequently, the Oregon couple withdrew their interstate application to adopt Anne's child. Following this obstacle to the placement of Anne's unborn child, Leavitt subsequently located a couple in Alberta, Canada, whom he felt would be suitable prospective adoptive parents. Accordingly, Anne executed the appropriate documents to effectuate this proposed placement.

On July 24, 1991, Anne delivered a baby boy [hereinafter Baby Boy Conaty] at Cedars–Sinai Medical Center in Los Angeles, California.[9] On July 25, 1991, Anne executed the remaining documents necessary for placement of her child with the Canadian couple. Due to medical complications, the baby was not released from the hospital until July 26, 1991. On that date, the Canadian couple returned to Canada with Baby Boy Conaty. Also, on July 26, 1991, the last published notice of the *ex parte* temporary injunction order was published in a Huntington, West Virginia, newspaper, thereby completing service by publication on Anne of both the temporary injunction order and the inverse paternity petition, which was published in conjunction with the injunction order. Following the child's birth, Anne traveled to England where she visited with her sister until she returned to Huntington, West Virginia, in November, 1991.

Shortly after the birth of Baby Boy Conaty, John learned of the child's birth and discovered that Mrs. Conaty recently had flown to Los Angeles. Having seen a listing

---

**7.** While Leavitt established the initial contact with the Oregon prospective adoptive parents, Anne also participated, to some degree, in the selection of this family.

**8.** The Oregon attorney wanted to notify John of the adoption arrangements between Anne and the Oregon couple even though John did not have, under then-existing Oregon law, an unconditional right either to notice of Anne's adoptive placement of their child or to withhold his consent to this adoption. *See* Or.Rev.Stat. § 109.092 (1975) (Act, 1975 Oregon Laws 1600, ch. 640, § 2) [current Or.Rev.Stat. § 109.092 (1995) (Main Vol.1997)] (regarding consent to adoption by mother who is not married); Or. Rev.Stat. § 109.096 (1983) (Act, 1983 Oregon Laws 1272, 1283, ch. 709, § 39) [current Or.Rev.

Stat. § 109.096 (1995) (Main Vol.1997)] (defining notice requirements); Or.Rev.Stat. § 109.225 (1991) (Main Vol.1997) (describing procedures for registration of paternity actions). Leavitt, however, opposed such notification presumably because this notice could have led to John's registration of his inverse paternity action in Oregon and the attendant difficulty of locating a permanent adoptive placement for Anne's unborn child.

**9.** Anne registered at the hospital using the name "Rita Wiseman". Anne testified that she used an alias because she was afraid of John and desired to maintain her privacy. Leavitt's client file on Anne demonstrates that Leavitt and Anne contemplated her use of this alias during one of their initial consultations.

in the yellow pages of the Huntington, West Virginia, telephone book for Leavitt in Beverly Hills, California,[10] John telephoned Leavitt in the hopes that he could assist with his inverse paternity action. Leavitt informed John he was familiar with his case and was unable to discuss it. On August 6, 1991, John's attorney telephoned Leavitt and informed him of the *ex parte* temporary injunction order. She then followed the telephone call with a letter to Leavitt and enclosed a copy of the inverse paternity petition and temporary injunction order.

Also in August, 1991, John's counsel deposed Brian and Dr. and Mrs. Conaty. Brian initially asserted the attorney-client privilege, based upon his prior representation of Anne in matters unrelated to the adoption of Baby Boy Conaty, in response to questioning about his sister's whereabouts and the birth and subsequent adoptive placement of her child. After the circuit court prohibited Brian from asserting this privilege where no attorney-client relationship, and consequently no attorney-client privilege, existed, he testified at a second deposition. During his second deposition, Brian denied having any knowledge of his sister's newborn child or her whereabouts,[11] despite his earlier role in monitoring the filings of the Circuit Court of Cabell County to locate any lawsuits filed by John against Anne seeking custody of the parties' child.

John's counsel likewise attempted to depose Dr. and Mrs. Conaty to garner information about his infant son. Upon receiving their subpoenas to appear for their depositions, Dr. and Mrs. Conaty asked Brian what action was required on their part. Believing the subpoenas to be a complaint in a lawsuit filed by John, which had been anticipated by Brian, he informed his parents to continue with their plans to vacation in Virginia Beach, Virginia. Consequently, neither Dr. nor Mrs. Conaty appeared for their depositions, and both of them were held in contempt for their nonappearance.

Thereafter, Dr. and Mrs. Conaty appeared at their second scheduled depositions and purged themselves of the contempt charges. Both of these defendants admitted that they had been in California with Anne at the time of her delivery and adoptive placement of Baby Boy Conaty and acknowledged that she had accompanied them on their trip to Virginia Beach. They further indicated that they had last seen Anne on the Friday immediately preceding their deposition testimony when they "let[ ] her off" at a Lexington, Kentucky, motel upon their return from Virginia Beach. Mrs. Conaty additionally testified that she knew of three airplane tickets to London, England, having been purchased for herself, Dr. Conaty, and Anne, and that she had known since April, 1991, of these travel arrangements. She stated that she and her husband planned to leave for London during the week following their depositions, that they were to see Anne before their flight, but that she did not know Anne's present whereabouts. In sum, both Dr. and Mrs. Conaty denied having any knowledge of the ultimate adoptive placement of Baby Boy Conaty, the location of their daughter, or when Anne could be expected to return to Huntington, West Virginia.

On October 3, 1991, the circuit court entered a default judgment in favor of John in his inverse paternity action, "West Virginia case 1," as a result of Anne's failure to appear. The court "ORDERED that John Woodruff Kessel is legally determined pursuant to West Virginia Code Section 48A–6–1(c) to be the natural father of the infant child born to Anne Gilmore Conaty on or about July 24, 1991[sic] with all the rights and obligations flowing therefrom." Later, on October 17, 1991, John filed a lawsuit, in conjunction with his West Virginia inverse paternity action, in the Superior Court of California for Los Angeles County [hereinafter "California case 1"]. The main purpose of the California litigation was to obtain the

---

10. Leavitt testified that he placed an advertisement in the Huntington telephone book yellow pages only once, in 1991. In this advertisement, Leavitt represented that he provided legal services in the field of adoption law.

11. Presumably, John sought information regarding Anne's location in order to obtain information from her regarding the whereabouts of and pre-adoptive arrangements concerning Baby Boy Conaty.

depositions of Leavitt and Anne's California physician who had delivered her child.

In November, 1991, John's California counsel deposed Leavitt who asserted the attorney-client privilege in response to questioning.[12] Following this deposition, Leavitt faxed a message to Brian suggesting that Anne retain an experienced litigation attorney in California to protect her interests. Leavitt also warned that John and his counsel should "be prevented from learning any more than they know already for another month if possible."[13] Brian testified that he did not recall having seen this message. Following Leavitt's assertion of the attorney-client privilege, John's California counsel filed a motion to compel him to answer the deposition inquiries. By order dated January 3, 1992, the superior court approved Leavitt's earlier assertion of the privilege and denied the plaintiffs' motion. No further proceedings were held in "California case 1".

Additionally, on approximately November 26, 1991, John filed a civil action in the Superior Court of California for Los Angeles County [hereinafter "California case 2"]. In this case, naming as defendants Anne, Leavitt, and other individuals, John asserted claims for conspiracy, fraud, intentional infliction of emotional distress, negligent infliction of emotional distress, and child abduction. The named defendants filed a demurrer asserting that John had failed to state a cause of action. On January 3, 1992, John's counsel filed a request to dismiss this case. No further action was taken in "California case 2".

In January, 1992, John continued with his West Virginia litigation in "West Virginia case 1". On January 10, 1992, the circuit judge ordered Anne to authorize the release of her legal and medical records in California. She initially refused to sign the authorizations. Anne later executed the releases when confronted with possible contempt of court charges. Upon signing the authorizations, Anne added the notation "under protest." John notified the circuit court of the protest language, and Anne was again ordered to sign the releases, this time without adding such language. After signing the releases anew, Anne immediately prepared a renunciation of her authorization and faxed her renunciation to Leavitt. She further requested Leavitt to forward the renunciation to Cedars–Sinai Hospital. The circuit court found Anne's renunciations to be in contempt of court and again required her to sign new releases. Anne ultimately executed the releases.

Upon receiving Anne's California medical records, John learned the whereabouts of the Canadian prospective adoptive couple. On approximately March 3, 1992, John, by Canadian counsel, filed a statement of claim, requesting guardianship, and a paternity action in the Court of Queen's Bench of Alberta, Canada, Judicial District of Calgary. Following a hearing, the Canadian trial court entered an order dated June 22, 1992, dismissing John's claims, finding his consent to be unnecessary, and granting the Canadian couple's petition for adoption.[14] John testified that he did not appeal this order or otherwise pursue further legal remedies in Canada because of indications that he would have been required to post a significant bond and reimburse the adoptive couple's expenses if he had been unsuccessful.

**12.** Defendant Leavitt testified that the California Rules of Evidence governing attorneys required him to affirmatively assert the attorney-client privilege in this situation. See Cal. Evid.Code § 955 (1965) (Main Vol.1995) (defining situations in which attorney is required to claim attorney-client privilege).

**13.** The concealment portion of the note arose from Leavitt's concern that John would attempt to thwart the Canadian adoption. Pursuant to the law of Alberta, Canada, as it existed in 1991, once a child had resided with legal guardians for an uninterrupted period of six months, the Alberta courts were almost certain to approve the petition of the legal guardians to adopt that child. See Alexandra Maravel, *Intercountry Adoption and the Flight from Unwed Fathers' Rights: Whose Right Is It Anyway?*, 48 S.C. L.Rev. 497, 522–23 (1997). Once this six-month period had expired, it would be very difficult to persuade the Canadian judiciary to remove the child from the prospective adoptive home. See id.

**14.** On August 26, 1991, the Court of Queen's Bench of Alberta, Judicial District of Calgary, had terminated Anne's parental rights and approved the Canadian couple as the sole legal guardians of Baby Boy Conaty.

Finally, on July 22, 1992, John filed a civil action in the Circuit Court of Cabell County, West Virginia [hereinafter "West Virginia case 2"], which is the subject of this appeal. In this matter, John and his father, Ray Miller Kessel [hereinafter Dr. Kessel],[15] asserted claims against Anne, Dr. and Mrs. Conaty, Brian, and Leavitt for fraud, civil conspiracy, tortious interference with parental relationship, outrage, violation of constitutional rights, and tortious interference with and deprivation of grandparental relationship. Following a trial in November, 1995, the jury, on December 4, 1995, returned a verdict against the defendants on the issues of fraud [16] and tortious interference [17]. The jury further awarded John compensatory damages of $2 million [18] and punitive damages of $5.85 million [19]. From these verdicts, the defendants appeal to this Court.[20]

## II.

### DISCUSSION OF ISSUES AND STANDARDS OF REVIEW

On appeal to this Court, the defendants assign the following errors: the circuit court lacked personal jurisdiction over defendant Leavitt; John failed to state a claim upon which relief can be granted as to his causes of action for fraud and tortious interference with parental relationship; the circuit court erroneously instructed the jury as to the validity and effect of the *ex parte* temporary injunction order, the applicability of the Interstate Compact on the Placement of Chil-

dren (ICPC) and the Uniform Child Custody Jurisdiction Act (UCCJA), the right of a parent to the custody of his/her child, the defendants' intent to violate John's due process and equal protection rights, and the meaning of "contempt of court" and the consideration of legal ethics standards; the circuit court improperly determined that the attorney-client privilege between defendants Leavitt and Anne had been extinguished due to the crime or fraud exception to this privilege; and the jury awarded excessive compensatory and punitive damages. In addition, Dr. Kessel cross-appeals and complains that the circuit court improperly granted the defendants a directed verdict as to his claims regarding his grandparental rights.

During our resolution of the issues raised by the parties, which were previously determined by the jury rendering the verdict in this case, we will be guided by the detailed standards of appellate review applicable to jury verdicts. " 'An appellate court will not set aside the verdict of a jury, founded on conflicting testimony and approved by the trial court, unless the verdict is against the plain preponderance of the evidence.' Point 2, Syllabus, *Stephens v. Bartlett*, 118 W.Va. 421[, 191 S.E. 550 (1937) ]." Syl. pt. 1, *Walker v. Monongahela Power Co.*, 147 W.Va. 825, 131 S.E.2d 736 (1963). Additionally,

[i]n determining whether the verdict of a jury is supported by the evidence, every reasonable and legitimate inference, fairly arising from the evidence in favor of the

15. During the course of the proceedings below, the circuit court granted a directed verdict in favor of the defendants with respect to Dr. Kessel's claims for interference with his grandparental rights. Accordingly, for the purposes of accuracy and ease of reference, the term "plaintiff" hereinafter will be used to refer solely to John.

16. The jury apportioned the fault of the defendants with regard to fraud as follows: Leavitt 55% fault; Brian 25% fault; Anne 10% fault; Dr. Conaty 5% fault; and Mrs. Conaty 5% fault.

17. The jury assigned the following percentages of fault for the tortious interference claim: Leavitt 35% fault; Brian 25% fault; Anne 30% fault; Dr. Conaty 2% fault; and Mrs. Conaty 8% fault.

18. See *infra* Section II.E.1. for the specific amounts of compensatory damages calculated by

the jury. The circuit court subsequently amended the compensatory damages award, by order dated December 28, 1995. In this order, the circuit court determined that the plaintiff's expenses were actually $116,687.47 as opposed to the $150,000.00 awarded by the jury. Thus, the compensatory damages award, as amended, is approximately $1.97 million, exclusive of any applicable interest which has accrued on this judgment.

19. See *infra* Section II.E.2. for a discussion of the punitive damages awarded by the jury.

20. Although defendant Leavitt requested and was granted leave to appeal to this Court, his appeal herein was dismissed due to his failure to post the appeal bond required of him. See *supra* note 2 and *infra* Section II.A. for further treatment of this Court's dismissal of Leavitt's appeal.

party for whom the verdict was returned, must be considered, and those facts, which the jury might properly find under the evidence, must be assumed as true.

Syl. pt. 3, *id.*

■ Furthermore, our review of the parties' assignments of error challenging specific legal rulings of the circuit court will be *de novo.* *See, e.g.,* Syl. pt. 2, in part, *Walker v. West Virginia Ethics Comm'n,* 201 W.Va. 108, 492 S.E.2d 167 (1997) ("Questions of law are subject to a *de novo* review."); Syl. pt. 1, *Chrystal R.M. v. Charlie A.L.,* 194 W.Va. 138, 459 S.E.2d 415 (1995) ("Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review."). We turn now to the parties' contentions.

### A.

### *Personal Jurisdiction over Defendant Leavitt*

■ The defendants, Anne, Dr. and Mrs. Conaty, and Brian, first assign as error the circuit court's determination that it had personal jurisdiction over defendant Leavitt. In this manner, the defendants represent that, during the proceedings below, the circuit court found it had personal jurisdiction over Leavitt as a result of his one-time advertisement in the yellow pages of the Huntington, West Virginia, telephone directory. The defendants, however, maintain that this one-time advertisement does not constitute contacts with this State sufficient to confer personal jurisdiction.

They argue further that Leavitt's activities do not satisfy the requirements of the two-part jurisdictional test enunciated in Syllabus Point 5 of *Abbott v. Owens–Corning Fiberglas Corp.,* 191 W.Va. 198, 444 S.E.2d 285 (1994):

A court must use a two-step approach when analyzing whether personal jurisdiction exists over a foreign corporation or other nonresident. The first step involves determining whether the defendant's actions satisfy our personal jurisdiction statutes set forth in *W. Va.Code,* 31–1–15 [1984] and *W. Va.Code,* 56–3–33 [1984].

The second step involves determining whether the defendant's contacts with the forum state satisfy federal due process.

First, the defendants concede that even if the advertisement amounted to "transacting business" in this State as contemplated by W. Va.Code § 56–3–33(a)(1) (1984) (Repl.Vol. 1997), the causes of action asserted by John did not arise from this contact as required by W. Va.Code § 56–3–33(b) (1984) (Repl.Vol. 1997), because the telephone advertisement did not factor into the decision of the Conaty defendants to communicate with defendant Leavitt.

Likewise, the defendants maintain that the second element of the *Abbott* test cannot be satisfied because assertion of personal jurisdiction over Leavitt offends the protections of federal due process. *Citing Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 416, 104 S.Ct. 1868, 1873, 80 L.Ed.2d 404, 412 (1984) (requiring nonresident defendant to have "continuous and systematic general business contacts" with forum state as prerequisite to finding personal jurisdiction); Syl. pt. 3, in part, *Pries v. Watt,* 186 W.Va. 49, 410 S.E.2d 285 (1991) (focusing upon whether nonresident defendant "has purposefully acted to obtain benefits or privileges in the forum state" in determining whether personal jurisdiction is proper).

John responds that the circuit court's assertion of personal jurisdiction over defendant Leavitt was proper because the record evidence demonstrates that Leavitt had more contacts with West Virginia than his one-time telephone advertisement. Among these contacts, John cites defendant Leavitt's direction of the activities of Lockwood and defendant Brian with respect to the various West Virginia court proceedings in the underlying inverse paternity action, and Leavitt's communications with various defendants encouraging their cooperation in expediting the Canadian adoption.

Additionally, John contends that the two factors of the *Abbott* test are satisfied in this case. First, with respect to the long-arm statute, Leavitt transacted business, contracted to supply services, and caused tor-

tious injury by acts and omissions in this State. *Citing Lozinski v. Lozinski,* 185 W.Va. 558, 562, 408 S.E.2d 310, 314 (1991) (defining " 'tortious act' as including any act committed in the state which involved a breach of duty to another and resulted in ascertainable damages").

Second, John maintains that personal jurisdiction over Leavitt is appropriate under the federal due process analysis. *Citing International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95, 102 (1945) (requiring, with respect to finding of personal jurisdiction, "certain minimum contacts ... such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice' " (citations omitted)); *Norfolk S. Ry. Co. v. Maynard,* 190 W.Va. 113, 116, 437 S.E.2d 277, 280 (1993) (recognizing that "[t]he critical element for determining minimum contacts is not the volume of the activity but rather 'the quality and nature of the activity' " (citation omitted)); *Pries v. Watt,* 186 W.Va. at 52, 410 S.E.2d at 288 (suggesting consideration of various factors to aid in court's assessment of personal jurisdiction). Employing these due process considerations, John urges that Leavitt purposefully availed himself of the benefits of this State because he advertised here and accepted Anne's case knowing her connection to this State. In addition, this State has a substantial interest in hearing this case given Leavitt's alleged disregard for its court's orders and John's rights as a biological father. Lastly, judicial economy supports personal jurisdiction in this State, because, as John claims, Leavitt was not unduly burdened by the West Virginia trial since he employed the same attorney as the other defendants and traveled only once to this State for trial purposes. *Citing S.R. v. City of Fairmont,* 167 W.Va. 880, 886–87, 280 S.E.2d 712, 716 (1981) (permitting court to consider interstate nature of suit in determining jurisdictional questions).

In resolving the issue of whether the circuit court properly exercised personal jurisdiction over defendant Leavitt, we are faced with a rather unique situation. The defendant who was most injuriously affected by the circuit court's finding of personal juris-

diction, Leavitt, is no longer before this Court as a party to the instant appeal. At the time this case was submitted on appeal to this Court, defendant Leavitt was requested to post a $7 million bond in the Circuit Court of Cabell County, by order of this Court dated January 16, 1997, which bond was later reduced to $1.1 million, pursuant to our order of February 6, 1997. No bond having been posted, this Court dismissed Leavitt's appeal by order dated March 20, 1997. Thereafter, Leavitt filed a petition for writ of certiorari in the United States Supreme Court to contest our dismissal of his appeal. By decision dated October 6, 1997, the United States Supreme Court denied Leavitt's petition for writ of certiorari. *See Leavitt v. Kessel,* — U.S. ——, 118 S.Ct. 266, 139 L.Ed.2d 192 (1997).

By dismissing Leavitt's appeal, we effectively have affirmed, as to Leavitt only, those rulings of the lower court which he had attempted to challenge by way of appeal. This Court's authority to dismiss a party's appeal upon his/her failure to satisfy a bond requirement is set forth in Rule 6(d) of the West Virginia Rules of Appellate Procedure:

> In civil cases relief available in ... the Supreme Court under this rule [regarding stay of proceedings pending appeal] may be conditioned upon the filing of a bond or other appropriate security in the circuit court, in such amount and upon such conditions as the court granting the stay feels is proper for the protection of the adverse party. The provisions of W. Va.Code, 58–5–14, are applicable.... *Failure to execute such bond may be grounds for the dismissal of the appeal.*

(Emphasis added). *See also* W. Va.Code § 58–5–14 (1995) (Repl.Vol.1997) ("When required by the court, an appeal ... shall not take effect until bond is given by the appellants or petitioners, or one of them, or some other person, in a penalty to be fixed by the court or judge by or in which the appeal ... is allowed ... with condition[.]"); W. Va. Code § 58–5–16 (1990) (Repl.Vol.1997) ("An appeal ... allowed from ... a final judgment, decree or order shall be dismissed whenever it appears that two months have elapsed since the date when the appeal ...

was granted before such bond is given as is required to be given before the appeal ... takes effect."). *See generally State v. Legg*, 151 W.Va. 401, 407, 151 S.E.2d 215, 219 (1966) (holding provisions of W. Va.Code § 58–5–16 to be mandatory); *Chenowith v. Keenan*, 61 W.Va. 108, 55 S.E. 991 (1906) (discussing generally effect of dismissal of appeal). *Cf.* Syl. pt. 1, *Lubeck Meat Packing, Inc. v. Motorists Mut. Ins. Co.*, 179 W.Va. 372, 369 S.E.2d 223 (1988) (" 'Where it appears to the Court upon mature consideration that an appeal presents no substantial issues of fact or law which can be considered fairly raised and where the trial court arrived at a correct result, *the appeal will be dismissed* as improvidently awarded *and the judgment of the circuit court will be summarily affirmed.*' Syllabus, *Napier v. Plymale*, 167 W.Va. 372, 280 S.E.2d 122 (1981)." (emphasis added)).

■ Based upon these many authorities, we hold that when a party appeals a lower court's ruling to the Supreme Court of Appeals of West Virginia and he/she is required to post an appeal bond, his/her failure to post such bond will result in the dismissal of that party's appeal and the consequent affirmance, as to that party, of the lower court's ruling. Thus, we affirm, as to Leavitt, the appealable order of the Circuit Court of Cabell County.

As a result of the dismissal of Leavitt's appeal, and the attendant affirmance of the lower court's rulings as to Leavitt, it may be said that Leavitt effectively has waived his right to challenge the circuit court's finding that he was properly within that court's personal jurisdiction. *See, e.g.*, Syl. pt. 4, in part, *West Virginia Secondary Sch. Activities Comm'n v. Wagner*, 143 W.Va. 508, 102

S.E.2d 901 (1958) ("Jurisdiction of the person may be conferred by consent of the parties or *the lack of such jurisdiction may be waived.*" (emphasis added)).[21] Because defendant Leavitt has waived his right to challenge the circuit court's finding of personal jurisdiction and because he is not presently before this Court as a party to the instant appeal, he cannot assert this, or any other, ground of error.

Our resolution of this issue is not yet complete, however, as the remaining defendants attempt to ride on Leavitt's coattails by also challenging the circuit court's assertion of personal jurisdiction over their codefendant, Leavitt.[22] In this regard, the remaining defendants have argued that "[a]ll of [sic] Defendants were prejudiced by the trial court's assertion of personal jurisdiction over Defendant Leavitt.... The Conaty Defendants were prejudiced by being put on trial accused of conspiring with a codefendant who had never been to West Virginia and was a Beverly Hills lawyer." The Conaty defendants allege prejudice arising from the jury's verdict finding both defendant Leavitt and the remaining defendants liable for fraud and tortious interference and the jury's assessment of damages for these transgressions. Apart from these assertions, though, the remaining defendants cite no authority for their proposition that they also should be permitted to challenge the circuit court's assertion of personal jurisdiction over Leavitt.

Neither can we discern any authority to permit a defendant to challenge the personal jurisdiction of a codefendant when that codefendant, by his/her acts or omissions, has waived his/her right to challenge such personal jurisdiction. On the contrary,

---

21. *See also Duncan v. Tucker County Bd. of Educ.*, 149 W.Va. 285, 288, 140 S.E.2d 613, 615 (1965) ("*Jurisdiction of the person may be conferred by* consent or *waiver* [.]" (emphasis added)); *Morris v. Calhoun*, 119 W.Va. 603, 605, 195 S.E. 341, 344 (1938) ("In the ordinary civil case, jurisdictional questions, especially those respecting jurisdiction of the parties, may be waived[.]"). *See generally* 11B Michie's Jur. *Jurisdiction* § 21, at 46 (1986) ("Jurisdiction of the person may be acquired by implication arising out of some act done[.]") and § 35, at 60 ("Because objections to the court's jurisdiction over

specific persons involve the rights of individuals to object to the exercise of judicial authority over them and not the power inherent in the court to resolve conflicts between individuals properly before it, *parties can confer personal jurisdiction* expressly or by their acts or failures to act." (emphasis added)).

22. The remaining defendants do not argue or otherwise complain that the circuit court's exercise of personal jurisdiction as to them was improper.

[t]raditionally, courts have been reluctant to allow persons to claim standing to vindicate the rights of a third party on the grounds that third parties are generally the most effective advocates of their own rights and that *such litigation will result in an unnecessary adjudication of rights which the holder* either does not wish to assert or *will be able to enjoy regardless of the outcome of the case.*

*Snyder v. Callaghan,* 168 W.Va. 265, 279, 284 S.E.2d 241, 250 (1981) (emphasis added) (citation omitted). Furthermore, the United States Supreme Court has announced a specific "prudential standing rule that normally bars litigants from asserting the rights or legal interests of others in order to obtain relief from injury to themselves." *Warth v. Seldin,* 422 U.S. 490, 509, 95 S.Ct. 2197, 2210, 45 L.Ed.2d 343, 361 (1975).[23]

■ Therefore, we hold that an appellant/defendant may not assign as error a circuit court's affirmative assertion of personal jurisdiction over a coappellant/codefendant when the coappellant/codefendant either has not challenged the assertion of personal jurisdiction over him/her or has otherwise, by his/her acts and/or omissions, waived his/her right to challenge the personal jurisdiction ruling. Accordingly, we find that the remaining defendants are not proper parties to challenge the circuit court's exercise of personal jurisdiction over defendant Leavitt. For this reason, and as a result of our dismissal of Leavitt's appeal, we leave undisturbed the circuit court's ruling in this regard.

### B.

### *Statement of Claim Upon Which Relief Can Be Granted*

The defendants' second assignment of error raises the question of whether John stated a claim upon which relief can be granted with respect to his causes of action for fraud and tortious interference with his parental relationship with Baby Boy Conaty. In this regard, the defendants ostensibly rely upon Rule 12(b)(6) of the West Virginia Rules of Civil Procedure, which permits a defendant to a civil action to move for dismissal of the case if the plaintiff "fail[s] to state a claim upon which relief can be granted." During the proceedings below, the circuit court reviewed the defendants' challenges to the two causes of action asserted by John and determined that John had stated claims upon which he could have been granted relief.

■ We have instructed circuit courts, when deciding a Rule 12(b)(6) motion to dismiss for failure to state a valid claim, to "constru[e] the factual allegations in the light most favorable to the plaintiffs." *Murphy v. Smallridge,* 196 W.Va. 35, 36, 468 S.E.2d 167, 168 (1996). In this regard, "[d]ismissal for failure to state a claim is proper where 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.'" *Id.* (quoting *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59, 65 (1984)) (additional citation omitted). Stated otherwise,

"[t]he trial court, in appraising the sufficiency of a complaint on a Rule 12(b)(6) motion, should not dismiss the complaint unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Syl. Pt. 3, *Chapman v. Kane Transfer Company, [Inc.],* [160] W. Va. [530,] 236 S.E.2d 207 (1977) [ (*citing* ] *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99,[ 102,] 2 L.Ed.2d 80[, 84] (1957)[) ].

23. *See also United States Dep't of Labor v. Triplett,* 494 U.S. 715, 720, 110 S.Ct. 1428, 1431, 108 L.Ed.2d 701, 713 (1990) ("Ordinarily, ... a litigant '"must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."'" (quoting *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 474, 102 S.Ct. 752, 760, 70 L.Ed.2d 700, 711 (1982) (quoting *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343, 355 (1975) (citations omitted)) (footnote omitted))); *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.,* 732 F.2d 452, 464 (5th Cir.1984) (acknowledging that "'a party has no standing to assert a right if it is not his own'" (quoting *United States v. 936.71 Acres of Land,* 418 F.2d 551, 556 (5th Cir.1969)) (footnote omitted)); *DuPree v. United States,* 559 F.2d 1151, 1153 (9th Cir.1977) ("[T]he presence of harm to a party does not permit him to assert the rights of third parties in order to obtain redress for himself." (citation omitted)).

Syl., *John W. Lodge Distrib. Co., Inc. v. Texaco, Inc.*, 161 W.Va. 603, 245 S.E.2d 157 (1978). *See also id.* at 606, 245 S.E.2d at 159 ("The trial court should not dismiss a complaint merely because it doubts that the plaintiff will prevail in the action").

▮ In addition to these principles permitting the circuit court to evaluate the adequacy of the complaint's factual allegations, all decisions of Rule 12(b)(6) motions are governed by "the liberal policy of the rules of pleading with regard to the construction of plaintiff's complaint[ ] and ... the policy of the rules favoring the determination of actions on the merits." *John W. Lodge* at 606, 245 S.E.2d at 159. Accordingly, we have directed that "the motion to dismiss for failure to state a claim should be viewed with disfavor and rarely granted." *Id.*

▮ When a circuit court *grants* a Rule 12(b)(6) motion and dismisses a complaint for failure to state a claim upon which relief can be granted, appellate review of the circuit court's dismissal of the complaint is *de novo.* *See, e.g., Shaffer v. Charleston Area Med. Ctr., Inc.*, 199 W.Va. 428, 433, 485 S.E.2d 12, 17 (1997) ("Where matters heard on a 12(b)(6) motion do not extend outside the pleading, our standard of review from an order dismissing a claim under Rule 12(b)(6) is de novo[.]" (citation omitted)); *Murphy v. Smallridge*, 196 W.Va. at 36, 468 S.E.2d at 168 ("We review *de novo* a dismissal under Rule 12(b)(6) of the West Virginia Rules of Civil Procedure[.]" (citation omitted)).

▮ By contrast, a circuit court's *denial* of a Rule 12(b)(6) motion to dismiss, which permits the plaintiff's case to proceed on the stated causes of action, is less often the subject of appellate review. "Ordinarily the denial of a motion for failure to state a claim upon which relief can be granted made pursuant to *West Virginia Rules of Civil Procedure* 12(b)(6) is interlocutory and is, therefore, not *immediately* appealable." Syl. pt. 2, *State ex rel. Arrow Concrete Co. v. Hill*, 194 W.Va. 239, 460 S.E.2d 54 (1995) (emphasis added). *See also Hutchison v. City of Huntington*, 198 W.Va. 139, 147, 479 S.E.2d 649, 657 (1996) (acknowledging that "[o]rdinarily, this Court does not entertain nor discuss a denial of a motion for failure to state a

claim under W. Va. R. Civ. P. Rule 12(b)(6), in that such an order is interlocutory in nature").

▮ Nevertheless, it is possible, as is evidenced by the case *sub judice*, for a party, whose Rule 12(b)(6) motion was denied by the circuit court, to ultimately raise this issue on appeal, not as an interlocutory order but as part of the final judgment underlying his/her appeal. Thus, "[w]hen a party, as part of an appeal from a final judgment, assigns as error a circuit court's denial of a motion to dismiss, the circuit court's disposition of the motion to dismiss will be reviewed *de novo.*" Syl. pt. 4, *Ewing v. Board of Educ. of County of Summers*, 202 W.Va. 228, 503 S.E.2d 541 (1998). Applying this *de novo* standard of review, we turn now to the defendants' arguments alleging that John failed to state claims upon which relief can be granted for fraud and tortious interference with parental relationship.

*1. Fraud*

▮ The defendants first contend that John failed to state a claim for fraud upon which relief can be granted because his complaint failed to specifically plead a cause of action for fraud. In this regard, the defendants suggest that the circuit court erred by determining that John's complaint contained sufficient allegations of fraud, as required by Rule 9(b) of the West Virginia Rules of Civil Procedure: "[i]n all averments of fraud ..., the circumstances constituting fraud ... shall be stated with particularity." The defendants further submit that "[t]he failure to plead particularly the circumstances constituting fraud ... inhibits full review of the substance of the claim of fraud by this Court on appeal [and] precludes the introduction of evidence supportive of any general allegation of fraud contained in the complaint[.]" Syl. pt. 4, *Croston v. Emax Oil Co.*, 195 W.Va. 86, 464 S.E.2d 728 (1995). *See also* Syl. pt. 1, in part, *Hager v. Exxon Corp.*, 161 W.Va. 278, 241 S.E.2d 920 (1978) ("[F]raud or mistake must be alleged in the appropriate pleading with particularity[,] and the failure to do so precludes the offer of proof thereof during the trial."). The defendants also complain

that John's complaint did not contain the words "fraud," "misrepresentation," or "deceit" in reference to his averments of their allegedly fraudulent conduct.

In addition, the defendants suggest that John's claim for fraud was not proper because they cannot be held liable for their allegedly fraudulent conduct. The defendants assert that one may hold another liable for fraud only if the allegedly liable party has a duty to the party seeking to impose such liability. Here, the defendants state that John is attempting to impose liability on them for their silence and concealment of certain information. Yet, the defendants maintain that, because they owed no duty to John to reveal such information, imposition of liability upon them because their refusal to speak was "fraudulent" is improper. *Citing* Restatement (Second) of Torts § 551(1) (1976) ("One who fails to disclose to another a fact that he knows may justifiably induce the other to act or refrain from acting ... is subject to the same liability to the other as though he had represented the nonexistence of the matter that he has failed to disclose, if, but only if, he is under a duty to the other to exercise reasonable care to disclose the matter in question.").

John answers that he did, in fact, state a valid cause of action for fraud. In this regard, John submits that it is not necessary to use the specific words "fraud" or "misrepresent" in a complaint asserting a claim for fraud in order to comply with the pleading requirements of Rule 9(b). Rather, it is essential only to plead relevant facts with such specificity and particularity as to imply a fraud has been committed or from which a conclusion of fraud necessarily results. *Citing* 37 Am.Jur.2d *Fraud and Deceit* § 424, at 577–78 (1968).

Furthermore, John urges that the defendants had a duty not to conceal from him the whereabouts of his son and advocates the recognition of a cause of action for fraud under the particular circumstances of this case. He indicates that liability for fraudulent conduct issues from an act, omission, or concealment involving the breach of a legal duty, trust, or confidence. Such fraudulent conduct must also produce an injury to the aggrieved party or result in the acquisition of an undue or unconscientious advantage over the aggrieved party. *Citing Stanley v. Sewell Coal Co.*, 169 W.Va. 72, 285 S.E.2d 679 (1981); *Miller v. Huntington & Ohio Bridge Co.*, 123 W.Va. 320, 15 S.E.2d 687 (1941); *Dickel v. Smith*, 38 W.Va. 635, 18 S.E. 721 (1893); *Hulings v. Hulings Lumber Co.*, 38 W.Va. 351, 18 S.E. 620 (1893). Fraud also may arise from the active concealment of information or as a result of voluntary misstatements in response to inquiries for information. *Citing Frazier v. Brewer*, 52 W.Va. 306, 43 S.E. 110 (1903) (finding party liable for fraudulent concealment if his/her willful concealment and suppression of facts causes another's detrimental reliance thereon). John suggests that the defendants committed fraudulent acts by withholding and misrepresenting information about Baby Boy Conaty thereby preventing him from exercising his parental rights.

Finally, John characterizes the defendants' actions in concealing information about his child as a type of civil conspiracy. *Citing* Syl. pt. 1, in part, *Dixon v. American Indus. Leasing Co.*, 162 W.Va. 832, 253 S.E.2d 150 (1979) ("In order for civil conspiracy to be actionable it must be proved that the defendants have committed some wrongful act or have committed a lawful act in an unlawful manner to the injury of the plaintiff[.]"). Typically, the acts of one co-conspirator are attributable to all persons who participate in the conspiracy. *Citing Wells v. Smith*, 171 W.Va. 97, 297 S.E.2d 872 (1982), *overruled in part on other grounds by Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991). Thus, John maintains that his cause of action alleging fraud perpetrated by all of the named defendants is proper since all conspiring defendants are accountable for the fraudulent acts of the conspiracy.

Prior to reaching the precise issue of whether John adequately stated a valid cause of action for fraud, we must first examine the rudimentary foundation upon which John rests his claim. It is imperative to note at the outset that a woman possesses a myriad of choices with respect to her personal repro-

ductive decisions.[24] Therefore, the various decisions that Anne made concerning the birth and adoptive placement of Baby Boy Conaty were squarely within her constitutionally protected decisional rights. However, we must not overlook John's rights as the father of this child.

While, historically, an unwed biological mother possessed a superior right to the custody of her child born without the benefit of marriage, such an automatic preference is no longer a settled and unyielding rule. *See, e.g., State ex rel. Roy Allen S. v. Stone*, 196 W.Va. 624, 631, 474 S.E.2d 554, 561 (1996) (noting that the "liberty interest" protected by the due process clause "includes a *parent's* right to establish and preserve relationships with *his or her* children, even if they are born outside the traditional family" (emphasis added) (citations omitted)); Syl. pt. 1, *Honaker v. Burnside*, 182 W.Va. 448, 388 S.E.2d 322 (1989) (recognizing *parent's* right to the custody of *his/her* child absent finding that *parent* is unfit or has waived custodial rights); Syl. pt. 1, *In re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973) (holding that right

of *parent* to custody of *his/her* child is paramount to custodial rights of all other persons).[25] Instead, an unwed biological father has a judicially recognized and constitutionally protected inchoate right to establish a parent-child relationship with his child provided he satisfies certain criteria evidencing his intent to assume the full responsibilities of parenthood. *Lehr v. Robertson*, 463 U.S. 248, 257, 103 S.Ct. 2985, 2991, 77 L.Ed.2d 614, 624 (1983) ("[T]he rights of the parents are a counterpart of the responsibilities they have assumed."); *State ex rel. Roy Allen S. v. Stone*, 196 W.Va. 624, 632, 474 S.E.2d 554, 562 (1996) ("In our opinion, the strength of a parent's bond with his or her child is not dependent upon some official or traditional arrangement; rather, the strength derives from the parent's personal and emotional investment and the relationship that develops from that investment.").

Specifically,

[w]hen an unwed father demonstrates a full commitment to the responsibilities of

24. *See, e.g., Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992) (recognizing women have right to seek and obtain abortion without notifying their husbands); *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (plurality opinion) (declaring women have right to seek and obtain abortion without spousal consent or, in the case of unmarried minors seeking and obtaining abortion, without parental consent); *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973) (holding women have qualified right to terminate pregnancy during period of fetal nonviability); *Eisenstadt v. Baird*, 405 U.S. 438, 92 S.Ct. 1029, 31 L.Ed.2d 349 (1972) (finding unmarried persons have right to obtain contraceptives); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (acknowledging married persons have right to obtain contraceptives); *Skinner v. Oklahoma ex. rel. Williamson*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (declaring individuals have fundamental right of procreation). *Cf. Doe v. Smith*, 486 U.S. 1308, 108 S.Ct. 2136, 100 L.Ed.2d 909 (1988) (refusing to permit unwed biological father to enjoin unwed biological mother from obtaining abortion).

In addition, individuals have a firmly established right to travel. *See, e.g., Shapiro v. Thompson*, 394 U.S. 618, 629, 89 S.Ct. 1322, 1329, 22 L.Ed.2d 600, 612 (1969) ("[T]he nature of our Federal Union and our constitutional con-

cepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement."), *overruled in part on other grounds by Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974); *United States v. Guest*, 383 U.S. 745, 757, 86 S.Ct. 1170, 1178, 16 L.Ed.2d 239, 249 (1966) ("The constitutional right to travel from one State to another, and necessarily to use the highways and other instrumentalities of interstate commerce in doing so, occupies a position fundamental to the concept of our Federal Union."); *Edwards v. California*, 314 U.S. 160, 178, 62 S.Ct. 164, 169, 86 L.Ed. 119, 127 (1941) ("The right to move freely from State to State is an incident of *national* citizenship protected by the privileges and immunities clause of the Fourteenth Amendment[.]"); *Williams v. Fears*, 179 U.S. 270, 274, 21 S.Ct. 128, 129, 45 L.Ed. 186, 188 (1900) ("Undoubtedly the right of locomotion, the right to remove from one place to another according to inclination, is an attribute of personal liberty, and the right, ordinarily, of free transit from or through the territory of any State is a right secured by the Fourteenth Amendment and by other provisions of the Constitution.").

25. For further treatment of the abolishment of the maternal preference and the recognition of a parent's custodial rights, see Section II.C.3., *infra*.

parenthood by "com[ing] forward to participate in the rearing of his child," *Caban* [*v. Mohammed* ], 441 U.S. [380,] 392, [99 S.Ct. 1760, 1768, 60 L.Ed.2d 297, 307 (1979),] his interest in personal contact with his child acquires substantial protection under the Due Process Clause.[26] At that point it may be said that he "act[s] as a father toward his children." *Id.*, at 389, n. 7, 99 S.Ct., at 1766, n. 7[, 60 L.Ed.2d, at 305, n. 7]. But the mere existence of a biological link does not merit equivalent constitutional protection.... "[T]he importance of the familial relationship, to the individuals involved and to the society, stems from the emotional attachments that derive from the intimacy of daily association, and from the role it plays in 'promot[ing] a way of life' through the instruction of children ... as well as from the fact of blood relationship." *Smith v. Organization of Foster Families for Equality and Reform*, 431 U.S. 816, 844, [97 S.Ct. 2094, 2109–2110, 53 L.Ed.2d 14, 35] (1977) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 231–233[, 92 S.Ct. 1526, 1541–1542, 32 L.Ed.2d 15, 34–35] (1972)).

The significance of the biological connection is that it offers the natural father an opportunity that no other male possesses to develop a relationship with his offspring. If he grasps that opportunity and accepts some measure of responsibility for the child's future, he may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's development. If he fails to do so, the Federal Constitution will not automatically compel a State to listen to his opinion of where the child's best interests lie.

*Lehr v. Robertson*, 463 U.S. at 261–62, 103 S.Ct. at 2993–94, 77 L.Ed.2d at 626–27 (footnotes omitted).

This Court, in echoing the pronouncement of the United States Supreme Court, likewise has identified an unwed biological father's interest in establishing a relationship with his child:

Although an unwed father's biological link to his child does not, in and of itself, guarantee him a constitutional stake in his relationship with that child, such a link combined with a substantial parent-child relationship will do so. When an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, his interest in personal contact with his child acquires substantial protection under the Due Process Clause in Section 10 of Article III of the West Virginia Constitution.[27]

Syl. pt. 2, *State ex rel. Roy Allen S. v. Stone*, 196 W.Va. 624, 474 S.E.2d 554. *See also State ex rel. Roy Allen S.*, 196 W.Va. at 638, 474 S.E.2d at 568 (directing that "it is highly relevant ... to consider ... whether the putative [biological] father was dilatory in grasping the opportunity to assert his parental rights and responsibilities").[28]

---

**26.** The Fourteenth Amendment to the United States Constitution guarantees that no "State [shall] deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1.

**27.** Article III, Section 10, of the West Virginia Constitution ensures that "[n]o person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers."

**28.** Many of our sister jurisdictions have also recognized an unwed biological father's interest in maintaining a parent-child relationship with his biological child when he demonstrates a willingness to accept the responsibilities of fatherhood. *See, e.g., Adoption of Kelsey S.*, 1 Cal.4th 816, 849, 4 Cal.Rptr.2d 615, 635, 823 P.2d 1216, 1236 (1992) ("If an unwed father promptly comes forward and demonstrates a full commitment to his parental responsibilities—emotional, financial, and otherwise—his federal constitutional right to

due process prohibits the termination of his parental relationship absent a showing of his unfitness as a parent. Absent such a showing, the child's well-being is presumptively best served by continuation of the father's parental relationship. Similarly, when the father has come forward to grasp his parental responsibilities, his parental rights are entitled to equal protection as those of the mother." (footnote omitted)); *Jermstad v. McNelis*, 210 Cal.App.3d 528, 550, 258 Cal.Rptr. 519, 532 (1989) (recognizing that "where the natural father has promptly come forward to grasp his opportunity interest and diligently pursued that interest" he has " 'the opportunity to establish a protected custodial relationship' " with his child (quoting *In re Baby Girl M.*, 37 Cal.3d 65, 74, 207 Cal.Rptr. 309, 315, 688 P.2d 918, 924 (1984))); *Appeal of H.R.*, 581 A.2d 1141, 1162 (D.C.App.1990) (per curiam) (separate opinion of Ferren, Assoc. J.) ("[W]hether a particular unwed, noncustodial father's opportunity

interest will be entitled to substantial protection under the due process clause depends on application of such factors as (1) the presence or absence of an established relationship between the child and an existing family; (2) whether the father has established a custodial, personal, or financial relationship with his child, or assumed responsibilities during the mother's pregnancy; (3) the impact, if any, of state action on the father's opportunity to establish a relationship with his child; (4) the age of the child when the action to terminate parental rights is initiated; and (5) the natural father's invocation or disregard of statutory safeguards designed to protect his opportunity interest."); *In the Matter of Adoption of Doe*, 543 So.2d 741, 748 (Fla.1989) ("[T]he biological relationship offers the parent the opportunity to assume parental responsibilities. Parental rights based on the biological relationship are inchoate, it is the assumption of the parental responsibilities which is of constitutional significance."); *In re Baby Girl Eason*, 257 Ga. 292, 296, 358 S.E.2d 459, 462 (1987) ("[U]nwed fathers gain from their biological connection with a child an opportunity interest to develop a relationship with their children which is constitutionally protected. This opportunity interest begins at conception and endures probably throughout the minority of the child. But it is not indestructible. It may be lost."); *In the Matter of the Petition of Steve B.D.*, 112 Idaho 22, 25, 730 P.2d 942, 945 (1986) (per curiam) ("[I]n order to secure the protection of the Fourteenth Amendment Due Process and Equal Protection Clauses, the unwed father must grasp the opportunity to make a significant custodial, personal, financial, and legal connection with the child." (internal quotation and citations omitted)); *In the Matter of R.E.*, 645 So.2d 205, 207 (La.1994) ("When an unwed father demonstrates a full commitment to the responsibilities of parenthood and an ability to participate beneficially in the rearing of his child, his interest in personal contact with his child acquires substantial protection under the state and federal due process clauses." (citations omitted)); *In re Application of S.R.S.*, 225 Neb. 759, 408 N.W.2d 272 (1987) (per curiam) (finding unwed biological father had protected interest in relationship with his son where he continuously provided for and interacted with his son during son's first two years of life and repeatedly attempted to ascertain son's whereabouts after unwed biological mother unilaterally placed son for adoption); *In re Adoption of Zschach*, 75 Ohio St.3d 648, 653, 665 N.E.2d 1070, 1075 (1996) (acknowledging that only "if a biological father comes forward and accepts the full responsibilities of parenthood [will he] be extended full protection of that relationship"), *cert. denied sub nom, Johnson v. Zschach*, 519 U.S. 1028, 117 S.Ct. 582, 136 L.Ed.2d 513 (1996); *In the Matter of the Adoption of Baby Boy W.*, 831 P.2d 643, 646 (Okla.1992) (noting that unwed biological father's parental interest will be preserved only where he has exercised statutory " 'parental rights and duties toward the child,' " which include "contributing to the support of the mother during the pregnancy and contributing to the support of the child after its birth" (citation omitted)); *In the Matter of the Adoption of Baby Boy D*, 742 P.2d 1059, 1067 (Okla.1985) ("The Constitution protects only parent-child relationships of biological parents who have actually committed themselves to their children and have exercised responsibility for rearing their children."). *Cf. B.G. v. H.S.*, 509 N.E.2d 214, 217 (Ind.App.1987) (requiring unwed biological father to file paternity action in order to protect his "opportunity to develop a responsible relationship with his child"). *But see, e.g., Quilloin v. Walcott*, 434 U.S. 246, 98 S.Ct. 549, 54 L.Ed.2d 511 (1978) (determining that unwed biological father did not have protected right to veto his eleven-year-old son's adoption by husband of child's mother where father had never lived with child, regularly supported child, exercised custody of child, or attempted to legitimate child until after adoption petition had been filed); *In the Matter of Adoption of Doe*, 543 So.2d 741, 749 (finding unwed biological father had no right to establish relationship with his child when he failed to "provide prebirth support to the unwed pregnant mother when such support [was] needed and within his means"); *In the Matter of the Petition of Steve B.D.*, 112 Idaho 22, 730 P.2d 942 (concluding unwed biological father did not have protected interest in relationship with his child where he did not marry child's mother before child's birth; failed to pay for birth expenses; never provided for child's financial support; made no attempt to interact with child; and delayed the initiation of legal proceedings to establish his parental interest); *Robert O. v. Russell K.*, 80 N.Y.2d 254, 590 N.Y.S.2d 37, 604 N.E.2d 99 (1992) (determining biological father had lost his protected interest in his child by not promptly demonstrating his commitment to parenthood; unwed biological father failed to ascertain that biological mother was pregnant with his child, although biological mother had not attempted to conceal fact of her pregnancy from him, or to take any steps to assert his parental rights until he learned of child's existence some ten months after child's adoption had been finalized); *In re Adoption of Baby Boy Dearing*, 98 Ohio App.3d 197, 648 N.E.2d 57 (1994) (finding putative father's interest in personal contact with child to be entitled to no protection because he did not participate in rearing, care, or support of child); *In the Matter of the Adoption of Baby Boy D*, 742 P.2d 1059, 1068 (refusing to protect unwed biological father's interest in parent-child relationship with his son where he provided no financial support or care for child's mother during her pregnancy; made no attempt to ascertain when and where his child would be born; and generally failed to assume any responsibilities of parenthood). *But cf. In re Clausen*, 442 Mich. 648, 684 n. 43, 502 N.W.2d 649, 665 n. 43 (1993) (per curiam) ("[P]rompt action by the father to assert parental rights, combined with the father's being prevented from developing a relationship

The circumstances of the instant appeal, though, are somewhat unusual in that, allegedly as a result of the defendants' actions, John was unable to assert his paternal rights by establishing a parental relationship with Baby Boy Conaty. Because the child was placed for adoption with a Canadian family almost immediately after his birth, John was not permitted the opportunity to see or otherwise visit with his son, much less provide for his support and otherwise fulfill his parental obligations. Several courts have recognized that when the child with respect to whom a father attempts to assert his parental rights is a newborn infant, a slightly modified inquiry is appropriate to determine whether the father has "grasped the opportunity" to establish a parent-child relationship.

Thus, where an unwed biological mother decided to place her newborn child for adoption immediately after birth, thereby precluding the child's unwed biological father from establishing a relationship with his child, the Supreme Court of Louisiana determined that "*if the father* appears and demonstrates that he is fully committed to his parental responsibilities and *has grasped the opportunity to commence a relationship* with his [recently born] child, the court must uphold his parental rights[.]" *In re Adoption of B.G.S.*, 556 So.2d 545, 558–59 (La.1990) (emphasis added).

■ Also acknowledging the difficulty which an unwed biological father may have in asserting his paternal rights when his parental agenda conflicts with that of the unwed biological mother, the District of Columbia Court of Appeals decided that "when an unwed mother has relinquished her right to custody of a child at birth for adoption by strangers, the unwed father's interest in developing a custodial relationship with his child is entitled to substantial constitutional protection *if he has early on, and continually, done all that he could reasonably have been expected to do under the circumstances to pursue that interest.*" *Appeal of H.R.*, 581 A.2d 1141, 1162–63 (D.C.App.1990) (per curiam) (separate opinion of Ferren, Assoc. J.) (emphasis added) (citations omitted).[29] See

---

with the child by actions of the courts or the custodians, are factors that excuse or mitigate the failure to establish such a relationship." (citations omitted)).

29. *Accord Adoption of Michael H.*, 10 Cal.4th 1043, 1060, 43 Cal.Rptr.2d 445, 455, 898 P.2d 891, 901 (1995) (holding that unwed biological father has no constitutionally protected interest in his newborn child "unless he shows that *he promptly came forward and demonstrated as full a commitment to his parental responsibilities as the biological mother allowed and the circumstances permitted within a short time after he learned or reasonably should have learned that the biological mother was pregnant with his child*" (emphasis added)), *cert. denied sub nom, Mark K. v. John S.*, 516 U.S. 1176, 116 S.Ct. 1272, 134 L.Ed.2d 219 (1996); *Robert O. v. Russell K.*, 80 N.Y.2d 254, 262, 590 N.Y.S.2d 37, 40, 604 N.E.2d 99, 102 (1992) ("[T]he unwed father of an infant placed for adoption immediately at birth faces a unique dilemma should he desire to establish his parental rights. Any opportunity he has to shoulder the responsibility of parenthood may disappear before he has a chance to grasp it, no matter how willing he is to do so. Accordingly ... in some instances the Constitution protects an unwed father's *opportunity* to develop a relationship with his infant son or daughter.... The right exists only for the unwed father who manifests his willingness to assume full custody of the child and does so promptly." (citation omitted)); *In the Matter of Raquel Marie X.*, 76 N.Y.2d 387,

402, 559 N.Y.S.2d 855, 861, 559 N.E.2d 418, 424 (1990) ("[A]n unwed father who has been physically unable to have a full custodial relationship with his newborn child is ... entitled to the maximum protection of his relationship, so long as *he promptly avails himself of all the possible mechanisms for forming a legal and emotional bond with his child* .... [H]owever, ... in order to have the benefit of the maximum protection of the relationship ... the biological father not only must assert his interest promptly ... but also must manifest his ability and willingness to assume custody of the child[.]" (emphasis added) (citations omitted)).

Numerous state courts also have devised detailed examples of pre-birth conduct by an unwed biological father indicative of his timely assumption of parental responsibilities. *See, e.g., Adoption of Kelsey S.*, 1 Cal.4th 816, 849, 4 Cal.Rptr.2d 615, 635–36, 823 P.2d 1216, 1236–37 ("The father's conduct both *before and after* the child's birth must be considered. Once the father knows or reasonably should know of the pregnancy, he must promptly attempt to assume his parental responsibilities as fully as the mother will allow and his circumstances permit. In particular, the father must demonstrate 'a willingness himself to assume full custody of the child—not merely to block adoption by others.'... A court should also consider the father's public acknowledgment of paternity, payment of pregnancy and birth expenses commensurate with his ability to do so, and prompt legal action to seek custody of the child." (quoting *In the Matter of Raquel Marie X.*, 559 N.Y.S.2d 855, 865, 76 N.Y.2d 387, 408, 559 N.E.2d 418, 428

also *Petition of Kirchner,* 164 Ill.2d 468, 487–88, 208 Ill.Dec. 268, 276, 649 N.E.2d 324, 333 (1995) (per curiam) (discussing "an unwed father's rights regarding an infant placed for adoption at birth who seeks to raise his child but is prevented from doing so through deception" and announcing that "fathers ... whose parental rights are not properly terminated and who, through deceit, are kept from assuming responsibility for and developing a relationship with their children, are entitled to the same due process rights as fathers who actually are given an opportunity and do develop this relationship"). *Cf. Wells v. Children's Aid Soc'y of Utah,* 681 P.2d 199, 206 (Utah 1984) (dictating that unwed biological father must "file a timely notice of his claim to paternity" to protect "his parental rights in [his] newborn infant").[30] Thus, it appears that John would have had a valid basis for asserting a constitutionally protected right to establish and maintain a parent-child relationship with his son despite his inability to have his physical custody or to visit with him prior to his pre-adoptive placement into Canada.[31]

(1990)) (footnote omitted)); *Adoption of Michael H.,* 10 Cal.4th at 1056, 43 Cal.Rptr.2d at 452, 898 P.2d at 898 ("To the extent the mother needs such critical [prenatal] assistance and the unwed father is able to provide it, the father, as one of the two individuals responsible for the pregnancy, should be encouraged to do so early on and should not be granted constitutional protection after birth if he has failed to timely fulfill this responsibility."); *In the Matter of Adoption of Doe,* 543 So.2d 741, 746 (Fla.1989) ("[A]n unwed father's prebirth conduct in providing or failing to provide support responsibilities and medical expenses for the natural mother is relevant to the issue of abandonment."); *In re Adoption of B.G.S.,* 556 So.2d 545, 551 (La.1990) (citing examples of conduct of unwed biological father that "amply demonstrated his dedication to his parental responsibilities": indicating, before his child's birth, his opposition to unwed biological mother's intention to place child for adoption; formally acknowledging paternity of his child; seeking notice of and actively opposing adoption proceedings; attempting to have himself designated as child's father on original birth certificate; seeking custody through habeas corpus proceedings; inserting his name as child's father on re-issued birth certificate; timely pursuing litigation; and legitimating child by marrying child's biological mother); *In the Matter of Raquel Marie X.,* 76 N.Y.2d 387, 408, 559 N.Y.S.2d 855, 865, 559 N.E.2d 418, 428 (conduct evidencing unwed biological father's commitment to parenthood "may include such considerations as his public acknowledgment of paternity, payment of pregnancy and birth expenses, steps taken to establish legal responsibility for the child, and other factors evincing a commitment to the child").

30. Implicit in our decision of this case is the necessarily limited scope of an unwed biological father's rights where a man attains fatherhood solely by virtue of his uninvited sexual conduct. Thus, we adopt with approval the artful clarification of these qualified rights by the Supreme Court of California:

At the risk of stating the obvious, we caution that our decision affords no protection, constitutional or otherwise, to a male who impregnates a female as a result of nonconsensual sexual intercourse. We find nothing in the relevant high court decisions that provides such a father a right to due process in connection with the custody and adoption of his biological child. Such a father also is not entitled to equal protection, i.e., the same rights as the mother, because the father and mother are clearly not similarly situated. The sexual intercourse was voluntary only for the father. Nor is such father entitled to be treated similarly to those males who become fathers as a result of consensual sexual intercourse.

*Adoption of Kelsey S.,* 1 Cal.4th 816, 849 n. 14, 4 Cal.Rptr.2d 615, 636 n. 14, 823 P.2d 1216, 1237 n. 14.

31. As we often have stated, an important consideration in determining whether an unwed biological father will be permitted to maintain a relationship with his child is whether the maintenance of the relationship would be consistent with the child's best interests. *See, e.g., State ex rel. Roy Allen S. v. Stone,* 196 W.Va. 624, 638, 474 S.E.2d 554, 568 (1996) ("Although a parent has a protectable interest in a child, a parent's rights are not absolute: '[t]he welfare of the child is the paramount consideration to which all of the factors, including common law preferential rights of the parents, must be deferred or subordinated.'" (quoting *Johnson v. Johnson,* 120 N.C.App. 1, 13, 461 S.E.2d 369, 376 (1995), *rev'd per curiam on other grounds,* 343 N.C. 114, 468 S.E.2d 59 (1996)) (additional internal quotations and additional citations omitted)); Syl. pt. 7, *Matter of Brian D.,* 194 W.Va. 623, 461 S.E.2d 129 (1995) ("Cases involving children must be decided not just in the context of competing sets of adults' rights, but also with a regard for the rights of the child(ren)."); *Michael K.T. v. Tina L.T.,* 182 W.Va. 399, 405, 387 S.E.2d 866, 872 (1989) ("[T]he best interests of the child is the polar star by which decisions must be made which affect children." (citation omitted)); *Pierce v. Jeffries,* 103 W.Va. 410, 413–14, 137 S.E. 651, 652 (1927) ("It is well settled in this state that the welfare of the child is of paramount importance in determining who is entitled to its custody, and that the welfare of

Turning now to the precise issue at hand, we must determine whether the circuit court erred in upholding John's cause of action for fraud.[32] John contends that but for the defendants' actions he would have been

the child is to be regarded more than the technical rights of the parent.").

We note additionally, in a tenuously related context, that the record accompanying this appeal seems to indicate that no guardian *ad litem* was appointed to protect the interests of Baby Boy Conaty with respect to his pre-adoptive placement into Canada and ultimate adoption in that country. While we do not glean any evidence to suggest that this omission irreparably harmed the parties' child or that the Canadian couple is not able to provide a suitable home for the infant, we nevertheless are concerned that, while the numerous adults involved in the adoption arguably were contemplating the child's interests, as well as their own, no one adult was solely concerned with the welfare of the child who was at the heart of the matter. Consistent with our desire to protect the interests of minor children which are not otherwise safeguarded, we recommend that, in future cases affecting the permanent custody of a child, a guardian *ad litem* be appointed to ensure that any proposed custodial arrangement does in fact benefit and promote the child's safety and well-being. *See Carter v. Carter*, 196 W.Va. 239, 251 n. 23, 470 S.E.2d 193, 205 n. 23 (1996) ("We suggest that when a case involves the unrepresented interests of a child, ... the circuit court appoint a guardian ad litem to assure protection of the children's interest." (citations omitted)); *State Dep't of Health & Human Resources, Child Advocate Office ex rel. Cline v. Pentasuglia*, 193 W.Va. 621, 625, 457 S.E.2d 644, 648 (1995) (" 'Although historically courts have addressed issues affecting children primarily in the context of competing adults' rights, *the present trend in courts throughout the country is to give greater recognition to the rights of children, including their right to independent representation in proceedings affecting substantial rights.' "* (emphasis in original) (quoting *Cleo A.E. v. Rickie Gene E.*, 190 W.Va. 543, 546, 438 S.E.2d 886, 889 (1993))).

**32.** Our discussion and decision of the fraud issue focuses upon the single inquiry of whether the defendants, individually or collectively, had a duty to disclose to John the information he requested, and they concealed from him, pertaining to the whereabouts of Baby Boy Conaty following his birth. We do not reach the issue of whether the defendants, or defendant Anne specifically, had a duty to notify John of either the circumstances surrounding her placement of their child for adoption or the subsequent Canadian adoption proceedings. Neither the circuit court's instructions nor the parties' briefs before this Court argue that the law applicable to the child's adoptive placement required Anne to provide such notice to John. To the contrary, our preliminary inquiry into this area suggests that

able to demonstrate his commitment to the responsibilities of parenthood so as to permit him to establish and maintain a relationship with Baby Boy Conaty. While we have noted the prominence of Anne's decisional

the law governing this 1991 adoptive placement would not have required such notice to have been given. *See Marr v. Superior Court*, 114 Cal.App.2d 527, 250 P.2d 739 (1952) (suggesting that *consent to adoption* must comply with laws of jurisdiction in which adoption petition is filed); *Estate of Johnson*, 100 Cal.App.2d 73, 223 P.2d 105 (1950) (indicating that *validity of adoption* is determined by laws of state or foreign country in which adoption is finalized); Alexandra Maravel, *Intercountry Adoption and the Flight From Unwed Fathers' Rights: Whose Right is it Anyway?*, 48 S.C. L.Rev. 497, 522–23 & n. 159 (1997) (describing notice requirements in Alberta, Canada, as requiring "notice to a biological father [only] if there [is] no permanent guardianship agreement or order," but instructing that "[t]he court may, however, dispense with any required notice except notice to the director of child and family services"; also revealing that "only the parties petitioning for adoption (and the child if at least twelve years of age) are entitled to be heard at the [final adoption] hearing before the court" (footnotes omitted)). *See also Robert O. v. Russell K.*, 173 A.D.2d 30, 35, 578 N.Y.S.2d 594, 597 (1992) ("It is well settled that a 'natural mother ha[s] no obligation to ... *volunteer* any information with respect to [the father.]' " (emphasis added) (quoting *Matter of Jessica XX*, 54 N.Y.2d 417, 427, 446 N.Y.S.2d 20, 24, 430 N.E.2d 896, 900 (1981), *aff'd sub nom, Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983))), *aff'd*, 80 N.Y.2d 254, 590 N.Y.S.2d 37, 604 N.E.2d 99 (1992). *Cf. Caban v. Mohammed*, 441 U.S. 380, 99 S.Ct. 1760, 60 L.Ed.2d 297 (1979) (implying that biological fathers are entitled to notice of pending adoption proceedings by holding unconstitutional New York statute that permitted biological mothers, but not biological fathers, to block adoption by withholding consent); *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (holding that unwed biological father is entitled to hearing and, impliedly, notice of any hearing prior to effecting change of child's custody); *Adoption of Michael D.*, 209 Cal.App.3d 122, 130, 256 Cal.Rptr. 884, 889 (1989) (noting that California statutory law requires that biological father be notified of pending adoption petition and that he be afforded "the right to be heard with respect to the proposed adoption" (citation omitted)), *superseded by statute as noted in In re Mario C.*, 226 Cal.App.3d 599, 276 Cal.Rptr. 548 (1990); *Cheryl H. v. Superior Court*, 41 Cal.App.3d 273, 280, 115 Cal.Rptr. 849, 853 (1974) (recognizing, in adoption context, that unwed biological father "is entitled to notice of any proceeding involving change in legal custody" of child).

rights, we must also consider the importance of John's parental rights.[33] On the one hand, "[i]t is a principle of the common law that wherever the law gives a right . . . , it also gives a remedy." 1 Am.Jur.2d *Actions* § 41, at 749–50 (1994) (citing *Wennerholm v. Stanford Univ. School of Med.*, 20 Cal.2d 713, 128 P.2d 522 (1942); *Perkins v. Pare*, 352 So.2d 64 (Fla.Dist.Ct.App.1977); *Rozell v. Rozell*, 281 N.Y. 106, 22 N.E.2d 254 (1939)). On the other hand, the mere impingement of a legal right is not enough to create an automatic right of recovery in tort. "There must also be a violation of a duty recognized by law[.]" *West Virginia Transp. Co. v. Standard Oil Co.*, 50 W.Va. 611, 615, 40 S.E. 591, 592 (1902). *See, e.g.*, 74 Am.Jur.2d *Torts* § 9, at 627 n. 81 (1974) (impliedly creating duty to refrain from disturbing another's exercise of his/her legal rights by recognizing that "[o]ne who does anything, or permits anything to be done, without just cause or excuse, the necessary consequence of which interferes with or annoys another in the enjoyment of his legal rights, is absolutely liable" (citing *Taylor v. City of Cincinnati*, 143 Ohio St. 426, 28 Ohio Op. 369, 55 N.E.2d 724 (1944))). With these principles in mind, we look to the law of fraud to determine whether John has stated a valid cause of action.

▮▮▮ Generally speaking, "[f]raud has been defined as including all acts, omissions, and concealments which involve a breach of legal duty, trust or confidence justly reposed, and which are injurious to another, or by which undue and unconscientious advantage is taken of another." *Stanley v. Sewell Coal Co.*, 169 W.Va. 72, 76, 285 S.E.2d 679, 682 (1981) (citations omitted). *Accord Dickel v. Smith*, 38 W.Va. 635, 641, 18 S.E. 721, 723 (1893). More precisely,

" ' "[t]he essential elements in an action for fraud are: (1) that the act claimed to be fraudulent was the act of the defendant or induced by him; (2) that it was material and false; that plaintiff relied on it and was justified under the circumstances in relying upon it; and (3) that he was damaged because he relied on it." Syl. Pt. 1, *Lengyel v. Lint*, 167 W.Va. 272, 280 S.E.2d 66 (1981).' Syllabus Point 2, *Muzelak v. King Chevrolet, Inc.*, 179 W.Va. 340, 368 S.E.2d 710 (1988)." Syllabus point 2, *Bowling v. Ansted Chrysler–Plymouth–Dodge, [Inc.]*, 188 W.Va. 468, 425 S.E.2d 144 (1992).

Syl. pt. 3, *Cordial v. Ernst & Young*, 199 W.Va. 119, 483 S.E.2d 248 (1996). *Accord Teter v. Old Colony Co.*, 190 W.Va. 711, 717, 441 S.E.2d 728, 734 (1994); *Powell v. Time Ins. Co.*, 181 W.Va. 289, 296, 382 S.E.2d 342, 349 (1989).

▮▮▮ Perhaps more instructive to the resolution of this issue is our acknowledgment that " 'an action for fraud can arise by the concealment of truth.' " *Teter*, 190 W.Va. at 717, 441 S.E.2d at 734 (quoting *Thacker v. Tyree*, 171 W.Va. 110, 113, 297 S.E.2d 885, 888 (1982)). Such a basis for a claim of fraud is possible because "[f]raud is the concealment of the truth, just as much as it is the utterance of a falsehood." *Frazier v. Brewer*, 52 W.Va. 306, 310, 43 S.E. 110, 111 (1902). *See also Van Deusen v. Snead*, 247 Va. 324, 328, 441 S.E.2d 207, 209 (1994) (" '[C]oncealment always involves deliberate nondisclosure designed to prevent another from learning the truth. A . . . party's willful nondisclosure of a material fact that he knows is unknown to the other party may evince an intent to practice actual fraud.' "

---

**33.** By our recognition of John's parental rights we in no way intend to unnecessarily trammel Anne's decisional rights; instead, we adhere to our prior practice and afford those personal rights of decision the utmost respect. *See Farley v. Sartin*, 195 W.Va. 671, 683–84, 466 S.E.2d 522, 534–35 (1995) (emphasizing that holding, which permitted wrongful death action to be maintained for tortious death of nonviable unborn child, "neither affects nor interferes with the constitutional protection afforded a woman who chooses to have an abortion, as was set forth originally in *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973)"; announcing further that "a wrongful death action will not lie against a woman who chooses to exercise her constitutional right to have an abortion. By definition, if a woman has a constitutional right to decide whether to carry an unborn child to term or abort it, then the act of aborting is not tortious. In such cases, the reasons for invoking the wrongful death statute do not apply; there is no tortious conduct to deter." (footnotes omitted)). We wish only to emphasize that once Baby Boy Conaty was born, he had two biological parents who had nearly co-equal rights to establish a parent-child relationship with him.

(quoting *Spence v. Griffin*, 236 Va. 21, 28, 372 S.E.2d 595, 598–99 (1988))).

■ In this vein, the Second Restatement of Torts recognizes a cause of action for fraudulent concealment: "[Any person] . . . who by concealment or other action intentionally prevents the other from acquiring material information is subject to the same liability to the other, for pecuniary loss as though he had stated the nonexistence of the matter that the other was thus prevented from discovering." Restatement (Second) of Torts § 550 (1976). Explaining the types of wrongful behavior contemplated by this section, Comment *b* to § 550 states that fraudulent concealment may arise

> when the defendant successfully prevents the plaintiff from making an investigation that he would otherwise have made, and which, if made, would have disclosed the facts; or *when the defendant frustrates an investigation* . . . . Even a false denial of knowledge or information by one party to a transaction, who is in possession of the facts, may subject him to liability as fully as if he had expressly misstated the facts, if its effect upon the plaintiff is to lead him to believe that the facts do not exist or cannot be discovered.

(Emphasis added). Thus, the active concealment of information from a party with the intent to thwart that party's efforts to conduct an investigation, relating to such information, constitutes actionable fraudulent concealment. *Lock v. Schreppler*, 426 A.2d 856, 860 (Del.Super.1981) (recognizing cause of action for fraudulent concealment similar to that provided by § 550: "For plaintiffs to recover damages for fraudulent concealment, plaintiffs must demonstrate that defendant took some action affirmative in nature designed or intended to prevent, and which does prevent, the discovery of facts giving rise to the fraud claim, some artifice to prevent knowledge of the facts or some representation intended to exclude suspicion and prevent inquiry." (citation omitted)), *superseded by statute as noted in Eastern Commercial Realty Corp. v. Fusco*, 654 A.2d 833 (Del.Supr.Ct.1995).[34]

■ In framing his cause of action for fraud, John also has alleged that the defendants' fraudulent conduct constituted a civil conspiracy. The law of this State recognizes a cause of action sounding in civil conspiracy. At its most fundamental level, a "civil conspiracy" is "a combination to commit a tort." *State ex rel. Myers v. Wood*, 154 W.Va. 431, 442, 175 S.E.2d 637, 645 (1970) (citing 15A C.J.S. *Conspiracy* § 1 (1967)). In *Dixon v.*

**34.** Seizing upon this language, other jurisdictions have also recognized a cause of action for fraudulent concealment pursuant to § 550 of the Restatement (Second) of Torts. *See, e.g., Fox v. Kane–Miller Corp.*, 542 F.2d 915, 918–19 (4th Cir.1976) (recognizing cause of action "based upon concealment which is 'intentional[ly] and effective[ly ]the hiding of a material fact with the attained object of creating or continuing a false impression as to that fact' " (quoting *Fegeas v. Sherrill*, 218 Md. 472, 476–77, 147 A.2d 223, 225 (1958))); *Roadmaster Industries, Inc. v. Columbia Mfg. Co., Inc.*, 893 F.Supp. 1162, 1179 (D.Mass. 1995) ("[I]n order to establish fraudulent concealment, a plaintiff must prove that the defendant took affirmative steps to conceal defects or to prevent the plaintiff from acquiring knowledge of the defects. . . . In addition to establishing intentional concealment of [material] information . . . , it must be established that the defendant owed to the plaintiff a fiduciary duty or other similar relation of trust and confidence that required disclosure." (citations omitted)); *Stevens v. Superior Court*, 180 Cal.App.3d 605, 608–09, 225 Cal.Rptr. 624, 626 (1986) (noting that "intentional concealment of a material fact is an alternative form of fraud and deceit equivalent to

direct affirmative misrepresentation" (citations omitted)); *Davidson v. Rogers*, 431 So.2d 483, 485 (Miss.1983) ("In order to recover damages for fraudulent concealment, [the plaintiff] must demonstrate [the defendant] took some action, affirmative in nature, which was designed or intended to prevent and which did prevent, the discovery of the facts giving rise to the fraud claim." (footnote omitted)); *Roberts v. Estate of Barbagallo*, 366 Pa.Super. 559, 568–69, 531 A.2d 1125, 1130 (1987) (stating that liability for fraud under § 550 "may arise by . . . an intentional concealment of true facts which is calculated to deceive the other party" (citation omitted)); *Paul v. Kelley*, 42 Or.App. 61, 65–66, 599 P.2d 1236, 1238–39 (1979) (explaining difference between "simple nondisclosure," which requires a duty to speak, and "active concealment," which has no such duty requirement; further indicating that "active concealment" contemplates " '[a]ny words or acts which create a false impression covering up the truth, . . . or which remove an opportunity that might otherwise have led to the discovery of a material fact . . . , or even a false denial of knowledge by one in possession of the facts' " (quoting William L. Prosser, Handbook of the Law of Torts § 106, at 695 (4th ed.1971))).

*American Indus. Leasing Co.,* 162 W.Va. 832, 834, 253 S.E.2d 150, 152 (1979), we provided a more detailed definition of this theory of liability:

> [A] civil conspiracy is a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose, not in itself unlawful, by unlawful means. The cause of action is not created by the conspiracy but by the wrongful acts done by the defendants to the injury of the plaintiff.

(Citing 15A C.J.S. *Conspiracy* § 1(1) and 16 Am.Jur.2d *Conspiracy* § 44). Given the tort-based liability of participants in a civil conspiracy, a plaintiff can maintain such a claim provided he/she satisfies the enumerated standard: "In order for civil conspiracy to be actionable it must be proved that the defendants have committed some wrongful act or have committed a lawful act in an unlawful manner to the injury of the plaintiff[.]" Syl. pt. 1, in part, *Dixon v. American Indus. Leasing Co.,* 162 W.Va. 832, 253 S.E.2d 150. *See also* Syl. pt. 7, *Cook v. Heck's Inc.,* 176 W.Va. 368, 342 S.E.2d 453 (1986) (same). *Cf.* Syl. pt. 3, *West Virginia Transp. Co. v. Standard Oil Co.,* 50 W.Va. 611, 40 S.E. 591 (1901) ("Where several combine and agree to do a lawful act, violative of no duty to another due from them, it is not an unlawful conspiracy subjecting them to an action by him, though the act injure him, and was so intended."); Syl. pt. 2, *Porter v. Mack,* 50 W.Va. 581, 40 S.E. 459 (1901) ("There can be no conspiracy to do that which is lawful in a lawful manner.").

Additionally, individuals who have conspired with one another to orchestrate and/or carry out a *fraudulent* plan or scheme can be held liable for their conduct. *See* 37 Am. Jur.2d *Fraud and Deceit* § 301, at 397 (1968) (stating that "everyone who engages in a fraudulent scheme forfeits all right to protection, either at law or in equity" (citing *Densmore v. County Court,* 106 W.Va. 317, 145 S.E. 641 (1928))); 37 Am.Jur.2d *Fraud and Deceit* § 305, at 403 & 405 (1968) (noting that relief from fraud may be had only against those who were "parties to the fraud," but explaining that "in order to establish liability, any person or persons sought to be charged need not have benefited from the transaction, have had any interest therein, or have colluded with the person benefited"; recognizing further that "[o]ne who participates in a fraud is of course guilty of fraud, and one who, with knowledge of the facts, assists another in the perpetration of a fraud is equally guilty" (footnotes omitted) (citing *Lincoln v. Claflin,* 74 U.S. 132, 7 Wall. 132, 19 L.Ed. 106 (1868))). *See also Frazier v. Brewer,* 52 W.Va. at 310, 43 S.E. at 111 ("He who adopts the results adopts also the means by which they are brought about.").

Having enunciated these general standards, which permit the assignment of liability for fraudulent conduct or concealment, we now look to John's specific cause of action: whether the defendants are liable to John for their alleged fraudulent concealment of information in response to inquiries about the post-birth whereabouts of his son. We observe that not only is this asserted cause of action novel to the jurisprudence of this State, but it appears that the courts of no other states have addressed directly whether such a claim may be maintained.

In some decisions, while a specific cause of action for fraud has been asserted by a father against those who have allegedly deprived him of his child, the courts have adeptly avoided a direct resolution of the validity of such a claim. For example, in *Daoud v. DeLeau,* 455 Mich. 181, 565 N.W.2d 639 (1997) (per curiam), the biological father brought a cause of action against his child's biological mother and the adoption agency claiming that they had fraudulently deprived him of a relationship with his child by placing the infant for adoption, unbeknownst to the biological father. The court, determining that the basis of the father's fraud claim was perjured testimony presented during the adoption proceedings, declined to rule upon the validity of the father's cause of action for fraud, finding instead that he sought relief from perjured testimony, which relief was limited to that provided in the applicable rules governing court proceedings in general. *Id.*

Similarly, the court in *Larson v. Dunn,* 449 N.W.2d 751 (Minn.App.), *aff'd in part, rev'd in part,* 460 N.W.2d 39 (Minn.1990), though

squarely confronted with a father's claim of fraudulent concealment of his daughter's whereabouts and information pertaining to her well-being, mechanically affirmed the trial court's dismissal of this claim without explanation. Additionally, in *McGrady v. Rosenbaum*, 62 Misc.2d 182, 308 N.Y.S.2d 181 (1970), *aff'd*, 37 A.D.2d 917, 324 N.Y.S.2d 876 (1971), the court found that the father did not have a redressable claim for wrongful interference with his visitation rights where his ex-wife, the child's mother, had been granted custody of the parties' child by a presumably valid court order. Because he could not maintain his main cause of action for interference, the court likewise determined that his fraud claims, based upon the manner in which the interference allegedly had been perpetrated, also were without merit. *Id. Accord Copeland v. Delvaux*, 89 Ohio App.3d 1, 623 N.E.2d 569 (1993) (per curiam) (affirming lower court's ruling, wherein court determined that applicable statute of limitations barred unwed biological father's claim for fraudulent adoption).

Other decisions, though involving issues of fraud, have not had a direct opportunity to resolve the issue of whether civil liability may be imposed upon one fraudulently concealing information about a child from that child's parent. This line of cases instead reviews whether the fraud alleged to have facilitated the procurement of an adoption decree is such as to permit the adoption to be set aside. The court in *In the Matter of the Adoption of Baby Girl S.*, 141 Misc.2d 905, 535 N.Y.S.2d 676 (1988), *aff'd*, 150 A.D.2d 993, 543 N.Y.S.2d 602 (1989), dismissed the adoption petition after finding that

> [t]he record establishes that this [adoption] proceeding is permeated with fraud and misrepresentation. Each of the parties [the mother, the prospective adoptive parents, and the attorney representing both the mother and the prospective adoptive parents], with the exception of [the unwed biological father], had an agenda not revealed in the [adoption] papers and abused the judicial process to achieve it.

*Id.*, 141 Misc.2d at 912, 535 N.Y.S.2d at 680. Nowhere in the opinion, though, did the court indicate whether the father would have

a separate cause of action against the defendants for their fraudulent conduct.

In an analogous case, the court in *Wade v. Geren*, 743 P.2d 1070 (Okla.1987), vacated an adoption decree based upon fraudulent representations concerning the identity of the unwed biological father made by the child's maternal grandparents, who sought her adoption. *Accord Petition of Doe*, 159 Ill.2d 347, 351, 202 Ill.Dec. 535, 536, 638 N.E.2d 181, 182 (1994) (invalidating adoption and commenting "the fault here lies initially with the mother, who fraudulently tried to deprive the father of his rights, and secondly, with the adoptive parents and their attorney, who proceeded with the adoption when they knew that a real father was out there who had been denied knowledge of his baby's existence"); *In re Adoption of Murphy*, 53 Ohio App.3d 14, 18, 557 N.E.2d 827, 832 (1988) (invalidating adoption proceeding because "actionable fraud attended the placement and initial adoption proceedings" of unwed biological father's child). *Cf. Robert O. v. Russell K.*, 80 N.Y.2d 254, 590 N.Y.S.2d 37, 604 N.E.2d 99 (1992) (declining to vacate adoption, which unwed biological father claimed had been fraudulently obtained, because record did not evince any attempts by unwed biological mother to deceptively conceal her pregnancy from the child's father); *In re Adoption of Hart*, 62 Ohio App.3d 544, 577 N.E.2d 77 (1989) (refusing to dismiss adoption petition as evidence did not indicate that adoptive parents had fraudulently concealed from court identity of unwed biological father).

Despite the lack of precedent recognizing a claim based in tort and sounding in fraud in circumstances fairly analogous to those underlying the instant appeal, this jurisprudential absence does not, alone, foreclose our recognition of such a claim. "As previously stated, ... a lack of precedent—standing alone—is an insufficient reason to deny a cause of action." *Farley v. Sartin*, 195 W.Va. 671, 682, 466 S.E.2d 522, 533 (1995) (footnote omitted). Notwithstanding an unwed biological father's responsibility to affirmatively protect his own rights, by "grasping the opportunity" to demonstrate his commitment to assuming parental re-

sponsibility for his child, we cannot condone the actions of the defendants in this case who, by their conduct, wrongfully interfered with John's ability to establish and assert his parental rights. Accordingly, we hold that the instant a child is born, both unwed biological parents have a right to establish a parent-child relationship with their child. To preserve his parental interest vis-a-vis his newborn child, an unwed biological father must, upon learning of the existence of his child, demonstrate his commitment to assume the responsibilities of parenthood by coming forward to participate in the care, rearing, and support of his newborn child and by commencing to establish a meaningful parent-child relationship with his child.[35]

▄▄▄ Further, where a person has knowledge of information concerning a newborn child's birth or physical location, or indicating where and in whose care the child may be found, and the child's parent[36] inquires of such person regarding his/her child's birth or physical location, and/or where and in whose care his/her child may be found, such person may be held liable for fraudulently concealing information if he/she affirmatively, intentionally, and willfully fails

to provide such information to the child's parent pursuant to his/her request for such information and such concealment unduly hinders or otherwise irreparably harms the parent's ability to establish a parent-child relationship with his/her child. Additionally, we hold that any person or persons who plot, plan, scheme, or otherwise conspire to affirmatively, intentionally, and willfully conceal information regarding a newborn child's birth or physical location, or indicating where and in whose care the child may be found, in response to inquiries by the child's parent for such information, may be held liable for his/her or their participation in such civil conspiracy.[37]

▄▄▄ Finding that John does, in fact, have a cause of action against the defendants for their alleged concealment of information regarding Baby Boy Conaty, we must now ascertain whether the allegations in John's complaint were sufficient to state such a claim. Typically, "[a] pleading which sets forth a claim for relief ... [must] contain (1) a short and plain statement of the claim showing that the pleader is entitled to relief, and (2) a demand for judgment for the relief to which he deems himself entitled." W. Va.

35. We emphasize that an unwed biological father's right to establish and maintain a parental relationship with his child does not foreclose an unwed biological mother's right to terminate her pregnancy. *See Doe v. Smith*, 486 U.S. 1308, 108 S.Ct. 2136, 100 L.Ed.2d 909 (1988) (refusing to permit unwed biological father to enjoin unwed biological mother from obtaining an abortion).

36. By the term "parent" we mean both biological parents and those persons who have attained the status of parents by virtue of adoption. *See* W. Va.Code § 48-4-11 (1984) (Repl.Vol.1996).

37. In rendering this decision, we wish to comment as to its intended effect and scope. First, we emphatically reiterate that our holding is in no way intended to abrogate a biological mother's freedom to select from various options available to her during the course of her pregnancy. Indeed, our fervent hope is that by carefully and narrowly defining the boundaries for the imposition of liability in a case such as this, these freedoms will be more scrupulously preserved and protected. Second, we emphasize that we do not impose upon a biological mother any affirmative duty to keep her child's biological father informed of the progress of her preg-

nancy or to relay to him any other information pertaining to a proposed adoption of the child other than that notice required to be given to the child's biological father pursuant to the applicable statutory or case law. Only when the mother, or any other person, affirmatively, intentionally, and willfully conceals information in response to a father's inquiries can she, or any other person, be subjected to liability. Last, we acknowledge that the scope of this decision necessarily will be limited by the implementation of revised adoption standards which afford greater consideration of a biological father's interest in establishing a relationship with his child. *See* W. Va.Code §§ 48-4-8, 48-4-8b (1997) (Supp. 1997) (expanding class of persons required to be given notice of pending adoption proceedings). *See also* Cal. Family Code §§ 7662, 7664, 7666 (1992) (Main Vol.1994) (requiring notice of pending adoption proceedings be given to "natural father") and 7660 (1992) (Main Vol.1994) (requiring notice of pending adoption proceedings be given to "presumed father"); *Adoption of Kelsey S.*, 1 Cal.4th 816, 4 Cal.Rptr.2d 615, 823 P.2d 1216 (1992) (holding unconstitutional statutory scheme whereby unwed biological mother could prevent unwed biological father from attaining status of presumed father, whose consent is required for adoption of nonmarital child).

R. Civ. P. Rule 8(a). However, when a party alleges that he/she has been injured by the fraud or fraudulent conduct of another, "the circumstances constituting fraud ... [must] be stated with particularity." W. Va. R. Civ. P. Rule 9(b). *See also Funeral Serv. by Gregory, Inc. v. Bluefield Community Hosp.*, 186 W.Va. 424, 430, 413 S.E.2d 79, 85 (1991) (instructing that "in order to establish fraud, the circumstances must be clearly alleged and proved"), *overruled on other grounds by Courtney v. Courtney*, 190 W.Va. 126, 437 S.E.2d 436 (1993); Syl. pt. 1, in part, *Hager v. Exxon Corp.*, 161 W.Va. 278, 241 S.E.2d 920 (1978) ("[F]raud or mistake must be alleged in the appropriate pleading with particularity[,] and the failure to do so precludes the offer of proof thereof during the trial.").

█ The reason for this deviation from the general pleading requirements when fraud is charged is both to allow the party alleged to have committed fraud to defend such charges and to permit the tribunal hearing the matter to conduct a full review of the complaining party's claims. Syl. pt. 4, in part, *Croston v. Emax Oil Co.*, 195 W.Va. 86, 464 S.E.2d 728 (1995) ("The failure to plead particularly the circumstances constituting fraud not only inhibits full review of the substance of the claim of fraud by this Court on appeal ...; such failure also precludes the introduction of evidence supportive of any general allegation of fraud contained in the complaint[.]").

█ Nevertheless, the requirement that fraud be "stated with particularity" does not automatically render a complaint fatally flawed if the magic word "fraud" has not been invoked. While certainly the better practice when stating a cause of action for fraud is to include the word "fraud" in the complaint, thereby ensuring that both the defendant and the court are aware of the claim asserted, the complaint generally will be deemed sufficient so long as a cause of action for fraud may be discerned from the allegations contained therein.

Fraud may be well pleaded even though the conduct referred to is not alleged expressly to be "fraudulent," provided that the facts alleged are such as constitute fraud in themselves, or are facts from which fraud will be necessarily implied. The acts charged are not less fraudulent because the word "fraud" or "fraudulent" is not employed by the pleader in characterizing them. In other words, an allegation of facts from which the conclusion of fraud necessarily results is sufficient.

37 Am.Jur.2d *Fraud and Deceit* § 424, at 577–78 (1968) (footnotes omitted).

Reviewing the complaint filed by John in the circuit court, we initially note that the use of the word "fraud" or "fraudulent" to describe the conduct complained of would have been preferable. Nevertheless, we conclude that the complaint's allegations set forth sufficient facts from which a jury could have found fraudulent conduct to have been committed by the defendants. Thus, we find that the averments charging that the defendants intentionally, purposefully, and maliciously prevented John from obtaining any pertinent information regarding Baby Boy Conaty's birth or subsequent pre-adoptive placement and that they continued a scheme to impair and frustrate his efforts to ascertain the whereabouts of his son sufficiently stated a cause of action for fraud. Accordingly, we find that the circuit court did not err in upholding John's claim.[38]

2. *Tortious Interference with Parental Relationship*

█ The defendants next contest the sufficiency of John's claim alleging that they tortiously interfered with his parental relationship with Baby Boy Conaty. They urge

---

**38.** Having determined the sufficiency of John's claim for fraud, we need not further review this matter. The issue of whether the record evidence adequately satisfied the elements of a cause of action for fraud was properly within the province of the jury. 8B Michie's Jur. *Fraud and Deceit* § 67, at 433 (1994) ("Generally, fraud is a question of fact to be determined by the jury from all the circumstances of the case." (footnote omitted)). Furthermore, the defendants do not appear to challenge the sufficiency of such evidence in their appeal. *See* Syl. pt. 3, *Higginbotham v. City of Charleston*, 157 W.Va. 724, 204 S.E.2d 1 (1974) ("Assignments of error that are not argued in the appellant's brief may be deemed by this Court to be waived."), *overruled on other grounds by O'Neil v. City of Parkersburg*, 160 W.Va. 694, 237 S.E.2d 504 (1977).

that the circuit court erred in concluding that John's complaint sufficiently stated grounds for relief on this theory because the court misstated the applicable law. Acknowledging John's purported reliance on the language of Section 700 of the Second Restatement of Torts,[39] the defendants entreat this Court to follow the decisions of the minority of jurisdictions, which have refused to recognize a claim for tortious interference with parental relationship based upon their determinations that such tort-based recovery would be detrimental to the best interests of the children involved at the center of these controversies. *Citing Whitehorse v. Critchfield,* 144 Ill.App.3d 192, 98 Ill.Dec. 621, 494 N.E.2d 743 (1986); *Larson v. Dunn,* 460 N.W.2d 39 (Minn.1990); *Zaharias v. Gammill,* 844 P.2d 137 (Okla.1992); *Cosner v. Ridinger,* 882 P.2d 1243 (Wyo.1994).

If, however, this Court should recognize a cause of action for tortious interference with parental relationship, the defendants assert that the definition of this tort contained in Section 700 does not apply to the facts of this case. Further, they submit that John has failed to state a cause of action for tortious interference because he is unable to satisfy two elements required of such a claim. First, the defendants represent that this tort is available only to those individuals who are custodial parents and thereby entitled to their child's sole legal custody. As John was not, and never has been, the custodial parent of Baby Boy Conaty, he is not entitled to seek recovery under this theory. Second, Section 700, as it is written, provides relief from damages occasioned by the abduction or compelled removal of a child from his/her parent who is entitled to his/her legal custody. Again, the defendants indicate that the facts underlying this appeal do not support John's claim as there is no indication either

that John was entitled to his son's custody or that Baby Boy Conaty was abducted from, or compelled to leave, John. Finally, the defendants dispute John's ability to maintain this cause of action where both he and Anne had equal custodial rights vis-a-vis Baby Boy Conaty.[40]

John replies that he has stated a valid claim upon which to obtain relief from the defendants' alleged tortious interference with his parental relationship with Baby Boy Conaty. Although this cause is novel to the jurisprudence of this State, a majority of jurisdictions throughout the country have recognized such a claim. *Citing, e.g., Hinton v. Hinton,* 436 F.2d 211, 141 U.S.App. D.C. 57 (D.C.Cir.1970), *aff'd,* 492 F.2d 669, 160 U.S.App. D.C. 403 (D.C.Cir.1974); *Kunz v. Deitch,* 660 F.Supp. 679 (N.D.Ill.1987); *Lloyd v. Loeffler,* 539 F.Supp. 998 (E.D.Wis. 1982), *aff'd,* 694 F.2d 489 (7th Cir.1982); *D & D Fuller CATV Constr., Inc. v. Pace,* 780 P.2d 520 (Colo.1989); *Plante v. Engel,* 124 N.H. 213, 469 A.2d 1299 (1983); *Bedard v. Notre Dame Hospital,* 89 R.I. 195, 151 A.2d 690 (1959). In urging this Court to adopt this cause of action, John suggests that such a claim is consistent with the existing law of this State, which recognizes the preeminence of a parent's right to the custody of his/her child, provided the parent is not unfit and has not waived, abandoned, transferred, or otherwise relinquished his/her custodial rights. *Citing Hammack v. Wise,* 158 W.Va. 343, 211 S.E.2d 118 (1975). John further supports his position by proposing that, regardless of any decisional rights enjoyed by Anne, "[o]nce the baby is born[, both] the baby and the father have rights."

Additionally, while John concedes that the facts of this case do not fit neatly into the definition of "tortious interference" contained

---

**39.** See *infra* for the text of Restatement (Second) of Torts § 700 (1976).

**40.** The defendants alternatively suggest that John's claim is based not upon Section 700 but upon Section 699 of the Second Restatement of Torts. *See* Restatement (Second) of Torts § 699 (1976) ("One who, without more, alienates from its parent the affections of a child, whether a minor or of full age, is not liable to the child's parent."). As the claim enunciated in Section 699 is nothing more than a claim for alienation

of a child's affections, for which no relief is available, and as this cause of action has been abolished in this State, the defendants contend that the circuit court erroneously permitted John to maintain his claim. *Citing* W. Va.Code § 56-3-2a (1969) (Repl.Vol.1997); Syl. pt. 2, *Weaver v. Union Carbide Corp.,* 180 W.Va. 556, 378 S.E.2d 105 (1989); Syl. pts. 1 and 4, *Wallace v. Wallace,* 155 W.Va. 569, 184 S.E.2d 327 (1971), *overruled on other grounds by Belcher v. Goins,* 184 W.Va. 395, 400 S.E.2d 830 (1990).

in Section 700, he nevertheless asks this Court to recognize his claim, stating that the lack of precedent does not automatically foreclose the recognition of a cause of action to remedy the wrong that has been done. *Citing Rosefield v. Rosefield,* 221 Cal.App.2d 431, 34 Cal.Rptr. 479 (1963). Finally, responding to the defendants' arguments that he has not satisfied all of the requisite elements to prosecute this cause of action, John asserts that he has, in fact, met these requirements. First, John indicates that there is no requirement that he have a judicial decree awarding him sole legal custody of Baby Boy Conaty in order to maintain his claim. *Citing Rosefield,* 221 Cal.App.2d 431, 34 Cal.Rptr. 479. Second, John disputes the defendants' charge that Baby Boy Conaty was not abducted from, or otherwise compelled to leave, John. In this regard, John states that the defendants orchestrated a scheme to prevent him from establishing a relationship with his infant son and, given his son's tender age of two days, effectively compelled the child to leave his father through their pre-adoptive placement of the boy into Canada. Lastly, John suggests that, despite the defendants' contrary view, he is permitted to assert a claim for tortious interference even though both he and Anne theoretically had equal rights to their son's custody. Under the facts of this case, John represents that he and Anne, realistically, did not have equal parental rights because Anne effectively prevented him from establishing and asserting his rights, thus elevating her own rights above his. Therefore, because the parties actually had unequal rights, as a result of the defendants' conduct, John should be permitted to maintain his claim. *Citing Rosefield,* 221 Cal.App.2d 431, 34 Cal.Rptr. 479.

The cause of action asserted by John, that of tortious interference with parental relationship, is a matter of first impression before this Court. Nevertheless, the recognition of this cause of action appears to be the standard adopted by a majority of other jurisdictions' courts that have been faced with this issue.[41] In order to determine whether this Court should follow the lead initiated by our sister jurisdictions, it is necessary for us

---

**41.** *See, e.g., DiRuggiero v. Rodgers,* 743 F.2d 1009 (3d Cir.1984) (construing law of New Jersey as allowing cause of action for tortious interference with parents' custodial rights); *Bennett v. Bennett,* 682 F.2d 1039, 221 U.S.App.D.C. 90 (D.C.Cir.1982) (recognizing applicability of tort to relatives of minor child); *Lloyd v. Loeffler,* 694 F.2d 489 (7th Cir.1982) (surmising Wisconsin law would permit cause of action for tortious interference with custodial relationship); *Anonymous v. Anonymous,* 672 So.2d 787 (Ala.1995) (listing elements of tortious interference with custody cause of action); *Matter of Mendel,* 897 P.2d 68 (Alaska 1995) (impliedly allowing maintenance of claim for tortious custodial interference); *Rosefield v. Rosefield,* 221 Cal.App.2d 431, 34 Cal.Rptr. 479 (1963) (explaining rationale for adopting tort); *D & D Fuller CATV Constr., Inc. v. Pace,* 780 P.2d 520 (Colo.1989) (en banc) (basing recognition of tort on pre-existing state crime of custodial interference); *Mathews v. Murray,* 101 Ga.App. 216, 113 S.E.2d 232 (1960) (permitting plaintiff to maintain claim for damages arising from defendant's interference with plaintiff's custody of his minor child); *Shields v. Martin,* 109 Idaho 132, 706 P.2d 21 (1985) (permitting recovery of damages for tortious interference with custodial relationship), *superseded by statute as noted in Doe v. Cutter Biological, a Div. of Miles, Inc.,* 852 F.Supp. 909 (D.Idaho 1994); *Montgomery v. Crum,* 199 Ind. 660, 161 N.E. 251 (1928) (permitting mother to maintain cause of action for damages resulting from defendant's tortious interference with her parental and custodial rights); *Wood v. Wood,* 338 N.W.2d 123 (Iowa 1983) (en banc) (determining tort would provide effective remedy and deterrent to problem of child snatching); *Washburn v. Abram,* 122 Ky. 53, 28 Ky. L. Rptr. 985, 90 S.W. 997 (1906) (allowing parent to recover damages occasioned by unlawful abduction or detention of his/her minor child); *Spencer v. Terebelo,* 373 So.2d 200 (La.App.1979) (recognizing cause of action in tort for interference with custodial relationship); *Hare v. Dean,* 90 Me. 308, 38 A. 227 (1897) (upholding cause of action for interference with parent's custody of his/her minor child); *Michaels v. Nemethvargo,* 82 Md.App. 294, 571 A.2d 850 (1990) (recognizing cause of action in tort for interference with parental relationship between parent and his/her minor child; limiting recovery to loss of child's services and expenses necessary to ensure child's welfare and precluding recovery of damages for society and companionship); *Murphy v. I.S.K. Con. of New England, Inc.,* 409 Mass. 842, 571 N.E.2d 340 (1991) (recognizing cause of action for tortious interference with parent-child relationship grounded in common law and Restatement (Second) of Torts § 700 (1976)); *Brown v. Brown,* 338 Mich. 492, 61 N.W.2d 656 (1953) (adopting language of Restatement of Torts § 700 (1938)); *Kramer v. Leineweber,* 642 S.W.2d 364 (Mo.App.1982) (noting Missouri's long-standing recognition of tort action for parental or custodial interference); *Tavlinsky v. Ringling Bros. Circus Co.,* 113 Neb. 632, 204 N.W. 388 (1925) (acknowledging that parents generally have cause of action for wrong-

first to understand the nature of this proffered claim and then to ascertain whether our existing law would impede our embracement of this cause.

 Section 700 of the Restatement (Second) of Torts articulates the elements of a

ful deprivation of custody of their minor child); *Plante v. Engel,* 124 N.H. 213, 469 A.2d 1299 (1983) (extending liability for tort to those conspiring to commit tort); *Casivant v. Greene County Community Action Agency, Inc.,* 652 N.Y.S.2d 115, 234 A.D.2d 818 (1996) (finding tort to be narrowly drawn), *aff'd,* 90 N.Y.2d 969, 665 N.Y.S.2d 952, 688 N.E.2d 1034 (1997); *LaGrenade v. Gordon,* 46 N.C.App. 329, 264 S.E.2d 757 (1980) (finding mother had right to maintain claim for tortious interference with parental or custodial relationship where father had, by contract, surrendered to mother his common law right to custody of parties' minor child), *appeal dismissed, review denied,* 300 N.C. 557, 270 S.E.2d 109 (1980); *Clark v. Bayer,* 32 Ohio St. 299, 30 Am. Rep. 593 (1877) (permitting lawful custodian of minor child to maintain claim for damages resulting from another's wrongful interference with such custodial relationship); *McBride v. Magnuson,* 282 Or. 433, 578 P.2d 1259 (1978) (en banc) (following other jurisdictions recognizing tort); *Bedard v. Notre Dame Hosp.,* 89 R.I. 195, 151 A.2d 690 (1959) (holding parent may bring cause of action for injury to his/her parental relationship with his/her child); *Hershey v. Hershey,* 467 N.W.2d 484 (S.D.1991) (recognizing cause of action in tort for interference with parental relationship, but specifically phrasing claim as one for alienation of affections); *Silcott v. Oglesby,* 721 S.W.2d 290 (Tex. 1986) (adopting cause of action by parent for tortious interference with custodial relationship and applying Restatement (Second) of Torts § 700 (1976)); *Magnuson v. O'Dea,* 75 Wash. 574, 135 P. 640 (1913) (allowing recovery of damages arising from tortious interference with custodial relationship). *But see, e.g., McDougald v. Jenson,* 596 F.Supp. 680 (N.D.Fla.1984) (refusing to recognize, under Florida law, cause of action for tortious interference with parental or custodial relationship), *aff'd,* 786 F.2d 1465 (11th Cir.1986); *Simmons v. Simmons,* 41 F.Supp. 545 (E.D.S.C.1941) (interpreting South Carolina law as prohibiting cause of action by one spouse against the other spouse for interference with custodial relationship between complaining spouse and parties' child based upon sanctity and promotion of "domestic felicity" and child's best interests); *Whitehorse v. Critchfield,* 144 Ill. App.3d 192, 98 Ill.Dec. 621, 494 N.E.2d 743 (1986) (declining to recognize cause of action for tortious interference with parent's custody and determining Legislature to be more appropriate body to implement civil sanctions for such interference); *Larson v. Dunn,* 460 N.W.2d 39 (Minn. 1990) (explicitly rejecting father's tort claim for intentional interference with his custodial rights; finding proposed cause of action to be contrary

claim for "tortious interference with parental or custodial[42] relationship".[43] Pursuant to the Restatement, "Causing [a] Minor Child to Leave or not to Return Home[,]" "[o]ne who, with knowledge that the parent does not consent, abducts or otherwise compels or

to best interests of children at issue in such disputes resulting from dissolution of marriage proceedings); *Zaharias v. Gammill,* 844 P.2d 137 (Okla.1992) (rejecting tort because increased litigation would be contrary to best interests of children involved). *See generally Marshak v. Marshak,* 226 Conn. 652, 628 A.2d 964 (1993) (agreeing with trial court's ruling that recognition of cause of action for custodial interference would likely be consistent with Connecticut law but finding facts insufficient to maintain such a claim in this particular case); *Bartanus v. Lis,* 332 Pa.Super. 48, 480 A.2d 1178 (1984) (not expressly adopting or rejecting tort of interference with custody by "harboring" minor child without his/her parent's consent; determining instead that facts alleged were insufficient to state such a claim because plaintiff had not demonstrated that he had lawful custody of his son at time of alleged interference); *White v. Blackburn,* 787 P.2d 1315 (Utah App.1990) (neither specifically adopting nor definitively rejecting cause of action for tortious interference with parental or custodial relationship; determining facts did not establish claim for such interference in this case).

42. We phrase the relationship protected by this cause of action in the alternative to encompass both "parental relationships" and "custodial relationships". In this manner, we view a "parental relationship" as the relationship fostered, or commenced, by an unwed biological father as a prerequisite to asserting his broader parental and custodial rights. By "custodial relationship" we mean the relationship between parent and child enjoyed by a parent who has physical or legal custody of his/her child.

43. Our discussion of tortious interference will be limited to tortious interference with a parent's parental or custodial relationship with his/her child as distinguished from tortious interference with a parent's visitation rights or tortious interference which results in a parent's loss of his/her child's society and companionship, *i.e.,* parental consortium. For further discussion of the two types of tortious interference not addressed by our decision, see Note, *Tort Recovery for Intentional Interference with Visitation Rights: A Necessary Alternative,* 32 U. Louisville J. Fam. L. 657 (1993–94) (discussing tortious interference with visitation), and Jean C. Love, *Tortious Interference with the Parent–Child Relationship: Loss of an Injured Person's Society and Companionship,* 51 Ind. L.J. 590 (1975–76) (discussing tortious interference with child's society and companionship) and Note, *Torts—Parent's Recovery for Loss of Society and Companionship of Child,* 80 W. Va. L.Rev. 340 (1977–78) (same).

induces a minor child to leave a parent legally entitled to its custody or not to return to the parent after it has been left him, is subject to liability to the parent." Restatement (Second) of Torts § 700 (1976).[44]

This Section permits a cause of action to be maintained both when the child has been forcibly abducted from his/her parent's custody and when he/she is prevented from returning to his/her parent's custody.

> Under the rule stated in this Section, an action may be maintained by the parent who is entitled to the custody of a minor child against one who by force abducts the child from its home, or one who induces the child to leave its home with knowledge that the parent has not consented.... So, too, the action can be maintained against one who, with knowledge that the child is away from home against the will of the parent, imprisons it or induces the child ... not to return home.

Restatement (Second) of Torts § 700 cmt. *a* (1976). However, under either the removal or retention theories, "[t]o become liable under the rule stated in this Section for inducing a child not to return home, it is necessary that the actor know that the child is away from home against the will of the parent." Restatement (Second) of Torts § 700 cmt. *b*.

Governing all claims for tortious interference with a parental or custodial relationship, though, is the underlying custodial or parental rights of the parties involved. Thus,

> [w]hen the parents are by law jointly entitled to the custody and earnings of the child, no action can be brought against one of the parents who abducts or induces the child to leave the other.... One parent

may be liable to the other parent for the abduction of his own child if by judicial decree the sole custody of the child has been awarded to the other parent.

Restatement (Second) of Torts § 700 cmt. *c*.

Refining, clarifying, and adopting this tort, various jurisdictions have established precise tests to be used in determining whether one has tortiously interfered with another's parental or custodial rights and have explained the rationale underlying their decisions to recognize this cause of action. For example, the Supreme Court of Alabama, in reviewing a claim by the plaintiff parents charging that a male juvenile and his parents had assisted the plaintiff's minor daughter in running away from home and had concealed her whereabouts from the plaintiffs, recognized that

> Section 700 does not create a new cause of action unknown to the common law. [Rather, i]t accurately reflects the common law principle that "parents have a right to the care, custody, services and companionship of their minor children, and [that] when they are wrongfully deprived thereof by another, they have an action therefor."

*Anonymous v. Anonymous*, 672 So.2d 787, 789 (Ala.1995) (quoting *Steward v. Gold Medal Shows*, 244 Ala. 583, 586, 14 So.2d 549, 552 (1943)) (additional citation omitted). The court then proceeded to clarify the requisite elements for a claim of tortious interference:

> To state a claim of intentional or malicious custodial interference, a [parent] need only plead facts tending to show:
>
> > "(1) [S]ome active or affirmative effort by [the] defendant to detract the child

---

44. The language of the Restatement is clear, and we emphasize further, that the claim asserted by John and contemplated by this Court is one for tortious interference and not for alienation of affections, as the defendants suggest. These two causes may be distinguished as follows. "Tortious interference with parental or custodial relationship" intimates that the complaining parent has been deprived of his/her parental or custodial rights; in other words, but for the tortious interference, the complaining parent would be able to exercise some measure of control over his/her child's care, rearing, safety, well-being, etc. By contrast, "alienation of affections" connotes only that the parent is not able to enjoy the company of his/her child; this cause of action

does not suggest that the offending party has removed parental or custodial authority from the complaining parent. We further recognize that "alienation of affections" is no longer a valid cause of action in this State. *See* W. Va.Code § 56-3-2a (1969) (Repl.Vol.1997) ("Notwithstanding any other provision of law to the contrary, no civil action shall lie or be maintained in this State ... for alienation of affections, unless such civil action was instituted prior to the effective date of this section [March 6, 1969]."). *See also* Restatement (Second) Torts § 699 cmt. *a* (1976) ("For the mere alienation of a child's affections no action can be maintained by the parent.").

from the parent's custody or service, (2) [that] the enticing or harboring [was] willful, [and] (3) [that the enticing or harboring was done] with notice or knowledge that the child had a parent whose rights were thereby invaded."

*Id.,* 672 So.2d at 790 (quoting 67A C.J.S. *Parent & Child* § 131, at p. 513 (1978)) (additional citation omitted). *See also Marshak v. Marshak,* 226 Conn. 652, 628 A.2d 964 (1993) (refusing to allow mother's claim for tortious interference with custodial relationship, where mother and father had joint legal custody of children at time of alleged interference, based upon Restatement (Second) of Torts § 700 cmt. *c* (1976)); *Murphy v. I.S.K. Con. of New England, Inc.,* 409 Mass. 842, 571 N.E.2d 340 (1991) (emphasizing importance of lack of parent's consent to child's absence from parent's home and enumerating criteria for jury to consider in this regard); *Kipper v. Vokolek,* 546 S.W.2d 521, 525–26 (Mo.App.1977) (discussing particular elements comprising tort claim for interference with parental or custodial relationship).

In a somewhat different case, the California District Court of Appeal reviewed the rationale for permitting a cause of action for tortious interference with parental or custodial relationship in enunciating the appropriate context for such a claim. *Rosefield v. Rosefield,* 221 Cal.App.2d 431, 34 Cal.Rptr. 479 (1963). The case arose in the context of divorce proceedings. Since the date of separation, the mother had had custody of the parties' child. During the pendency of the proceedings and shortly before custody was to be awarded to the mother, the father, with the help of his father (the paternal grandfather), took the child from the mother and concealed his whereabouts from her. At the time the appellate court heard this case, the father and child had not yet been located.

Reviewing the mother's claim of tortious interference against the paternal grandfather,[45] the *Rosefield* Court noted that "[t]he actions of the third party [grandfather], as alleged, did not simply help the father to gain custody of the child, as from a stranger, but

effectively deprived the mother of a right, elemental and of value inestimable, which she, too, had." 221 Cal.App.2d at 433, 34 Cal.Rptr. at 481. Though declining to definitively rule as to the propriety of the claim asserted against the father, the Court did find, given the circumstances, that the father's actions impermissibly infringed upon the mother's parental and custodial rights.

> We believe that it was a legal wrong for the husband and father to abscond with the child, and that respondent [grandfather] would be liable in damages even for the father's actions, if conspiracy were shown. Of course, not every transportation of a child by one parent causing the other parent some loss of custody and association with the child would be wrongful. If, however, one parent makes away with the offspring, removes it effectually from judicial control, conceals it, and leaves the other parent utterly bereft of the means of enjoying any of the privileges of parenthood, it is folly to say that the decamping parent is merely exercising his "equal right" to the custody of the child. There is no equality about it.

*Id.,* 221 Cal.App.2d at 435, 34 Cal.Rptr. at 482.

Similarly, the court in *Plante v. Engel,* focused upon the rationale supporting its adoption of a cause of action for tortious interference with parental or custodial relationship. 124 N.H. 213, 469 A.2d 1299 (1983). In *Plante,* the mother and father had commenced an action for divorce. In conjunction with these proceedings, the father was awarded custody of the parties' child. The mother thereafter, in violation of the custody order and without telling the father, took the parties' child with her when she moved to Texas. Upholding the father's claim against the maternal grandparents for interfering with his right to the custody of his child, the Supreme Court of New Hampshire based its decision, in large part, on the deep respect accorded a parent's right to the custody of his/her child.

---

**45.** The Court noted that the child's father had not been served with process and therefore was not a party to the appeal. *Rosefield v. Rosefield,*

221 Cal.App.2d 431, 432, 34 Cal.Rptr. 479, 480 (1963)

The high place accorded filiation stems not from the material bond whereby services are provided to each other by parent and child but from recognition that there is a sanctity in the union of parent and child that transcends economics and deserves the utmost respect. Because this relationship is so intimately connected with the parent's person, we hold that where there is an intentional interference with a parent's custody of his or her child, an injured parent is entitled to a remedy that completely compensates him or her.

*Id.*, 469 A.2d at 1301–02 (citations omitted).

Unlike the jurisdictions referenced above, this State has not previously recognized the tort of interference with a parental or custodial relationship. However, the law of West Virginia has explicitly adopted interference torts in other contexts. For example, in Syllabus point 2 of *Barone v. Barone*, 170 W.Va. 407, 294 S.E.2d 260 (1982), we held that "[a]n intended beneficiary may sue for tortious interference with a testamentary bequest."

In addition, we very recently reiterated the standard enunciated for the tort of interference with an employment relationship that originally was announced in Syllabus point 2 of *Torbett v. Wheeling Dollar Sav. & Trust Co.*, 173 W.Va. 210, 314 S.E.2d 166 (1983):

"To establish prima facie proof of tortious interference, a plaintiff must show:

(1) existence of a contractual or business relationship or expectancy;

(2) an intentional act of interference by a party outside that relationship or expectancy;

(3) proof that the interference caused the harm sustained; and

(4) damages.

"If a plaintiff makes a prima facie case, a defendant may prove justification or privilege, affirmative defenses. Defendants are not liable for interference that is negligent rather than intentional, or if they show defenses of legitimate competition between plaintiff and themselves, their financial interest in the induced party's business, their responsibility for another's welfare, their intention to influence another's business policies in which they have an interest, their giving of honest, truthful requested advice, or other factors that show the interference was proper."

*Tiernan v. Charleston Area Medical Center*, 203 W.Va. 135, 148–49, 506 S.E.2d 578, 591–92 (1998) (quoting Syl. pt. 2, *Torbett*, 173 W.Va. 210, 314 S.E.2d 166).

Finally, in *Thacker Coal & Coke Co. v. Burke*, 59 W.Va. 253, 254, 53 S.E. 161, 162 (1906), we permitted an injured party to recover damages for tortious interference with a contractual relationship: "[i]f one wantonly and maliciously, whether for his own benefit or not, induces a person to violate his contract with a third person to the injury of that third person, it is actionable." (Internal quotations and citation omitted). *But cf.* Syl. pt. 1, *Shrewsbery v. National Grange Mut. Ins. Co.*, 183 W.Va. 322, 395 S.E.2d 745 (1990) ("It is impossible for one party to a contract to maintain against the other party to the contract a claim for tortious interference with the parties' own contract; each party has agreed to be bound by the terms of the contract itself, and may not thereafter use a tort action to punish the other party for actions that are within its rights under the contract."). This brief survey suggests that the recognition of interference torts is not novel to the jurisprudence of this State. Thus, it may be said that the acceptance of a cause of action for tortious interference with parental or custodial relationship would simply be a logical progression of this jurisdiction's pre-existing tortious interference law.

Moreover, the Legislature of this State officially has codified, as a criminal offense, interference with a legal guardian's custody of a minor child. W. Va.Code § 61–2–14d (1984) (Repl.Vol.1997) specifically recognizes as a crime in this State the "[c]oncealment or removal of [a] minor child from [his/her] custodian or from [a] person entitled to visitation":

(a) Any person who conceals, takes or removes a minor child in violation of any court order and with the intent to deprive another person of lawful custody or visitation rights shall be guilty of a felony, and, upon conviction thereof, shall be imprisoned in the penitentiary not less than one

nor more than five years, or in the discretion of the court, shall be imprisoned in the county jail not more than one year or fined not more than one thousand dollars, or both fined and imprisoned.

(b) Any person who violates this section and in so doing removes the minor child from this State or conceals the minor child in another state shall be guilty of a felony, and, upon conviction thereof, shall be imprisoned in the penitentiary not less than one nor more than five years or fined not more than one thousand dollars, or both fined and imprisoned.

(c) It shall be a defense under this section that the accused reasonably believed such action was necessary to preserve the welfare of the minor child. The mere failure to return a minor child at the expiration of any lawful custody or visitation period without the intent to deprive another person of lawful custody or visitation rights shall not constitute an offense under this section.

In addition, anyone who "aid[s] or abet[s]" in an offense of custodial interference, as defined by W. Va.Code § 61–2–14d, is also criminally liable:

If any person in any way knowingly aid or abet any other person in the commission of any offense described in section fourteen, fourteen-a, fourteen-c or fourteen-d [§ 61–2–14, § 61–2–14a, § 61–2–14c, or § 61–2–14d] of this article, either as accessory before or an accessory after the fact, such person so aiding and abetting shall be guilty as a principal in the commission of such offense and shall be punished in the same manner and to the same extent as is provided in said sections for the person who committed the offense.

W. Va.Code § 61–2–14e, in part, (1984) (Repl.Vol.1997).

At least one state has based its adoption of the tort of interference with parental or custodial relationships, in part, upon the fact that it, too, had criminalized custodial interference. In *D & D Fuller CATV Construction, Inc. v. Pace,* 780 P.2d 520 (Colo.1989) (en banc), the Supreme Court of Colorado noted that that state recognized the crime of custodial interference. *See* Colo.Rev.Stat.

§ 18–3–304 (1986). The Court then reasoned:

Based on the fact that it is a crime in this state to take a child from his or her lawful custodian and to deprive the lawful custodian of custody of a child, we recognize the tort of interference with the parent-child relationship set forth in Restatement (Second) of Torts § 700 (197[6] ).

780 P.2d at 524. *See also Spencer v. Terebelo,* 373 So.2d 200, 202 (La.App.1979) (concluding that penal statute prohibiting criminal custodial interference, La.Rev.Stat. § 14:45 (1966), "forms the basis of the legal duty owed by" the offending parent to the complaining parent); *Silcott v. Oglesby,* 721 S.W.2d 290 (Tex.1986) (recognizing tort cause of action for custodial interference, in part, based upon existing criminal offense of interference with child custody (citing Tex. Penal Code Ann. § 25.03 (Vernon 1974))). *But see Whitehorse v. Critchfield,* 144 Ill. App.3d 192, 98 Ill.Dec. 621, 494 N.E.2d 743 (1986) (deferring to Legislature imposition of civil penalties for custodial interference because Legislature already had established criminal penalties for such an offense (citing Ill.Rev.Stat. ch. 38, paras. 10–5, 10–6 (1985))); *Larson v. Dunn,* 460 N.W.2d 39 (Minn.1990) (rejecting tort of parental or custodial interference partially because of Legislature's provision of criminal penalties, in Minn.Stat. § 609.26 (1986), for abduction of children from custodial parent); *Zaharias v. Gammill,* 844 P.2d 137 (Okla.1992) (declining to adopt tort of custodial interference, in part, because of existing criminal penalties applicable to persons abducting minor children (citing 21 Okla. Stat. § 1119 (1991))). *Cf. Rosefield v. Rosefield,* 221 Cal.App.2d 431, 433, 34 Cal.Rptr. 479, 481 (1963) (noting that Cal. Civil Code § 49 (1939) "forbids the abduction of a child from a parent" and acknowledging that third persons violating this section and/or committing tortious interference can be held liable to the complaining parent for damages arising from the interference).

Furthermore, we have a long-standing tradition of respecting the rights of parents to the custody of their children. *See, e.g.,* Syl. pt. 3, in part, *State ex rel. Harmon v. Utter-*

*back,* 144 W.Va. 419, 108 S.E.2d 521 (1959) ("The right of a parent to the custody of his or her child, being founded in nature and wisdom and recognized and declared by statute, 'will be respected unless such right is transferred, relinquished or abandoned[.]"), *overruled on other grounds by* Syl. pt. 3, *Overfield v. Collins,* 199 W.Va. 27, 483 S.E.2d 27 (1996); Syl. pt. 4, *State ex rel. Neider v. Reuff,* 29 W.Va. 751, 2 S.E. 801 (1887) ("The right of the father or mother to the custody of their minor child, is not an absolute right, to be accorded to them under all circumstances, for it may be denied to either of them, if it appears to the court, that the parent otherwise entitled to this right, 'is unfit for the trust.'").[46] In this regard we have declared that

> [i]n the law concerning custody of minor children, no rule is more firmly established than that the right of a natural parent to the custody of his or her infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions.

Syl. pt. 1, *In re Willis,* 157 W.Va. 225, 207 S.E.2d 129 (1973). We also have articulated that

> "[a] parent has the natural right to the custody of his or her infant child and, unless the parent is an unfit person because of misconduct, neglect, immorality, abandonment, or other dereliction of duty, or has waived such right, or by agreement or otherwise has permanently transferred, relinquished or surrendered such custody, the right of the parent to the custody of his or her infant child will be recognized and enforced by the courts." Syllabus, *State ex rel. Kiger v. Hancock,* 153 W.Va. 404[,] 168 S.E.2d [798] (1969).

Syl. pt. 2, *Hammack v. Wise,* 158 W.Va. 343, 211 S.E.2d 118 (1975).

Identifying the preeminence of a parent's right to enjoy a parental or custodial relationship with his/her child, various jurisdictions have attempted to further protect this right by permitting the recovery of damages when one tortiously interferes with such a relationship. *See, e.g., Anonymous v. Anonymous,* 672 So.2d 787 (Ala.1995) (noting that Restatement § 700 reflects common law view that parents have right to custody of their children); *Murphy v. I.S.K. Con. of New England, Inc.,* 409 Mass. 842, 571 N.E.2d 340 (discussing parent's interest in parental and custodial relationship with his/her child in context of common law cause of action for interference with such relationship); *Plante v. Engel,* 124 N.H. 213, 469 A.2d 1299 (1983) (permitting recovery of damages for intentional interference with parent's custodial relationship with his/her child based upon highly regarded right of parent to custody of his/her child); *Bedard v. Notre Dame Hospital,* 89 R.I. 195, 151 A.2d 690 (1959) (basing right to recovery in tort upon parent's legally protected right to custody of his/her child founded in common law and statutory enactments).

█ Based upon the prior recognition of other tortious interference claims by this Court, our criminal statutes providing penal remedies for unlawful custodial interference, and the high esteem with which we regard the rights of parents to maintain relationships with their children, we find that it is proper to recognize, as a valid cause of action, the claim of tortious interference as asserted by John. Accordingly, we hold that a parent[47] may maintain a cause of action against one who tortiously interferes with the parent's parental or custodial relationship with his/her minor child, which right accrues the instant the child is born.

█ We additionally hold, consistent with our prior holding in Syllabus point 2 of *Torbett v. Wheeling Dollar Sav. & Trust Co.,* 173 W.Va. 210, 314 S.E.2d 166 (1983), that to make out a *prima facie* claim for tortious interference with parental or custodial relationship, the complaining parent must demonstrate: (1) the complaining parent has a right to establish or maintain a parental or

---

46. For further discussion of parental rights in this State see Section II.B.1., *supra,* and Section II.C.3., *infra.*

47. See *supra* note 36 for the definition of the term "parent" as used in this decision.

custodial relationship with his/her minor child; (2) a party outside of the relationship between the complaining parent and his/her child intentionally interfered with the complaining parent's parental or custodial relationship with his/her child by removing or detaining the child from returning to the complaining parent, without that parent's consent, or by otherwise preventing the complaining parent from exercising his/her parental or custodial rights; (3) the outside party's intentional interference caused harm to the complaining parent's parental or custodial relationship with his/her child; and (4) damages resulted from such interference.

■■■■ Further, we hold that where a parent presents a *prima facie* case of tortious interference with his/her parental or custodial relationship, the party interfering with such relationship may assert the affirmative defense of justification, *i.e.*, the party possessed a reasonable, good faith belief that interference with the parent's parental or custodial relationship was necessary to protect the child from physical, mental, or emotional harm, as contemplated by W. Va.Code § 49–1–3 (1994) (Repl.Vol.1996). A party also cannot be held liable for tortious interference with a parental or custodial relationship if he/she acted negligently, rather than intentionally; possessed a reasonable, good faith belief that the interference was proper (*i.e.*, no notice or knowledge of an original or superseding judicial decree awarding parental or custodial rights to complaining parent); or reasonably and in good faith believed that the complaining parent did not have a right to establish or maintain a parental or custo-

dial relationship with the minor child (*i.e.*, mistake as to identity of child's biological parents where paternity has not yet been formally established).[48]

■■■■ Lastly, we hold that a parent cannot charge his/her child's other parent with tortious interference with parental or custodial relationship if both parents have equal rights, or substantially equal rights (as in the case of a nonmarital child where the putative biological father seeks to establish a meaningful parent-child relationship with his child and, until such a relationship has been commenced, does not have rights identical to those of the child's biological mother), to establish or maintain a parental or custodial relationship with their child. In other words, when no judicial award of custody has been made to either parent, thereby causing the parents' parental and custodial rights to be equal, no cause of action for tortious interference can be maintained by one parent against the other parent. Likewise, where no judicial decree has been entered awarding custody of a nonmarital child to one or the other of the child's biological parents, the complaining biological parent cannot assert a claim of tortious interference with parental or custodial relationship against the other biological parent.[49]

■■■■ Having established that John may properly assert a claim for tortious interference with his parental relationship with Baby Boy Conaty, we must now ascertain whether his complaint sufficiently stated this cause of action.[50] As we iterated in the preceding

**48.** In Plaintiff's Instruction Number 20, as amended, the circuit court indicated that the defendants could offer defenses to John's claims of tortious interference:

The Court instructs the jury that in your consideration of whether or not an intentional act of interference was committed by the defendants, or any of them, you are instructed that an intentional act of interference is one which is a substantial factor in preventing a relationship from occurring. An act is done intentionally, if it is done deliberately, with the purpose of interfering with the rights of a party.

If you find that plaintiffs [sic] have established their [sic] claim for wrongful interference by a preponderance of the evidence, *the burden then shifts to the defendants to prove*

*their defenses by a preponderance of the evidence.*

(Emphasis added).

**49.** We reserve ruling, for a more factually appropriate case, the issue of whether one parent may state a claim for tortious interference against the other parent when one parent has achieved superior custodial rights through a judicial decree of custody.

**50.** As will be explained more fully in Section II.F., *infra*, we limit our recognition of this cause of action to permit only parents of minor children to pursue a claim for tortious interference with their parental relationship. This cause of action is not available to grandparents of minor children upon allegations of tortious interference with their grandparental relationship.

section, generally "[a] pleading which sets forth a claim for relief ... [must] contain ... a short and plain statement of the claim showing that the pleader is entitled to relief." W. Va. R. Civ. P. Rule 8(a), in part. In this manner, while allegations of "fraud or mistake shall be stated with particularity[; m]alice, intent, knowledge, and other condition of mind of a person may be averred generally." W. Va. R. Civ. P. Rule 9(b), in part. Moreover, in order to withstand a challenge that the complaint fails to state a claim upon which relief may be granted, the complaint must indicate that "the plaintiff can prove ... facts in support of his claim which would entitle him to relief." Syl., in part, *John W. Lodge Distributing Co., Inc. v. Texaco, Inc.*, 161 W.Va. 603, 245 S.E.2d 157 (1978) (internal quotations and citations omitted). During the proceedings below, the circuit court determined that John's complaint properly stated a claim for tortious interference.

Given our review of the pertinent authority and our holding stated above, we find that the circuit court erred in permitting John to maintain his tortious interference claim against Anne. As expressed in the comments to Restatement § 700 and echoed in our decision, when both parents are equally, or substantially equally, entitled to establish or maintain a parental or custodial relationship with their child, *neither* of them can maintain a cause of action against the other for tortious interference with that relationship.

The circumstances underlying this case suggest that John and Anne had substantially equal rights vis-a-vis Baby Boy Conaty. Anne, as the biological mother of the child, had an undisputed right to maintain a custodial relationship with her son. John, as the putative biological father, had a right to establish a parental relationship with his son in order to acquire parental rights sufficient to enable him to subsequently assert his right to custody of the boy. At no time did either parent obtain superior parental or custodial rights as no court order was ever entered granting either John or Anne exclusive custody of their son. Because both Anne and John had substantially equal rights to have a parental or custodial relationship with Baby Boy Conaty, John could not assert a claim for tortious interference against Anne. In fact, the prosecution of such a claim between parents with co-equal rights effectively permits one parent to elevate his/her parental or custodial rights above those of the other parent rather than leaving such a determination to the judiciary equipped to resolve such custodial disputes. *See, e.g., Garska v. McCoy*, 167 W.Va. 59, 278 S.E.2d 357 (1981) (defining factors to be considered by court in determining custody of child). Therefore, we find that the circuit court erred in permitting John to assert against Anne a claim of tortious interference with his parental rights. However, as we explain below, our decision in this regard does not necessitate the reversal of the jury's verdict.

By contrast, John can state a claim for tortious interference against the remaining defendants, Dr. and Mrs. Conaty and Brian. As our holding indicates, a parent who has been deprived of his/her parental or custodial relationship with his/her child generally is not prevented from asserting such a claim against other nonparental relatives of his/her child. Instead, it appears that these types of tortious interference claims are quite often asserted against the child's grandparents, aunts, and uncles who have participated in the removal or retention of the child from the complaining parent.[51]

51. *See, e.g., Fenslage v. Dawkins*, 629 F.2d 1107 (5th Cir.1980) (applying Texas law; asserting tortious interference claim against paternal grandparents and paternal aunt, uncle, and nephew); *Kajtazi v. Kajtazi*, 488 F.Supp. 15 (E.D.N.Y.1978) (applying New York law; naming as defendants to tortious interference action paternal grandfather and paternal uncle); *Lloyd v. Loeffler*, 539 F.Supp. 998 (E.D.Wis.1982) (applying Wisconsin law; maintaining tortious interference claim against maternal grandparents), *aff'd*, 694 F.2d 489 (7th Cir.1982); *Rosefield v. Rosefield*, 34 Cal.Rptr. 479, 221 Cal.App.2d 431 (1963) (charging paternal grandfather with tortious interference); *Montgomery v. Crum*, 199 Ind. 660, 161 N.E. 251 (1928) (alleging tortious interference by paternal grandparents and paternal aunt and uncle); *Brown v. Brown*, 338 Mich. 492, 61 N.W.2d 656 (1953) (claiming tortious interference by paternal grandparents and paternal aunts and uncle); *Hayes v. Reynolds*, 579 S.W.2d 119 (Mo.App.1979) (bringing cause of action for tortious interference against maternal grandparents and maternal aunt); *Plante v. Engel*, 124 N.H. 213, 469 A.2d 1299 (1983) (complaining of tortious interference by maternal

Thus, John is not precluded from prosecuting his tortious interference claim against the remaining defendants.

■ Turning now to the sufficiency of John's complaint, we find that he adequately stated a claim against defendants Brian and Dr. and Mrs. Conaty for tortious interference with his parental or custodial relationship with Baby Boy Conaty. Allegations that the defendants "knowingly, willfully, intentionally and wrongfully conspired to hide [John's] child from him and to place the child for adoption, for the purpose of depriving [John] of the right to parenthood" and that "[t]he defendants' acts were done knowingly, intentionally, maliciously and with the specific intention to deprive [John] of his right to parenthood and the love, comfort, society and companionship of his child," sufficiently apprised these defendants that John was complaining of their alleged interference with his parental relationship with Baby Boy Conaty.

In our decision of this issue, we have determined that John could not state a claim against Anne for tortious interference with his parental relationship with their child. We also have decided that his claims against defendants Brian and Dr. and Mrs. Conaty for tortious interference were properly advanced. Despite Anne's inability to be liable under this theory of recovery and our establishment of defenses thereto more numerous than those upon which the circuit court instructed the jury, see *supra* note 48, we consider moot any further discussion of this matter. At trial, John asserted two alternative theories of wrongdoing by the defendants: fraud and tortious interference. Despite the jury's determination that all of the defendants were liable to John under both theories, John is nevertheless limited to a singular recovery. Since we have found John's claims of fraud against the defendants to have been properly stated and maintained, he may base his recovery on this theory. *See Board of Educ. of McDowell County v.*

*Zando, Martin & Milstead, Inc.*, 182 W.Va. 597, 608, 390 S.E.2d 796, 807 (1990) ("'It is generally recognized that there can be only one recovery of damages for one wrong or injury. Double recovery of damages is not permitted; the law does not permit a double satisfaction for a single injury. A plaintiff may not recover damages twice for the same injury simply because he has two legal theories.'" (quoting Syl. pt. 7, *Harless v. First Nat'l Bank in Fairmont*, 169 W.Va. 673, 289 S.E.2d 692 (1982)) (additional citations omitted)); Syl. pt. 1, in part, *Thornton v. Charleston Area Medical Ctr.*, 158 W.Va. 504, 213 S.E.2d 102 (1975) ("At common law, an injured party may have only one full recovery . . . ."). *Cf.* Syl. pt. 6, *Orr v. Crowder*, 173 W.Va. 335, 315 S.E.2d 593 (1983) ("Where a jury returns a general verdict in a case involving two or more liability issues and its verdict is supported by evidence on at least one issue, the verdict will not be reversed, unless the defendant has requested and been refused the right to have the jury make special findings as to his liability on each of the issues."). Accordingly, we need not address further the defendants' liability for tortiously interfering with John's parental relationship with his son, and we do not disturb that portion of the circuit court's order.[52]

### C.

#### *Jury Instructions*

■ We next are asked to determine whether the trial court's decision to grant and to refuse certain jury instructions was proper in this case. First and foremost, we emphasize that, "[a]s a general rule, objections to a trial judge's charge must be clear and explicit enough to tell the trial judge what the parties want done to correct the alleged error." *Skaggs v. Elk Run Coal Co., Inc.*, 198 W.Va. 51, 70, 479 S.E.2d 561, 580 (1996). This requirement of a "clear and explicit" objection is echoed by Rule 51 of the

---

grandparents); *Silcott v. Oglesby*, 721 S.W.2d 290 (Tex.1986) (seeking to recover damages for tortious interference from maternal grandfather).

**52.** As with the foregoing assignment of error, our review of this issue is necessarily limited to determining whether John adequately stated a

claim for tortious interference with his parental relationship with Baby Boy Conaty upon which relief can be granted. Because the parties do not challenge on appeal the sufficiency of the evidence supporting this claim, our inquiry ends here. *See supra* note 38.

West Virginia Rules of Civil Procedure, which provides, in pertinent part: "[n]o party may assign as error the giving or the refusal to give an instruction unless he objects thereto before the arguments to the jury are begun, stating distinctly, as to any given instruction, the matter to which he objects and the grounds of his objection[.]"

Once a party's challenge to an objectionable jury instruction is properly before this Court, we conduct a more thorough inquiry to ascertain the degree of prejudice, if any, suffered by the objecting party. In Syllabus point 4 of *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995), we enunciated an abuse of discretion standard to review such challenges:

A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not mislead [sic] by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.

*See also* Syl. pt. 6, *Tennant v. Marion Health Care Found., Inc.*, 194 W.Va. 97, 459 S.E.2d 374 (1995) ("The formulation of jury instructions is within the broad discretion of a circuit court, and a circuit court's giving of an instruction is reviewed under an abuse of discretion standard. A verdict should not be disturbed based on the formulation of the language of the jury instructions so long as the instructions given as a whole are accurate and fair to both parties."); Syl. pt. 2, *Roberts v. Stevens Clinic Hosp., Inc.*, 176 W.Va. 492, 345 S.E.2d 791 (1986) (" 'Instructions must be read as a whole, and if, when so read, it is apparent they could not have misled the jury, the verdict will not be disturbed, through [sic] one of said instructions which is not a binding instruction may have been susceptible of a doubtful construction while standing alone.' Syl. Pt. 3, *Lambert v. Great Atlantic & Pacific Tea Company[, Inc.]*, 155 W.Va. 397, 184 S.E.2d 118 (1971)."). Pursuant to this deferential approach, "[w]e will reverse only if the instructions are incorrect as a matter of law or capable of confusing and thereby misleading the jury." *Guthrie*, 194 W.Va. at 672, 461 S.E.2d at 178. Accordingly, where the party challenging the giving of a jury instruction properly objected to the instruction during the trial court proceedings, and where we determine, upon a review of the trial court's decision to grant the challenged instruction, that the trial court did not abuse its discretion in permitting the instruction, the inquiry ends here, and the party's objection to the challenged instruction must fail.

Where, however, the error complained of involves a trial court's refusal to give a particular requested instruction, we "will ... presume[ ] that [the] trial court acted correctly ... unless it appears from the record in the case ... that the instructions refused were correct and should have been given." *Coleman v. Sopher*, 201 W.Va. 588, 602, 499 S.E.2d 592, 606 (1997) (internal quotations and citations omitted). "As a general rule, the refusal to give a requested instruction is reviewed for an abuse of discretion." Syl. pt. 1, in part, *State v. Hinkle*, 200 W.Va. 280, 489 S.E.2d 257 (1996).

If we observe that the complaining party objected to the instruction at trial but the trial court abused its discretion in granting the instruction, we proceed to a harmless error analysis. "Harmless error", as described by Rule 61 of the West Virginia Rules of Civil Procedure, contemplates that:

no error or defect in any ruling ... or in anything done ... by the court ... is ground [sic] for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding

which does not affect the substantial rights of the parties.

Similarly, in *Skaggs*, 198 W.Va. at 70–71, 479 S.E.2d at 580–81, we "direct[ed] reviewing judges to inquire, when determining whether an alleged error is harmless, whether they are in 'grave doubt about the likely effect of an error on the jury's verdict,' *O'Neal* [*v. McAninch*], 513 U.S. [432,] 435, 115 S.Ct. [992,] 994, 130 L.Ed.2d [947,] 951 [ (1995) ]; if a court does have grave doubt, then the error is harmful." Thus, if the contested instruction does not affect the complaining party's substantial rights, any alleged error is harmless, and the challenge to the trial court's jury instruction must fail. *See Tennant*, 194 W.Va. at 111, 459 S.E.2d at 388 ("Under West Virginia law, when substantial rights are not affected, reversal is not appropriate. A party is entitled to a new trial only if there is a reasonable probability that the jury's verdict was affected or influenced by trial error."). By contrast, if the contested instruction affects the substantial rights of the party opposing the instruction, or if the reviewing court has "grave doubt" about the prejudicial effect of the challenged instruction on the jury's verdict, the trial court's decision to give the instruction constitutes reversible harmful error. *Cf.* Syl. pt. 5, *Wheeler v. Murphy*, 192 W.Va. 325, 452 S.E.2d 416 (1994) ("'"An erroneous instruction is presumed to be prejudicial and warrants a new trial unless it appears that the complaining party was not prejudiced by such instruction." [Citations omitted.]' Syllabus Point 6, *Ratlief v. Yokum*, 167 W.Va. 779, 280 S.E.2d 584 (1981).").

With respect to an erroneous decision by a trial court to refuse to give a particular instruction, we have established specific guidelines to be used in determining whether such a ruling constitutes reversible harmful error.

"A trial court's refusal to give a requested instruction is reversible error only if: (1) the instruction is a correct statement of the law; (2) it is not substantially covered in the charge actually given to the jury; and (3) it concerns an important point in the trial so that the failure to give it seriously impairs a defendant's ability to effectively present a given defense."

*State v. Wade*, 200 W.Va. 637, 646, 490 S.E.2d 724, 733 (quoting Syl. pt. 11, *State v. Derr*, 192 W.Va. 165, 451 S.E.2d 731 (1994)), *cert. denied*, —— U.S. ——, 118 S.Ct. 576, 139 L.Ed.2d 415 (1997).

■ Finally, where the party objecting to an instruction on appeal challenges the legal sufficiency of the instruction as opposed to the actual giving of, or the refusal to give, the instruction, we employ a *de novo* standard of review. *See, e.g,* Syl. pt. 1, in part, *State v. Hinkle*, 200 W.Va. 280, 489 S.E.2d 257 ("[T]he question of whether a jury was properly instructed is a question of law, and the review is *de novo*."). *See also State v. McGuire*, 200 W.Va. 823, 828, 490 S.E.2d 912, 917 (1997) ("Our review of the legal correctness of a jury instruction . . . is performed de novo[.]" (footnote omitted)); *B.F. Specialty Co. v. Charles M. Sledd Co.*, 197 W.Va. 463, 466, 475 S.E.2d 555, 558 (1996) ("Whether an instruction is legally correct is a question of law [sic] and our review is *de novo*. *State v. Guthrie*, 194 W.Va. 657, 671 n. 12, 461 S.E.2d 163, 177 n. 12 (1995).").

Applying the above-described standards to the case presently before us, we now proceed to evaluate, in turn, the defendants' challenges to the following jury instructions given or refused by the trial court in the proceedings below: (1) the validity and effect of the *ex parte* temporary injunction, issued in the inverse paternity proceeding ("West Virginia case 1"), which enjoined Anne from placing her child for adoption until the child's paternity had been established; (2) the applicability of the Interstate Compact for the Placement of Children and the Uniform Child Custody and Jurisdiction Act; (3) the existence of a parent's right to the custody of his/her child; (4) the effect of the defendants' actions on John's rights to due process and equal protection of the law; and (5) the consideration of contempt of court orders against defendants Anne and Dr. and Mrs. Conaty and of alleged violations of legal ethics rules by defendants Brian and Leavitt.

*1. Validity and Effect of Ex Parte Temporary Injunction*

■ The defendants first complain that the circuit court erred by giving and refusing

to give certain instructions pertaining to the *ex parte* temporary injunction order obtained by John in his inverse paternity action. In early June, 1991, John filed a petition in the circuit court of Cabell County seeking a conclusive determination of whether or not he was the father of Anne's then-unborn child. In conjunction with this paternity petition, John requested injunctive relief including:

1. An Order prohibiting [Anne] from consenting to an adoption of her unborn child until the issue of [John's] paternity of said child has been determined;

2. An Order compelling [Anne] to advise [John] of her whereabouts and to provide him with updated information regarding the condition of the unborn child; and

3. An Order compelling [Anne] to advise [John] of the impending birth of the child reasonably in advance of the delivery of said child.

Following a hearing on John's petition requesting, in part, injunctive relief, the circuit court entered an *ex parte* temporary injunction on June 26, 1991, "prohibiting [Anne] from placing her unborn child for adoption by anyone through any agency, church, group, attorney, or private household until the paternity of [John] can be established or refuted." The court further ordered John "to provide notice to [Anne] of this Injunction," presumably by publication.[53]

During the proceedings underlying the instant appeal, the trial court evaluated evidence pertaining to the *ex parte* temporary injunction entered in John's previous inverse paternity proceeding. The court then advised the jury, over the defendants' objection: "You are instructed in this case that the injunction obtained by John Kessel on June 26, 1991, was not void." Plaintiff's Instruction No. 38(a) (as amended). Additionally, the court instructed the jury, over the objection of the defendants, that:

When a Court has jurisdiction in the sense of power to decide whether an injunction or other writ shall be awarded, the party against whom it issues is bound to obey it, although the awarding of it may have been erroneous, and, in that sense, improper and improvident, and it may operate unreasonably and unjustly; he must obey it until vacated or dissolved. Even though an injunction may have been erroneously granted, unless it is absolutely void, it is the duty of the parties enjoined to obey it scrupulously, and they will be held to a strict observance of it.

Plaintiff's Instruction No. 38 (as amended). The court thereafter refused to give two instructions proffered by the defendants pertaining to the effect of the *ex parte* temporary injunction. Defendants' Instruction Number 3 would have provided: "You are instructed that Anne Conaty did not violate the injunction issued by the Circuit Court of Cabell County, West Virginia, on June 26, 1991, because the Circuit Court of Cabell County was without jurisdiction to prevent her from placing her child for adoption."[54] Similarly, Defendants' Instruction Number 46 would have directed: "You are instructed that the injunction issued by the Circuit Court was of no effect because no bond had been given and because the Judge made no finding that a bond was not required."[55] From these rulings of the circuit court, the defendants appeal to this Court.

---

**53.** It is unclear whether the circuit court definitely intended John to provide Anne with notice of the injunction order by publication or whether the court anticipated notice by some other means. In this regard the court directed simply that: "[John] is ORDERED to effect service upon [Anne] of the Petition to Establish Paternity and For Injunctive Relief by publication and to provide notice to [Anne] of this Injunction."

**54.** While the defendants did not specifically use the word "object" in opposing the circuit court's decision to refuse this instruction, they did present an argument to the court in support of their position that the instruction should have been granted.

**55.** The record does not reflect an objection, either general or specific, by the defendants with respect to the circuit court's decision to refuse Defendants' Instruction Number 46. During the rendering of its decision in this regard, the court stated: "The Court is going it [sic] refuse 46.... The Court is going to refuse that instruction based upon the same arguments the defense made previously and for the reason that the Court has made previously." The record does not reflect any verbal response by the defendants to this ruling.

On appeal, the defendants primarily challenge the trial court's ruling as to the validity of the *ex parte* temporary injunction entered during John's inverse paternity action. As a result of this ruling, the defendants complain that certain instructions granted and refused by the court were erroneous as they perpetuated the trial court's initial error in refusing to find that the injunction was void. They first challenge as improper the jurisdiction of the Circuit Court of Cabell County to enjoin acts occurring outside of its territorial jurisdiction. At the time the *ex parte* temporary injunction was issued by the circuit court, John averred that Anne had removed herself from her previous residence in Huntington, West Virginia, and that he did not know her subsequent whereabouts. Thus, the defendants assert, it may be inferred that John knew that any prospective adoptive placement of the parties' child would occur outside of Cabell County, West Virginia.

The defendants then argue that by issuing the *ex parte* temporary injunction preventing Anne from placing the parties' child for adoption, the circuit court exceeded its territorial jurisdiction in direct contravention of West Virginia statutory law. *Citing* W. Va.Code § 53–5–3 (1923) (Repl.Vol.1994) ("Jurisdiction of a bill for an injunction to any judgment, act or proceeding shall, unless it be otherwise specially provided, be in the circuit court of the county in which the judgment is rendered, or the act or proceeding is to be done, or is doing, or is apprehended, and the same may be granted to a judgment of a justice in like manner and with like effect as to other judgments."). *See also* Syl. pt. 2, *Meadows ex rel. Professional Employees of West Virginia Educ. Ass'n v. Hey*, 184 W.Va. 75, 399 S.E.2d 657 (1990) ("Under W. Va. Code § 53–5–3 (1981), the circuit court of one county does not have the authority to enjoin the acts of citizens occurring in other counties, except where the judge of the other county is interested in the proceeding and unable to act."). Consequently, the defendants maintain, because the circuit court did not have jurisdiction to enter the injunction, it was void.

The defendants next contend that the *ex parte* temporary injunction is without legal effect because John did not post an injunctive bond with the circuit court and the court did not specifically waive this requirement. In support of this contention, the defendants cite W. Va.Code § 53–5–9 (1923) (Repl.Vol. 1994):

> An injunction ... shall not take effect until bond be given in such penalty as the court or judge awarding it may direct, with condition to pay the judgment or decree (proceedings on which are enjoined) and all such costs as may be awarded against the party obtaining the injunction, and also such damages as shall be incurred or sustained by the person enjoined, in case the injunction be dissolved, and with a further condition, if a forthcoming bond has been given under such judgment or decree, to indemnify and save harmless the sureties in such forthcoming bond and their representatives against all lost [sic] or damages in consequence of such suretyship; or, if the injunction be not to proceedings on a judgment or decree, with such condition as such court or judge may prescribe.

The defendants further bolster their argument by citing this Court's holding interpreting the effect of this statutory prerequisite to the effectiveness of an injunction: "[a]n order of injunction is of no legal effect under section 10, chapter 133, Code [W. Va.Code § 53–5–9], unless the court requires a bond, or recites in the order that no bond is required for good cause, or unless the movant is a personal representative." Syl. pt. 4, *Meyers v. Washington Heights Land Co.*, 107 W.Va. 632, 149 S.E. 819 (1929). In explaining this holding, the Court in *Meyers* stated:

> The intent and purpose of the statute is manifest, namely, that he who invokes the injunctive process of the court must be [sic] proper bond guarantee to make good to any person whose rights are prejudicially affected by such injunction all damages and injuries thus occasioned to him.... If there was reason [for excusing the enjoining party from posting the statutorily required bond], it should have been recited in the order. Again we say courts of record must speak by their records. The court's record containing no reason why

the injunction should have been issued without bond, it must be considered that there was no reason. Therefore, the granting of the injunction in such manner was erroneous. Not only that, but the injunction was without binding force. The statute so says. There was therefore no legal or binding injunctive inhibition on the [party sought to be enjoined]. . . .

107 W.Va. at 643–44, 149 S.E. at 823–24. The defendants also suggest that this bond requirement is likewise applicable to temporary injunctions. *Citing* Syl. pt. 2, *Conley v. Brewer,* 85 W.Va. 725, 102 S.E. 607 (1920) ("It is error on decreeing a temporary injunction to make the same effective without requiring of the plaintiff a bond in such penalty as the court may prescribe, conditioned according to law."); *Chesapeake & Ohio R.R. Co. v. Patton,* 5 W.Va. 234 (1872). Therefore, the defendants claim that the *ex parte* temporary injunction had no legal effect as a result of John's failure to post bond and the circuit court's failure to require him to do so or to definitely waive such a requirement.

The defendants additionally urge that Anne cannot be found to have violated the *ex parte* temporary injunction because she did not receive actual notice of the injunctive order until after the enjoined act had occurred. In this vein, the defendants represent that a party must have actual notice of the terms of an injunction before he/she may be charged with its contents: "[w]here a party has actual notice of an order of injunction, although it may not have been yet served, or be defectively served upon him, the order becomes operative on him from that time." Syl. pt. 3, *Wenger v. Fisher,* 55 W.Va. 13, 46 S.E. 695 (1904).

Further, the defendants suggest that the evidence presented at trial failed to establish that Anne had knowledge of the injunction before she placed Baby Boy Conaty for adoption. Anne testified that she did not know of the *ex parte* injunction order until November, 1991, when she returned from England where she had been visiting with her sister since shortly after the birth of the parties' child in July, 1991. Additionally, Anne was never personally served with the injunction order. Nevertheless, the defendants note that the jury affirmatively answered special interrogatories finding that both defendants Anne and Leavitt knew of the injunctive order prior to Baby Boy Conaty's adoptive placement.[56]

Moreover, the defendants complain that Anne cannot be found to have violated the injunctive order because she was not served with the injunction until after the enjoined acts had occurred. While the injunction was entered on June 26, 1991, the defendants claim that service of the injunctive order on Anne was not effective until July 26, 1991, the last date of publication of the injunctive order, or some date thereafter. As Anne had completed all of the pre-adoptive placement paperwork on July 25, 1991, she had effectively already placed Baby Boy Conaty for adoption on July 26, 1991, and her actions in so doing could not then have been enjoined. *Citing* Syl. pt. 4, *Chesapeake & Ohio R.R. Co. v. Patton,* 5 W.Va. 234 ("An injunction should not be granted for an act done and completed, though contrary to law, unless under peculiar circumstances."). Hence, the defendants argue the *ex parte* temporary injunction was unenforceable because Anne did not obtain notice or knowledge of and was not served with the injunction order until after she had completed the prohibited acts.

John replies that the *ex parte* temporary injunction was valid and that the trial court

. . . .

---

**56.** The special interrogatories requested the jury to determine:

 1. Do you believe by a preponderance of the evidence that Anne Conaty personally knew when she placed Baby Boy Conaty with the [Canadian adoptive parents] that the Circuit Court of Cabell County had entered an order prohibiting her from placing the child for adoption?

Yes <u>X</u> No ____

 2. Do you believe by a preponderance of the evidence that David Leavitt personally knew when Anne Conaty placed Baby Boy Conaty with the [Canadian adoptive parents] that the Circuit Court of Cabell County had entered an order prohibiting her from placing the child for adoption?

Yes <u>X</u> No ____

did not err in so ruling. He further suggests that the most appropriate redress for the defendants' grievances would have been to appeal the circuit court's injunctive order or to request a writ of prohibition to prevent its enforcement. As the defendants failed to pursue either of these remedies, though, John also responds to their arguments before this Court. He first contests the defendants' position that Anne had performed the acts sought to be enjoined, *i.e.,* adoptive placement of Baby Boy Conaty, prior to the effective date of service of the injunctive order upon her. He suggests that the final paperwork required to be completed by the hospital before the child could be released to the prospective adoptive parents was not finalized until July 26, 1991, the same date that service of the injunctive order on Anne by publication became effective. Thus, John contends that Anne could have prevented the infant's adoptive placement after she received notice, via publication, of the injunction.

John next proposes that the injunction was properly entered pursuant to the circuit court's domestic relations jurisdiction. W. Va.Code § 48A–6–1 (1995) (Repl.Vol.1996) defines the circuit court's domestic relations jurisdiction applicable to the *ex parte* temporary injunction at issue in this assignment of error:

> (b) A "paternity proceeding" is a summary proceeding, equitable in nature and within the domestic relations jurisdiction of the courts, wherein a circuit court . . . may . . . protect the respective personal rights of a child for whom paternity has not been lawfully established, of the mother of the child and of the putative father of the child.

Under this jurisdiction, John claims that the circuit court was empowered to "enjoin the offending party from . . . interfering with the custodial or visitation rights of the other. . . ." W. Va.Code § 48–2–13(a)(11–12) (1993) (Repl.Vol.1996). *See also* W. Va.Code § 48–2–15 (1996) (Repl.Vol.1996).

John also suggests that the circuit court properly exercised personal jurisdiction over Anne by virtue of her status as a domiciliary of Cabell County, West Virginia. *Citing*

*Meadows,* 184 W.Va. 75, 399 S.E.2d 657. West Virginia remained Anne's state of domicile, despite her temporary absence from this region, because she retained her intention to remain in this state for an indefinite period of time. *Citing* Syl. pt. 8, in part, *White v. Manchin,* 173 W.Va. 526, 318 S.E.2d 470 (1984) ("Domicile is a combination of residence (or presence) and an intention of remaining. If domicile has once existed, mere temporary absence will not destroy it, however long continued." (internal quotations and citation omitted)). In support of this theory John asserts that during her sojourn in California and other states, Anne did not change her permanent address to one other than her prior address in Huntington, West Virginia. In addition, Anne's intent to return to this State is exemplified by her request for a leave of absence from her Huntington, West Virginia, teaching position, rather than an unconditional resignation of this post. As both she, and her child, were domiciliaries of West Virginia, the Cabell County Circuit Court properly exercised *in personam* jurisdiction over Anne in issuing the *ex parte* temporary injunction order. *Citing Rogers v. Commonwealth,* 176 Va. 355, 361, 11 S.E.2d 584, 586 (1940) (holding that domicile of nonmarital child is same as that of child's mother).

Finally, John urges that the circuit court possessed jurisdiction to enter injunctive relief by virtue of its authority to determine matters related to the paternity of a child. Specifically, a circuit court obtains personal jurisdiction in paternity matters, in part, pursuant to W. Va.Code § 48A–6–1 (1989) (Cum. Supp.1991):

> (b) A person who has sexual intercourse in this state submits to the jurisdiction of the courts of this state for an action brought under this article with respect to a child who was conceived by that act of intercourse. Service of process may be perfected according to the rules of civil procedure.

Given the circuit court's jurisdiction over Anne's person, John maintains that the court had the power to issue an injunction to restrain Anne from performing certain acts even if such acts were to be performed out-

side of the circuit court's territorial jurisdiction. *Citing United States Fire Ins. Co. v. Fleenor,* 179 Va. 268, 18 S.E.2d 901 (1942). Furthermore, John contends that even if the injunction was later determined to be invalid, Anne was required to abide by its terms until such a judicial determination had been made. *Citing Howat v. Kansas,* 258 U.S. 181, 189–90, 42 S.Ct. 277, 280–81, 66 L.Ed. 550, 559 (1922); *Eastern Assoc. Coal Corp. v. Doe,* 159 W.Va. 200, 206, 220 S.E.2d 672, 677 (1975).

Having scrupulously examined the defendants' arguments pertaining to this particular assignment of error, we initially are inclined to refuse to address their merits based upon the fact that such arguments, though couched in terms of erroneous jury instruction rulings, are, in fact, nothing more than attempts to challenge the validity of the *ex parte* temporary injunction at this late date. Ordinarily, we would reject such an untimely challenge where the record evinces no prior objection to the injunctive order's validity. *See* Syl., *Brast v. Kanawha Oil Co.,* 46 W.Va. 613, 33 S.E. 302 (1899) ("An *ex parte* order granting an injunction is not appealable until after a motion made to vacate or set it aside.").[57] Nevertheless, because we find that a determination of the injunction's validity is an integral and indispensable step in assessing the propriety of the jury instructions granted and refused by the trial court, we will undertake to evaluate, on the merits, the issues presented for consideration.

The defendants first challenge the propriety of the circuit court's instruction advising that the injunction "was not void." *See* Plaintiff's Instruction No. 38(a) (as amended). Typically, a court may issue an injunction to enjoin only those acts occurring within that court's territorial jurisdiction.

W. Va.Code § 53–5–3 (1923) (Repl.Vol.1994) directs that "[j]urisdiction of a bill for an injunction to any judgment, act or proceeding shall, unless it be otherwise specially provided, be in the circuit court of the county in which the judgment is rendered, or the act or proceeding is to be done, or is doing, or is apprehended[.]" *See also* Syl. pt. 1, *Ray v. Hey,* 183 W.Va. 521, 396 S.E.2d 702 (1990) (" 'By section 4, c. 133, Code 1913 (sec.4950) [*W. Va.Code,* 53–5–3 [1931]], jurisdiction to award injunctive process is vested exclusively in the circuit court of the county wherein the act or proceeding sought to be enjoined is to be done, or is doing, or is apprehended, notwithstanding some of the defendants may reside in another county[,] except as provided in sections 6 and 9 of the same chapter (secs.4952, 4955) [*W. Va.Code,* 53–5–4, –7 [1931]], and where a co-ordinate court has jurisdiction on grounds other than the award of such injunction.' Syllabus Point 1, *Wayland Oil & Gas Co. v. Rummel,* 78 W.Va. 196, 88 S.E. 741 (1916).").

However, a well-recognized exception exists to permit courts to enjoin acts occurring outside of their territorial jurisdiction where the injunctive relief is merely ancillary to an underlying proceeding over which the court unquestionably has jurisdiction. In this respect, Syllabus point 3 of *Shobe v. Latimer,* 162 W.Va. 779, 253 S.E.2d 54 (1979), indicates that "W. Va.Code § 53–5–3 has been held to be applicable only where an injunction is the exclusive relief sought, and not where injunctive relief is merely ancillary to the primary claim advanced in the case. *Lewis, Hubbard & Co. v. Pugh,* 115 W.Va. 232, 174 S.E. 880 (1934); *State v. Fredlock,* 52 W.Va. 232, 43 S.E. 153 (1902)." *See also* Syl. pt. 2, *State v. Fredlock,* 52 W.Va. 232, 43 S.E. 153 ("A court

---

57. In addition to finding no record evidence indicating that Anne challenged the validity of the injunctive order in the inverse paternity action by moving the circuit court to vacate or set aside its order, we similarly are unable to locate anything to demonstrate that Anne sought relief from this Court by way of prohibition or appeal. Although we reluctantly have determined the necessity of addressing the injunction's validity in this particular case, we recapitulate our prior admonitions suggesting to enjoined parties that they may petition this Court for a writ of prohibition in order

to obtain relief from the enforcement of an injunctive order. *See, e.g.,* Syl. pt. 3, in part, *State ex rel. Glass Bottle Blowers Ass'n of United States & Canada v. Silver,* 151 W.Va. 749, 155 S.E.2d 564 (1967) (holding, in prohibition proceeding seeking to prevent enforcement of preliminary injunction, " '[a]s a general rule any person who will be affected or injured by the proceeding which he seeks to prohibit is entitled to apply for a writ of prohibition' " (quoting Syl. pt. 6, in part, *State ex rel. Linger v. County Court,* 150 W.Va. 207, 144 S.E.2d 689 (1965))).

having jurisdiction *in personam,* may require the defendant to do, or refrain from doing, beyond its territorial jurisdiction, anything which it has power to require him to do or omit within the limits of its territory."). Interpreting the language of the *Shobe* holding, we discern that "exclusive" " 'is synonymous with the words "only" and "sole[ ]",' " 21A Michie's Jur. *Words and Phrases* 159 (1987) (quoting *United Fuel Gas Co. v. Morley Oil & Gas Co.,* 102 W.Va. 374, 376, 135 S.E. 399, 400 (1926)), and that "ancillary" signifies "a proceeding attendant upon or which aids another proceeding considered as principal," Black's Law Dictionary 85 (6th ed.1990).

Looking to the petition filed in John's inverse paternity proceeding, we find that John requested both a determination of paternity and injunctive relief in aid of obtaining, or ancillary to, such a paternity determination. Under the applicable statutory law, John was entitled to petition the court for an ascertainment of his fatherhood of Anne's child. *See* W. Va.Code § 48A-6-1(a)(7) (1989) (Cum. Supp.1991) ("(a) A civil action to establish the paternity of a child ... may be instituted, by verified complaint, in the circuit court of the county where the plaintiff, the defendant or the child resides. Such action may be brought by any of the following persons: ... (7) A man purporting to be the father of a child born out-of-wedlock, when there has been no prior judicial determination of paternity."). Likewise, the Circuit Court of Cabell County had express jurisdiction to hear the paternity matter raised by John because John was, at that time, a resident of Cabell County.

With respect to the specific contents of John's inverse paternity petition, it is apparent from the record evidence that he filed his action both to determine whether he was, in fact, the father of Anne's child and to prevent Anne from placing her child for adoption until his paternity had been established or refuted. In this regard he expressed to the circuit court, during the *ex parte* temporary injunction hearing, his desire to obtain a conclusive determination of his paternity or lack thereof. Moreover, one may infer, from reviewing the petition filed by John, that

injunctive relief would have been meaningless without an attendant determination that John was the father of Anne's child. In this manner, if all that John sought and received was the injunctive relief at issue, he would have been powerless to assert his parental and/or custodial rights vis-a-vis the child unless he had been judicially determined to be the child's father. Thus, because the injunction issued by the circuit court was merely ancillary to the primary inverse paternity proceeding, the goal of which was to determine whether John was the father of Anne's child, the court was empowered to enjoin Anne's adoptive placement of Baby Boy Conaty, although the contemplated acts were likely to occur outside of Cabell County, West Virginia.

Additionally, the circuit court was entitled to entertain John's request for injunctive relief and to grant such relief in order to preserve the status quo pending the resolution of the underlying inverse paternity action. We long have recognized the propriety of issuing an injunction to preserve the status quo of pending litigation. *See, e.g.,* Syl. pt. 2, *Powhatan Coal & Coke Co. v. Ritz,* 60 W.Va. 395, 56 S.E. 257 (1906) ("The function of a preliminary injunction, whether it be prohibitory or mandatory, is to preserve the *status quo* until, upon final hearing, the court may grant full relief."), *overruled on other grounds by Eastern Assoc. Coal Corp. v. Doe,* 159 W.Va. 200, 220 S.E.2d 672 (1975). *See also* Syl. pt. 3, *Eastern Assoc. Coal Corp. v. Doe,* 159 W.Va. 200, 220 S.E.2d 672 ("A court may protect its power to determine its own jurisdiction by issuing a temporary injunction to maintain the *status quo* pending an adversary determination of its own jurisdiction."); Syl. pt. 1, in part, *Leslie Co. v. Cosner Coal Co.,* 131 W.Va. 483, 48 S.E.2d 332 (1948) (permitting injunction to be dissolved where no clear showing is made requiring injunctive relief "for the preservation of the *status quo* "). Thus, the circuit court had the authority to issue injunctive relief in John's inverse paternity action in order to preserve, to the extent possible, the status quo until a conclusive determination of John's paternity could be made.[58]

---

**58.** We note that the preservation of the status quo was particularly proper in this case given the

Finally, the circuit court was permitted to issue a temporary injunction on an *ex parte* basis. We specifically have recognized that "[a] circuit court judge may issue a valid injunction on the *ex parte* motion of a litigant." Syl. pt. 1, *Eastern Assoc. Coal Corp. v. Doe,* 159 W.Va. 200, 220 S.E.2d 672. Because of the one-sided nature of the proceedings surrounding such an order and the respect we afford the rights of the adverse party, "[a]n *ex parte* preliminary injunction is an extraordinary remedy which is justified only under extraordinary circumstances." Syl. pt. 1, *Ashland Oil, Inc. v. Kaufman,* 181 W.Va. 728, 384 S.E.2d 173 (1989). When faced with a request for *ex parte* injunctive relief,

> "a court shall grant such an injunction only if it clearly appears from specific facts shown by affidavit or verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before the adverse party or his attorney can be heard in opposition. The applicant's attorney must certify to the court the efforts, if any, which have been made to give the notice and the reasons supporting any claim that notice should not be given."

Syl. pt. 1, in part, *United Mine Workers of Am., Local Union 1938 v. Waters,* 200 W.Va. 289, 489 S.E.2d 266 (1997) (quoting Syl. pt. 3, in part, *Ashland Oil, Inc. v. Kaufman,* 181 W.Va. 728, 384 S.E.2d 173).

An examination of the injunctive order indicates that the circuit court, in granting *ex parte* injunctive relief, properly complied with the prerequisite findings mandated by *United Mine Workers* and *Ashland.* The court specifically found "[t]hat [John], as well as any prospective adopting parents, will be irreparably harmed if the unborn child is placed for adoption without the establishment of [John's] paternity and without [John's] consent," thereby rendering necessary the injunction prohibiting Anne from placing her child for adoption. Furthermore, the transcript of the *ex parte* temporary injunction hearing reflects the attempts made by John's counsel to provide notice to Anne of the paternity petition and injunctive proceedings:

> A. [by John] We tried to serve her brother, Brian,—She lived with her brother Brian on Eleventh Avenue—multiple times and no one was home. We tried to serve her parents in town. No one there.
>
> She told me David Lockwood was her attorney. Also Brian told me David Lockwood was her attorney. I had a former attorney in February who had talked with Mr. Lockwood and said that he was her attorney, but evidently—
>
> Q. [by Court] [Lockwood] represented to the Court yesterday or today that he was not representing her.
>
> A. Exactly.
>
> Q. So, that is why we couldn't let service go through him.
>
> . . . . .
>
> MS. EIFERT [counsel for John]: My office attempted to serve [Anne] two times at her previous residence where she resided with Brian; and, in fact, a person in the neighborhood said Ms. Conaty did not reside there any more. We have since that still attempted to serve it at that residence but Brian has never been there to pick it up.
>
> The week before the hearing we tried serving it Wednesday, Thursday, Friday at the Conaty home on Thirteenth Avenue [sic] and they were not home.
>
> We went to the Circuit Clerk and had it sent by certified mail under Rule 4 and then today is the first time it is in the newspaper by order of publication; and I also, as [John] said, on June the 5th sent a courtesy copy to Dave [Lockwood] because I had understood from John that Dave was her attorney.

Following this exchange, the court specifically found that "I am of the opinion that [John] has used due diligence in order to get personal service upon [Anne]. I don't know what else they could do; and, therefore, the Court feels comfortable in having the ex parte hearing in this matter." Hence, the court recog-

---

competing constitutional rights of Anne, to travel and to make decisions regarding her pregnancy, and John, to establish a parental relationship with his child, implicated therein.

nized the circumstances under which *ex parte* injunctive relief is appropriate and found that such relief was appropriate in the underlying inverse paternity action. In sum, it appears that, on several grounds, the circuit court possessed subject matter jurisdiction to issue the *ex parte* temporary injunction.[59]

■ The Circuit Court of Cabell County also had personal jurisdiction to enjoin Anne from placing her child for adoption. Pursuant to W. Va.Code § 48A–6–1(b) (1989) (Cum.Supp.1991), "[a] person who has sexual intercourse in this state submits to the jurisdiction of the courts of this state for an action brought under this article with respect to a child who was conceived by that act of intercourse." The parties do not dispute that the conception of Baby Boy Conaty occurred anywhere but in the state of West Virginia. Accordingly, it appears that both Anne and John, by their actions, have submitted to personal jurisdiction in West Virginia with respect to all proceedings pertaining to the paternity of Baby Boy Conaty. Since the circuit court granted the *ex parte* temporary injunction incident to the underlying inverse paternity proceeding, the circuit court properly asserted personal jurisdiction to enjoin Anne from placing her child for adoption until the child's paternity had been established.

■ Furthermore, the circuit court was permitted to exercise personal jurisdiction over Anne in relation to issuing the *ex parte* temporary injunction pursuant to the explicit law of injunctions. As we recognized above, a circuit court may enter an *ex parte* temporary injunction where the circumstances warrant such relief. Given the circuit court's authority to issue temporary injunctions *ex parte*, we are compelled to find the court could properly enter an injunction despite Anne's contentions that she did not have prior notice of the injunction hearing and that she was absent from the hearing as a result of this lack of notice. Implicit in the term *"ex parte"* is the recognition that one party seeks judicial relief on his/her own initiative despite the fact that the other party

is not then presently before the court. The very definition of *"ex parte"* commands such an interpretation: " '[e]x parte' is defined as on one side only; by or for one party; done for, in behalf of or on the application of, one party only." 21A Michie's Jur. *Words and Phrases* 64 (Supp.1997) (citing *In re Kaufman,* 187 W.Va. 166, 171 n. 5, 416 S.E.2d 480, 485 n. 5 (1992) (internal quotations and citation omitted)). Therefore, the fact that we have permitted courts to issue injunctive orders *ex parte* implies that we also have approved the entry of such orders despite the adverse party's absence. Reiterating our finding set forth above, because we have determined that the circuit court properly evaluated and applied the factors requisite to issuing *ex parte* injunctive relief, we conclude that the circuit court did not lack personal jurisdiction to enjoin Anne's adoptive placement of her infant son solely because the relief was granted *ex parte* and not in Anne's presence.

Moreover, the statutory provision governing the issuance of injunctions, generally, places the question of whether the party sought to be enjoined should be given notice of the injunction proceedings within the sound discretion of the circuit court.

> [A]ny court or judge *may* require that reasonable notice shall be given to the adverse party, or his attorney-at-law, or in fact, of the time and place of moving for it, before the injunction is awarded, if in the opinion of the court or judge it be proper that such notice should be given.

W. Va.Code § 53–5–8 (1955) (Repl.Vol.1994) (emphasis added). Likewise, this Court has approved the ability of the circuit court to discretionarily provide notice to the adverse party. *See Ashland Oil, Inc. v. Kaufman,* 181 W.Va. at 731 & n. 4, 384 S.E.2d at 176 & n. 4 (reaffirming our prior approval of the discretionary notice provision contained within W. Va.Code § 53–5–8 and reiterating that " 'a circuit judge[,] or judge thereof in vacation, on application for injunction, may exercise a sound discretion in the matter of requiring notice to be given to the adverse

---

**59.** For the reasons stated in Section II.C.2., *infra,* we reject John's contentions that the injunction was proper pursuant to the domestic relations jurisdiction of the circuit court contained in the UCCJA.

**154**

party[,] or his attorney[-]at[-]law or in fact, of the time and place of moving for it before the injunction is awarded' " (quoting Syl. pt. 1, in part, *Kalbitzer v. Goodhue,* 52 W.Va. 435, 44 S.E. 264 (1903))). Thus, it again appears that the circuit court's assertion of jurisdiction over Anne in its issuance of the *ex parte* temporary injunction was appropriate. Based upon our foregoing analysis, we conclude that the Circuit Court of Cabell County had both subject matter and personal jurisdiction to grant the *ex parte* temporary injunction requested by John. As such, we further find that the circuit court, in the trial of John's civil action, did not err in instructing the jury that the injunction order "was not void." [60]

Next, the defendants argue that the circuit court erroneously instructed the jury that an enjoined party must obey an injunction, even if it was erroneously granted, unless the injunction is absolutely void or until it is subsequently vacated or dissolved. *See* Plaintiff's Instruction No. 38 (as amended). As we noted above, the formulation of a trial court's jury charge is within its discretion and, where the instruction given is a correct statement of the law, we are reluctant to find an abuse of the court's discretion. *See, e.g.,* Syl. pt. 4, *State v. Guthrie,* 194 W.Va. 657, 461 S.E.2d 163 (1995). Upon a review of the applicable law, we are convinced that the instruction challenged by the defendants in this instance was, in fact, a correct statement of the applicable law. In Syllabus point 2 of *Eastern Associated Coal Corp. v. Doe,* 159 W.Va. 200, 220 S.E.2d 672, we recognized that "[a] court having jurisdiction of the parties and colorable jurisdiction of the subject matter may issue an injunction which must be obeyed regardless of whether it is ultimately determined to have been erroneously or improvidently awarded." *See also* Syl. pt. 3, *State ex rel. Askin v. Dostert,* 170 W.Va. 562, 295 S.E.2d 271 (1982) ("Where a court has jurisdiction to issue a particular order, the fact that such order is erroneous,

irregular, or is improvidently rendered, does not justify one in disregarding or violating the order, and then citing the court's error as a defense to a charge of contempt. Where, however, the court or judge lacks jurisdiction, or is without power or authority to render the order, refusal to comply with such order may not be punished as contempt."); *State v. Fredlock,* 52 W.Va. 232, 243, 43 S.E. 153, 157 (1902) ("When a court has jurisdiction in the sense of power to decide whether an injunction or other writ shall be awarded, the party against whom it issues is bound to obey it, although the awarding of it may have been erroneous, and, in that sense, improper and improvident, and it may operate unreasonably and unjustly. He must obey it until vacated or dissolved." (citations omitted)).

Reviewing the instruction challenged in this instance by the defendants, we can find no error in the statement of the law or in the circuit court's decision to so instruct the jury. Our examination of this instruction as it was originally tendered to the circuit court further indicates that its basis in law was correct. In support of this instruction, John cites *Doe* and *Fredlock,* both of which we have found to be supportive of the statement contained in the challenged instruction. Therefore, we find that the circuit court did not err in granting this instruction over the defendants' objections.

The defendants' third allegation of error with regard to the injunction instructions concerns the circuit court's refusal to give an instruction proffered by the defendants, directing: "You are instructed that Anne Conaty did not violate the injunction issued by the Circuit Court of Cabell County, West Virginia, on June 26, 1991, because the Circuit Court of Cabell County was without jurisdiction to prevent her from placing her child for adoption." Defendants' Instruction No. 3. In reviewing arguments pertaining to a circuit court's refusal to give a particular jury instruction, "[i]t will be presumed that a trial court acted correctly . . . in refusing to

---

**60.** While we have concluded that the lack of notice to Anne prior to the entry of the injunctive order was not fatal to the order's validity in this case, we caution that this decision is narrowly limited to the precise facts of the case presently before us and based upon the law existing at the time that the injunctive order was issued in June, 1991. Such controversies arising from the granting of injunctive relief today, however, would be governed by the new West Virginia Rules of Civil Procedure, adopted February 19, 1998, and effective April 6, 1998.

give instructions to the jury, unless it appears from the record in the case ... that the instructions refused were correct and should have been given." *Coleman v. Sopher,* 201 W.Va. 588, 602, 499 S.E.2d 592, 606 (1997) (internal quotations and citations omitted). Where the instruction is determined to have been correct such that it should have been given,

> "[a] trial court's refusal to give a requested instruction is reversible error only if: (1) the instruction is a correct statement of the law; (2) it is not substantially covered in the charge actually given to the jury; and (3) it concerns an important point in the trial so that the failure to give it seriously impairs a defendant's ability to effectively present a given defense."

*State v. Wade,* 200 W.Va. 637, 646, 490 S.E.2d 724, 733 (quoting Syl. pt. 11, *State v. Derr,* 192 W.Va. 165, 451 S.E.2d 731 (1994)), *cert. denied,* —— U.S. ——, 118 S.Ct. 576, 139 L.Ed.2d 415 (1997).

Our first inquiry, then, is whether the instruction proffered by the defendants but refused by the circuit court was a correct statement of the applicable law. Although we have determined that the circuit court properly exercised its authority by entering the *ex parte* temporary injunction to prohibit Anne from placing her child for adoption, we are concerned about the subsequent ramifications of this order. Our statutory and jurisprudential law permits a court to assert jurisdiction over a party who is not presently before it, and who may not have received notice of the judicial hearing, for the purpose of entering an injunction to prohibit him/her from conducting him/herself in a particular manner. This assumption of personal jurisdiction is well documented in the law of this State and cannot be disputed.

The problem arises, however, when one attempts to enforce an injunction that has been entered in the aforementioned manner against a party who, even after the entry of the injunction, cannot be personally served with the prohibitory order. In such a case, a court may order service of the injunction order by publication. While the enjoined party would be required to comply with the prohibitory terms of the injunction, it is conceivable that he/she may never have acquired actual notice of its terms. *See* 14A Michie's Jur. *Notice* § 3, at 4–5 (1989) ("Actual notice is actual knowledge, by the party, of the very matter or thing of which he is said to have notice." (footnote omitted)). Though we have held "[w]here a party has actual notice of an order of injunction, although it may not have been yet served, or be defectively served upon him, the order becomes operative on him from that time," Syl. pt. 3, *Wenger v. Fisher,* 55 W.Va. 13, 46 S.E. 695 (1904); Syl. pt. 2, *Osborn v. Glasscock,* 39 W.Va. 749, 20 S.E. 702 (1894) (same), we remain concerned by the potential inequities of this situation.

More simply stated, we are hesitant to require a party to comply with the terms of an injunctive order where it is questionable whether the enjoining court could, within the bounds of due process, compel such compliance. In this regard, we look to W. Va.Code § 61–5–26 (1923) (Repl.Vol.1997), which defines the criminal offense of "contempt of court":

> The courts and the judges thereof may issue attachment for contempt and punish them summarily only in the following cases: ... (d) disobedience to or resistance of any ... person, to any lawful process, judgment, decree or order of the said court.... No court shall impose a fine for contempt, unless the defendant be present in court, or shall have been served with a rule of the court to show cause, on some certain day, and shall have failed to appear and show cause.

*See also* W. Va.Code § 62–6–6 (1965) (Repl. Vol.1997) ("No court shall impose a fine upon a[ny] person, for disobedience of its process or any contempt, unless he be present in a court at the time, or shall have been served with a rule of the court, returnable to a time certain, requiring him to show cause why the fine should not be imposed, and shall have failed to appear and show cause."). *See generally State ex rel. Arnold v. Conley,* 151 W.Va. 584, 587, 153 S.E.2d 681, 683 (1966) (recognizing criminal nature of charge of "contempt of court" (citations omitted)), *overruled on other grounds by State ex rel. Koppers Co., Inc. v. International Union of Oil, Chem. & Atomic Workers,* 171 W.Va. 290,

298 S.E.2d 827 (1982); Syl. pt. 1, *State v. Ralphsnyder*, 34 W.Va. 352, 12 S.E. 721 (1890) (same). Rule 42(b) of the West Virginia Rules of Criminal Procedure further clarifies the manner in which a court should apprise an offending party of a charge of contempt:

> A criminal contempt, except [where summary disposition is permissible], shall be prosecuted on notice. The notice shall state the time and place of hearing, allowing a reasonable time for the preparation of the defense, and shall state the essential facts constituting the criminal contempt charged and describe it as such. The notice shall be given orally by the judge in open court in the presence of the defendant or, on application of the prosecuting attorney or of an attorney appointed by the court for that purpose, by an order to show cause or an order of arrest[.]

Implicit within the procedure designated for charging one with contempt of court is the presence of the offending party before the court or sufficiently within the court's jurisdiction so as to permit him/her to be aware of the court's show cause ruling. Generally stated, a "show cause order" is a "[c]ourt order, decree, execution, etc., to appear as directed, and present to the court such reasons and considerations as one has to offer why a particular order, decree, etc., should not be confirmed, take effect, be executed, or as the case may be." Black's Law Dictionary 1379–80 (6th ed.1990) (citation omitted).

■ Tempered with the delineated procedures for charging one with contempt of court, though, is the overriding consideration, pertaining to all criminal proceedings, of the due process protection afforded by our State Constitution: "No person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers." W. Va. Const. art. 3, § 10. "A fundamental element of 'due process of law' is an opportunity to be heard, ... and an opportunity to be heard ... ' "has little reality or worth unless one is informed that the matter is pending and can choose for himself [or herself] whether to ... contest." ' " *Segal v. Beard*, 181 W.Va. 92, 100, 380 S.E.2d 444, 452 (1989) (quoting *Goss v. Lopez*, 419 U.S. 565, 579, 95 S.Ct. 729, 738, 42 L.Ed.2d 725, 737 (1975) (quoting *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 657, 94 L.Ed. 865, 873 (1950))). Hence, if an adverse party does not receive actual notice of an injunctive order, it is extremely unlikely that he/she would be apprised of the circuit court's subsequent institution of contempt charges arising from his/her violation of the unknown order.[61] Under such circumstances, it remains to be seen whether a court could properly charge such a party with contempt. As this precise issue is not presently before us, we reserve for another day a final determination of this matter.

Considering the above authorities, we conclude that it would be patently unfair to rule that Anne was compelled to comply with the terms of the *ex parte* temporary injunction when a question exists as to whether the circuit court could have sanctioned her noncompliance with its terms. The effect of our ruling, then, is to conclude that while the injunction was validly entered by a court having jurisdiction of both the subject matter

**61.** Our rejection of the propriety of service by publication of an injunctive order should not be misconstrued as indicating any disapproval by this Court with the established procedure of permitting service of a complaint by publication. *See* W. Va. R. Civ. P. Rule 4(e) (describing procedure for constructive service of process, *i.e.*, service by publication). The reason for this distinction is apparent from the purpose of each of these service requirements. When one is attempting to serve an adverse party with a complaint, the notice is calculated to inform that party that a lawsuit has been filed against him/her and that he/she may respond or otherwise appear at some future date to challenge the action. By contrast, notice of an injunction is undoubtedly more crucial as the court, through its injunctive order, seeks to immediately prohibit the enjoined party from doing a specific act or from conducting him/herself in a particular manner, thereby requiring an almost instantaneous affirmative response from the enjoined party. Furthermore, upon receiving actual notice of an injunctive order, an enjoined party may be charged with contempt of court for any violation of the injunction's prohibitory terms. As this comparison indicates, the duties thrust upon an adverse party to an injunction order are simply more burdensome, and immediately so, than those required of a party adverse to a filed complaint.

and the parties, the court lacked the power to enforce its order while Anne was absent from its territorial jurisdiction and John was unable to personally serve her with this decree. As a result, we find that the *ex parte* temporary injunction order may have been *voidable,* but that it was not absolutely *void. See* Black's Law Dictionary 1573 (6th ed. 1990) ("There is this difference between the two words 'void' and 'voidable': *void* in the strict sense means than an instrument or transaction is nugatory and ineffectual so that nothing can cure it; *voidable* exists when an imperfection or defect can be cured by the act or confirmation of him who could take advantage of it."); *id.,* at 1574 (defining "voidable judgment" as "[o]ne apparently valid, but in truth wanting in some material respect" (citation omitted)). *See also* Syl. pt. 4, *Hartwell v. Marquez,* 201 W.Va. 433, 498 S.E.2d 1 (1997) (making *void/voidable* distinction with respect to order of default judgment).

In reaching this result, we note that at least one of our prior decisions facially recognizes the necessity of ensuring that an enjoined party receive actual notice of the conduct that has been judicially proscribed in order to preserve the court's authority to enforce its injunctive order. *See Eastern Assoc. Coal Corp. v. Doe,* 159 W.Va. at 210, 220 S.E.2d at 679 (" 'An injunction duly issuing out of a court of general jurisdiction with

equity powers upon pleadings properly invoking its action, *and served upon persons made parties therein and within the jurisdiction,* must be obeyed by them however erroneous the action of the court may be, even if the error be in the assumption of the validity of a seeming but void law going to the merits of the case. It is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected[.]' " (quoting *Howat v. Kansas,* 258 U.S. 181, 189–90, 42 S.Ct. 277, 280–81, 66 L.Ed. 550, 559 (1922)) (emphasis in original omitted and new emphasis added) (citations omitted)). To the extent that our prior holdings in Syllabus point 3 of *Wenger v. Fisher,* 55 W.Va. 13, 46 S.E. 695, and Syllabus point 2 of *Osborn v. Glasscock,* 39 W.Va. 749, 20 S.E. 702, are inconsistent with the result here obtained, they are expressly disapproved.[62]

■ From the foregoing discussion, then, it appears that the instruction proffered by the defendants was a correct statement of law insofar as "Anne ... did not violate the injunction issued by the Circuit Court of Cabell County" because, until she had personally appeared before the court or had received personal service of the injunction order, she was effectively incapable of violating its provisions due to its unenforceability.

---

**62.** At this juncture we note that the decision rendered upon this particular issue is limited to the facts of the instant appeal. As we explained in note 60, *supra,* the new West Virginia Rules of Civil Procedure would be applicable to a case arising today under the same or similar circumstances. With respect to this particular ruling, it appears that the new Rules provide more guidance as to the import and necessity of service of the injunctive order upon the enjoined party. *Compare* W. Va. R. Civ. P. Rule 65 (Main Vol. 1998) ("The practice respecting preliminary injunctions shall be in accordance with the practice heretofore followed in this State, including the use of a verified complaint or supporting affidavit.") *with* W. Va. R. Civ. P. Rule 65(b) (Supp. May 1998) ("Every temporary restraining order granted without notice shall be ·indorsed with the date and hour of issuance; shall be filed forthwith in the clerk's office and entered of record; shall define the injury and state why it is irreparable and why the order was granted without notice; and shall expire by its terms within such time after entry, not to exceed 10 days, as

the court fixes, unless within the time so fixed the order, for good cause shown, is extended for a like period or unless the party against whom the order is directed consents that it may be extended for a longer period. The reasons for the extension shall be entered of record. In case a temporary restraining order is granted without notice, the motion for a preliminary injunction shall be set down for hearing at the earliest possible time and takes precedence of all matters except older matters of the same character; and when the motion comes on for hearing the party who obtained the temporary restraining order shall proceed with the application for a preliminary injunction and, if the party does not do so, the court shall dissolve the temporary restraining order[.]") *and* W. Va. R. Civ. P. Rule 65(d) (Supp. May 1998) ("Every order granting an injunction and every restraining order ... is binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise.").

The next factor to be determined in assessing whether the circuit court's failure to grant this instruction constitutes reversible error is whether the contents of this instruction were substantially covered in the remainder of the jury charge. A review of the jury instructions given by the circuit court reveals that the jury did not receive an instruction indicating either that Anne had or had not violated the injunction. Thus, the court remained silent as to Anne's compliance, or lack thereof, with the prior injunctive order.

■ Finally, an appellate court reviewing the propriety of a lower court's decision to refuse a particular jury instruction is required to determine whether the subject of the instruction was so important that its omission from the jury charge constitutes reversible harmful error. Under the entire record of the trial court proceedings presented to us for review in this matter, we find that the failure of the circuit court to give the defendants' proffered instruction does not constitute reversible error. In reaching this conclusion, we note that, rather than affirmatively instructing the jury that Anne did or did not violate the injunctive order, the court merely remained silent on this point. Thus, the jury was permitted to determine, for

itself, whether Anne had or had not violated this proscription and to consider such conduct in relation to the remaining evidence indicative of Anne's fraudulent conduct.[63]

Omitting from the evidence presented during the underlying trial all reference to the *ex parte* temporary injunction, the jury reasonably could have found numerous other indicia of fraud upon which to base Anne's liability for this claim.[64] At trial, the evidence showed that John repeatedly had informed Anne that he did not consent to the adoption of their child and that Anne knew of his objections. The evidence also suggested that Anne knew, on July 8, 1991, as reflected by Leavitt's notes from their meeting on that date, that John had filed a civil action in West Virginia pertaining to their then-unborn child. With this background, many of Anne's actions assume new significance when viewed with respect to the allegations of fraud. For example, in direct contravention of John's requests and the circuit court's commands, Anne failed to authorize the release of her California medical records that would have provided John with information pertaining to his child's prospective adoptive parents and the location of their residence. In this regard, Anne did not refuse to release

---

**63.** We limit our discussion of the evidence to John's cause of action alleging fraud as we have determined that Anne cannot be held liable to John for tortious interference in the present case. *See supra* Section II.B.2.

**64.** While we determine, in resolving this issue, that the jury could have based its findings of liability for fraud upon voluminous evidence independent of the injunctive order, we wish to indicate that the jury's consideration of the injunction does not require a reversal of its verdict as it could properly have considered such evidence as indicative of John's efforts to establish a parent-child relationship with his child. In fact, in reaching its decision to specifically inquire of the jury as to the knowledge of defendants Anne and Leavitt of the injunction prior to Baby Boy Conaty's adoptive placement, the circuit court explained, as follows:

As I look at the case, I propose to offer to the jury an interrogatory, and I would like to give it to you and tell you why. I think some of the uniqueness of this case revolve [sic] around the efforts of Dr. Kessel in advance of the placement. Quite frankly, had Dr. Kessel not sought the jurisdiction of the Circuit Court of

Cabell County prior to the placement, I don't think we would be here. Mr. Leavitt indicated to the jury, without objection of any party, that this was the first case of this nature that had ever gone to trial and that every other judge in the country had thrown these cases out. And what I find different about this case is this is a case where you have a proactive plaintiff who sought relief prior to the birth.

For the text of the above-referenced interrogatories, see *supra* note 56.

Furthermore, in responding to these interrogatories, it appears that the jury may have considered whether Anne and Leavitt did, in fact, have knowledge of the injunctive order despite John's inability to personally serve this order upon Anne. We decline to address the effect of these interrogatories upon the jury's finding that Leavitt committed fraudulent and tortious acts as his appeal is not presently before us. *See supra* Section II.A. Nevertheless, for the same reasons relied upon in finding that the record was replete with evidence exclusive of the injunctive order upon which the jury could have based its liability determinations for fraud, we find that the jury's responses to the special interrogatories do not necessitate the reversal of the jury's verdict in this case.

such information on just one occasion. Rather, the record indicates that Anne protested such authorizations on at least three occasions and ultimately complied with the court's directive only on pain of contempt charges. Given the rigid time constraints involved, the jury could have inferred that such refusals were meant to "buy more time" to ensure the success of the Canadian adoption.

The jury also could have discerned Anne's efforts to fraudulently conceal from John information pertaining to their child's post-birth whereabouts from the fact that she used an assumed name when she entered the hospital in preparation for her child's birth. Moreover, trial evidence indicated that Anne did not decide upon this name at the time that she actually entered the hospital, but that she had planned, since at least early July, 1991, to use the fictitious identity. While the jury was left to determine whether Anne, herself, devised this scheme or whether the idea was provided by one of the remaining defendants, and whether she believed such an assumed identity was necessary to protect herself from what she perceived to be threats from John, the jury nevertheless could have concluded that the employment of this alias had the effect of further inhibiting John's efforts to locate his newborn child and to establish a parent-child relationship with him. As the numerous inferences of fraudulent conduct discussed above are by no means exhaustive of the record evidence from which the jury could have charged Anne with fraudulent behavior, it is apparent that the circuit court's refusal of the defendants' instruction did not constitute reversible error.

Lastly, the defendants charge that the circuit court erroneously refused their proffered instruction pertaining to the effect of John's failure to post an injunction bond and the circuit court's failure to require him to do so. *See* Defendants' Instruction No. 46. They contend that the lack of an injunction bond coupled with the absence of specific findings by the circuit court that such security was not required rendered the *ex parte* temporary injunction ineffective. A party may preserve for appellate review his/her objection to a lower court's refusal to give a requested instruction if he/she "objects thereto before the arguments to the jury are begun, stating distinctly, as to any given instruction, the matter to which he objects and the grounds of his objection[.]" W.Va. R.Civ.P. Rule 51, in part. Where a party has properly preserved his/her objection for review by this Court, we consider whether a particular jury instruction refused by the trial court should have been granted by examining whether (1) the instruction correctly states the law; (2) the instruction is substantially covered elsewhere in the jury charge; and (3) the instruction concerns a point so crucial that its omission substantially affects the defendant's ability to effectively present his/her defense. *State v. Wade*, 200 W.Va. at 646, 490 S.E.2d at 733.

Reviewing the record of the proceedings during which this particular instruction was refused, we are unable to locate any distinctly stated objection, or the grounds therefor, with respect to Defendants' Instruction Number 46. Accordingly, our appellate review of this issue is foreclosed. Syl. pt. 1, *Jordan v. Bero*, 158 W.Va. 28, 210 S.E.2d 618 (1974) ("Where an objection is made to an instruction for the first time on appeal and such instruction is not so deficient so as to require invocation of the 'plain error' rule, in consonance with Rule 51, W.Va.R.C.P., this Court will not consider the late objection.").

Nevertheless, even if we address the merits of the defendants' assignment of error on this ground, we determine that the circuit court did not commit reversible harmful error by refusing this particular instruction. It is true that the instruction correctly stated the generally applicable law, that is an injunction is of no effect where an injunction bond has not been posted and where the issuing judge has not made findings to dispense with the bond requirement. In this respect, W.Va.Code § 53–5–9 (1923) (Repl. Vol.1994) specifically mandates:

An injunction (except in the case of any personal representative, or other person from whom, in the opinion of the court or judge awarding the same, it may be improper to require bond) shall not take effect until bond be given in such penalty as

the court or judge awarding it may direct, with condition to pay the judgment or decree (proceedings on which are enjoined) and all such costs as may be awarded against the party obtaining the injunction, and also such damages as shall be incurred or sustained by the person enjoined, in case the injunction be dissolved[.]

Furthermore, this Court has recognized the necessity of an injunctive bond: " '[a]n order of injunction is of no legal effect under ... [Code, 53–5–9], unless the court requires a bond, or recites in the order that no bond is required for good cause, or unless the movant is a personal representative.' Pt. 4 Syl., *Meyers v. [Washington Heights] Land Co.,* 107 W.Va. 632[, 149 S.E. 819 (1929) ]." Syl. pt. 7, *Hall v. McLuckey,* 134 W.Va. 595, 60 S.E.2d 280 (1950).

However, the instruction did not correctly state the law as it pertained to the facts underlying the instant appeal. The phrasing of the instruction, "[y]ou are instructed that the injunction issued by the Circuit Court was of no effect because no bond had been given *and* because the Judge made no finding that a bond was not required" (emphasis added), would seem to indicate that the bond requirement had been completely disregarded by the circuit court issuing the *ex parte* temporary injunction. This is not a correct characterization of the court's resultant ruling. The defendants accurately represent that John was not required to post an injunction bond upon receiving the injunctive relief he had requested. The defendants incorrectly indicate, though, that the circuit court failed to make findings that no bond was required. Both the injunctive order and the transcript of the injunction hearing suggest that the circuit court determined that an injunction bond was not required because good cause existed to dispense with this mandate. In this regard, the circuit court specifically ruled "[t]hat [Anne] will not be harmed by the granting of a Temporary Injunction preventing her from placing the child for adoption prior to the establishment of [John's] paternity."

■ Despite the strict statutory requirement of an injunctive bond, for all intents and purposes the final determination of whether an injunction bond will be required of a certain party in a specific case is dependent upon the prerogative of the enjoining court. Our judicial interpretation of that standard recognizes that there will occasionally be cases in which the facts and circumstances simply do not compel the posting of an injunctive bond, *i.e.,* where "good cause" has been shown. In determining whether a bond should be required in a given case, the enjoining court should consider the reason for requiring the posting of an injunctive bond. "The purpose [of an injunction bond] in all cases is to protect the defendant against loss or damage by reason of the injunction in case the court finally decides that the plaintiff was not entitled to it[.]" 42 Am.Jur.2d *Injunctions* § 315, at 1115 (1969) (footnote omitted). *See Pioneer Co. v. Hutchinson,* 159 W.Va. 276, 290, 220 S.E.2d 894, 903 (1975) ("The purpose of an injunction bond is to require the party initiating the injunctive process to protect persons whose rights are prejudicially affected from loss occasioned by damages or injury."), *overruled, in part, on other grounds by State ex rel. E.D.S. Fed. Corp. v. Ginsberg,* 163 W.Va. 647, 259 S.E.2d 618 (1979); *Meyers v. Washington Heights Land Co.,* 107 W.Va. at 643, 149 S.E. at 823–24 ("The intent and purpose of the statute [W. Va.Code § 53–5–9] is manifest, namely, that he who invokes the injunctive process of the court must be [sic] proper bond guarantee to make good to any person whose rights are prejudicially affected by such injunction all damages and injuries thus occasioned to him."). *See also* Syl. pt. 3, *Glen Jean, Lower Loup & Deepwater R.R. Co. v. Kanawha, Glen Jean & E. R.R. Co.,* 47 W.Va. 725, 35 S.E. 978 (1900) ("Where no bond has been required, damages are not recoverable, unless the injunction was maliciously sued out, without probable cause."). Here, the court determined that Anne would not be harmed by the issuance of the temporary injunction, and thus presumably concluded that if she was not harmed by the injunction's issuance, she likewise would suffer no damages if the injunction ultimately would be found to have been improperly granted. Thus, it seems that, contrary to the defendants' assertions, the circuit court did contemplate whether a bond would be neces-

sary to the injunction's issuance and, finding no harm to the enjoined party, dispensed with this requirement.

Furthermore, it may be argued that the defendants waived any right they had to challenge the absence of an injunctive bond. By not timely raising this issue before the issuing court, they effectively foreclosed their ability to raise this issue in their proffered jury instruction. In Syllabus point 2 of *Chesapeake & Ohio Railroad Co. v. Patton*, 5 W.Va. 234 (1872), we held, in part, that "[a] party ought to be allowed a reasonable time after his attention is called to the defect in the [injunction] bond, by rule or notice, in which to execute a proper bond, and on his failure to do so the injunction ought to be dismissed." Impliedly, then, it would seem that before an enjoined party can obtain relief from an injunction issued without the appropriate bond, he/she must raise the issue to permit the party obtaining the injunction an opportunity to cure the alleged defect. *Glen Jean, Lower Loup & Deepwater R.R. Co. v. Kanawha, Glen Jean & E. R.R. Co.*, 47 W.Va. at 727, 35 S.E. at 978–79 ("It becomes the defendant to an injunction suit to see that a good and sufficient bond is given, and unless he does so, he can recover no damages, in the presence of probable cause, and in the absence of malice."). *See also West Virginia Secondary Sch. Activities Comm'n v. Wagner*, 143 W.Va. 508, 515, 102 S.E.2d 901, 906 (1958) ("If the circuit court had jurisdiction to issue the injunction and the bond is insufficient because the penalty is clearly inadequate, the court *upon proper application* should require the execution of a sufficient bond within a designated period of time and, for failure to comply with that requirement, should and presumably would dissolve the injunction." (emphasis added)).

It is not apparent from the record of this case, though, that the defendants ever complained of this defect to either the circuit court or John, the party obtaining the injunction, so as to permit either or both of them to remedy this perceived error. As the prompt raising of such perceived errors is crucial to ensure that they can be adequately and expeditiously remedied by the appropriate circuit court, the failure of the defendants to timely raise this objection forecloses their ability to rely on this defect by way of their proffered jury instruction. *See, e.g.,* Syl. pt. 1, *Jenkins v. Johnson*, 181 W.Va. 281, 382 S.E.2d 334 (1989) (per curiam) (" 'In the exercise of its inherent power a court of equity may, after the adjournment of the term at which by final decree a permanent preventive injunction was awarded, modify or vacate the injunction, after due notice, by subsequent proceedings in the same suit, whether the injunction was awarded after litigation or by consent of the parties, when it clearly appears that, because of a change in the controlling facts or the relations of the parties or the law upon which the injunction rests, its continuance is unjust or inequitable. [This rule is now embodied in Rule 60(b)(5) of the West Virginia Rules of Civil Procedure.]' Syllabus Point 3, as amended, *Edlis, Inc. v. Miller*, 132 W.Va. 147, 51 S.E.2d 132 (1948)." (brackets in original)). *See also* W.Va.R.Civ.P. Rule 60(b) (requiring party seeking relief from "final judgment, order, or proceeding" to make such motion within a "reasonable time," and, for certain enumerated reasons, within "not more than eight months after the judgment, order, or proceeding was entered or taken"); *Savas v. Savas*, 181 W.Va. 316, 319 n. 2, 382 S.E.2d 510, 513 n. 2 (1989) ("The term 'reasonable time' is not susceptible of a precise definition. This statement is made at 11 C. Wright & A. Miller, [*Federal Practice & Procedure* ] § 2866 at 228–29 [ (1973) ]: ' "What constitutes reasonable time must of necessity depend upon the facts in each individual case." The courts consider whether the party opposing the motion has been prejudiced by the delay in seeking relief and they consider whether the moving party had some good reason for his failure to take appropriate action sooner.' (Footnotes omitted)." (additional citation omitted)). *See generally Page v. Columbia Natural Resources, Inc.*, 198 W.Va. 378, 391–92, 480 S.E.2d 817, 830–31 (1996) (recognizing the purpose of requiring timely objections (to jury instructions) is to permit the circuit court an opportunity to correct alleged errors).

Because the first element of our review for ascertaining whether reversible error resulted from a court's refusal to give a requested

instruction has not been satisfied, *i.e.*, whether the instruction correctly stated the applicable law, we need not further address this matter. Therefore, we find that the circuit court did not err by refusing to give Defendants' Instruction Number 46.

### 2. Applicability of ICPC and UCCJA

The defendants next argue that the circuit court erred by granting John's instructions reciting the language of the Interstate Compact on the Placement of Children [hereinafter ICPC] and the Uniform Child Custody Jurisdiction Act [hereinafter UCCJA], and by informing the jury that the ICPC applied to the underlying Canadian adoption proceedings. We will address each of these issues in turn.

#### a. Interstate Compact on the Placement of Children (ICPC)

■ The defendants first complain that the circuit court erroneously determined that the ICPC [65] applied to the adoption proceedings involving Baby Boy Conaty. Prior to the underlying trial in this matter, the circuit court, during a pre-trial hearing, determined that the ICPC "is designed for the protection of children who are placed across state lines for adoption. [In addition, t]he Act establishes orderly procedures for the interstate placement of children and fixes responsibility for those involved in the placing of the child." More specifically, subsection (a) of Article III of the compact provides:

> No sending agency shall send [or] bring ... into any other party state any child ... as a preliminary to a possible adoption

unless the sending agency shall comply with each and every requirement set forth in this article and with the applicable laws of the receiving state governing the placement of children therein.

W.Va.Code § 49–2A–1, art. III(a) (1975) (Repl.Vol.1996). Interpreting this section, the circuit court noted that the definition of a "sending agency" [66] includes a person, and therefore Anne could be considered a "sending agency" under the ICPC.

Finding that the Circuit Court of Cabell County had acquired jurisdiction of the parties' child by virtue of John's inverse paternity proceeding, the circuit court suggested

> [a] reasonable inference from the evidence is that Anne Conaty and Mr. Leavitt knew of Dr. Kessel's claim and knew of the acts of the West Virginia court, yet placed the child with the [adoptive parents] in Alberta, Canada, at least in part because the province of Alberta has not adopted the I.C.P.C.[67]

The court further concluded that "when Anne Conaty left West Virginia in January of 1991, she was at that time at least contemplating adoption and this had in fact been discussed." Construing the above-stated ICPC provisions in conjunction with its interpretation of the pertinent facts, the circuit court found

> where an expectant mother crosses a state line as a part of a placement plan and arrangement for adoption, the transaction should be viewed as an interstate placement. To hold otherwise would permit expectant mothers to avoid the safeguards

---

**65.** The Interstate Compact on the Placement of Children [hereinafter ICPC], codified at W. Va. Code §§ 49–2A–1 to –2 (1975) (Repl.Vol.1996), provides a procedure to be followed in the interstate adoption of children. Generally, the ICPC requires a "sending agency," which may be a state, agency, or individual, to complete preadoptive placement forms which are submitted to the compact administrators in both the "sending state" and the "receiving state". The intent of this procedure is to ensure that children placed for adoption in a jurisdiction other than their home state will receive the benefit of child welfare laws in the adopting state and that they will be placed into suitable adoptive environments. *See* W. Va.Code § 49–2A–1, art. I (reciting purposes of ICPC).

**66.** The ICPC defines a "sending agency" as "a party state, officer or employee thereof; a subdivision of a party state, or officer or employee thereof; a court of a party state; a person, corporation, association, charitable agency or other entity which sends, brings, or causes to be sent or brought any child to another party state." W. Va.Code § 49–2A–1, art. II(b).

**67.** However, the court did recognize that Leavitt had filed certain ICPC documents with the California authorities in June, 1991, with respect to the first attempted placement of Baby Boy Conaty involving the Oregon family.

of the I.C.P.C. to children by mechanically manipulating the point of delivery.

Article 10 of the I.C.P.C. directs that the compact be ... "liberally construed to effectuate its purposes".... And that purpose is to protect children, not to protect the rights of parents. The I.C.P.C. is not to protect John Kessel's rights, but nor is it to be construed to permit Anne Conaty to avoid the protections of her child by simply going to California with the intent to avoid its application. Therefore, as a matter of law, this Court finds the West Virginia Code Chapter 48, Article 2A, Section 1 applies to the facts of this case and more particularly to the placement of the baby boy Conaty born on July 24, 1991 in Cedars Sinai Hospital in Los Angeles, California, to Anne Conaty.

Reaching this conclusion, the court further revealed, during its examination of the proffered jury instructions, that its decision was based, in part, on Secretariat Opinion 49, rendered June 30, 1986,[68] by the Secretariat of the ICPC.[69] The circuit court reaffirmed its earlier decision to find the ICPC applicable to the adoption of Baby Boy Conaty and instructed the jury, over the defendants' objection, that:

the Court has ruled that the West Virginia ICPC applies to the placement of the the the [sic] child born to Anne Conaty and John Kessel on July 24, 1991. Consequently,

the parties had a duty to comply with the requirements of West Virginia ICPC and the reciprocal California statute.

Plaintiff's Instruction Number 58(a) (as amended). The circuit court also granted, as amended, Plaintiff's Instructions Numbers 58 and 59 which quoted, practically *verbatim*, the language of the California and West Virginia ICPC provisions,[70] and to which the defendants objected.

On appeal to this Court, the defendants contend that the ICPC instructions given by the trial court were erroneous. First, they complain that the court's decision to give these instructions may have suggested to the jury that the adoption procedures for the Canadian adoption of Baby Boy Conaty had not been complied with even though Canada is not a member of the ICPC and despite the finalization of the adoption by the Alberta court. Next, the defendants indicate that no other state supreme court has found the ICPC to be applicable to the situation involved in this case: a mother from State A travels to State B where she delivers her child and places him/her for adoption with adoptive parents in State B. In support of their position, they cite *Yopp v. Batt*, 237 Neb. 779, 467 N.W.2d 868 (1991). The Nebraska Supreme Court ruled, in *Yopp*, that under the scenario described above, because the child was born and placed for adoption in State B and because the child had never

**68.** This opinion addressed the question of whether "a birthmother who comes to State A from another state in order to give birth and then places her child with a State A couple [can] thereby avoid application of [the] Interstate Compact on the Placement of Children":

Where the expectant mother crosses a state line as part of the placement plan and arrangement, the transaction should be viewed as an interstate placement. In enacting the Compact, the intent of the state legislatures was not to make the protections of placements depend on mechanical manipulation of the delivery point. Such logistic calculations are nothing more than subterfuges and studied efforts to avoid the inte[n]ded and normal consequences of the law. Article X of the ICPC directs that the Compact be "liberally construed to effectuate its purposes." As set forth in Article I and evidenced in the entire pattern of the procedures and requirements specified throughout the Compact, the emphasis is on the interstate character of the arrangements. If the arrange-

ment process is interstate, placement is interstate. The definition of "placement" in Article II also supports this interpretation.
*Reprinted in* American Public Welfare Association, I Compact Administrator's Manual 3.105–3.107 (n.d.).

**69.** The Office of the Secretariat is the governing body which oversees the administration of the ICPC in the various member states throughout the United States and renders advisory opinions as to the application and effect of the Compact's provisions.

**70.** The California version of the ICPC in effect at the time of the 1991 adoption of Baby Boy Conaty is contained in Cal. Family Code §§ 264 to 274 (1974) (Family Code Appendix to Main Vol.1994) [current Cal. Family Code §§ 7900 to 7910 (1992) (Main Vol.1994)]. West Virginia's ICPC, which is virtually identical to that of California, is located in W. Va.Code §§ 49–2A–1 to –2 (1975) (Repl.Vol.1996).

traveled to or become a resident of State A after its birth, the ICPC did not apply because the placement was not considered interstate in nature. *Id.,* 237 Neb. at 792, 467 N.W.2d at 878.

Finally, construing the precise language of the ICPC provisions, the defendants maintain that they simply do not apply to the adoptive placement at issue in this case. First, the word "child" is not defined as including unborn children. *Citing* W. Va. Code § 49–2A–1, art. II(a) (" 'Child' means a person who, by reason of minority is legally subject to parental, guardianship or similar control."). Furthermore, the definitions of "sending agency" and "receiving state" specifically designate their applicability in terms of the sending or receiving of a "child".[71] Construing the circuit court's ruling, the defendants submit that the effect of such widespread applicability of the ICPC could conceivably render every state to or through which a pregnant woman travels a potential receiving state pursuant to the ICPC. They also indicate that the result obtained under the circuit court's decision creates an impossible legal fiction: Anne, as a sending agency, placed her unborn child into California, with herself, until the child was born after which she placed her child for adoption into Canada. The ICPC precisely excludes from its application a child's placement by his/her parent with a relative or other family member. *Citing* W. Va.Code § 49–2A–1, art. VIII(a) ("This compact shall not apply to: (a) The sending or bringing of a child into a receiving state by his parent, stepparent, grandparent, adult brother or sister, adult uncle or aunt, or his guardian and leaving the child with any such relative or nonagency guardian in the receiving state.").

John disputes the defendants' interpretation of the ICPC as being inapplicable to Baby Boy Conaty's adoption proceedings. He first asserts that whether the Canadian court upheld the adoption of Baby Boy Conaty is irrelevant with respect to whether the provisions of the ICPC were violated in the underlying adoption proceedings. Moreover, John distinguishes the case cited by the defendants in support of their position, *Yopp v. Batt,* indicating that the facts of *Yopp* did not involve the rights of the child's biological father or suggest any attempt by the child's biological mother to traverse state lines in an attempt to avoid compliance with the procedures mandated by the ICPC.

John further replies that the circuit court correctly determined that Anne was a sending agency under the ICPC as other states' courts have found that a parent can be a sending agency within the ICPC's definition of that term. *Citing J.D.S. v. Franks,* 182 Ariz. 81, 893 P.2d 732 (1995); *In re Adoption No. 10087,* 324 Md. 394, 597 A.2d 456 (1991). Finally, relying upon the Secretariat Opinion upon which the circuit court based its decision, John contends that Anne should have filed the appropriate documentation with the West Virginia ICPC compact administrator. In this regard, John proposes that Anne, as a sending agency whose domicile was in West Virginia, should have filed the ICPC forms in West Virginia and that such forms should have been sent to California, the receiving state.

Typically, when we review a party's challenge to a particular instruction given by a trial court, we substantially defer to the court's discretion to so instruct the jury and reverse only if the circuit court has abused its discretion in such a manner as to constitute reversible harmful error. Evaluating the circuit court's ruling and the parties' arguments, we note that all participants examining the applicability of the ICPC to the Canadian adoption of Baby Boy Conaty have focused primarily upon the application of the statutory language to the facts and circumstances underlying this controversy. We find, however, that the better approach to determining whether the ICPC governs the adoption at issue involves looking first to the precise language of the statute to ascertain whether the drafters, in crafting these proce-

---

**71.** *See supra* note 66 for the definition of "sending agency". The ICPC interprets the term "receiving state" as "the state to which a child is sent, brought, or caused to be sent or brought, whether by public authorities or private persons or agencies, and whether for placement with state or local public authorities or for placement with private agencies or persons." W. Va.Code § 49–2A–1, art. II(c).

dures, envisioned the situation with which we are now faced.

Reading the various provisions of the ICPC discussed by the parties and the circuit court, we note one common similarity: these provisions, in the main, refer to "party states." For example, Article I, setting forth the compact's purpose, specifically provides, "It is the purpose and policy of the *party states* to cooperate with each other in the interstate placement of children...." W. Va.Code § 49–2A–1, art. I (emphasis added). Likewise, the directives for effectuating a proper placement under the compact contemplate transportation of a child from one party state and his/her placement into another party state:

> No sending agency shall send, bring, or cause to be sent or brought into *any other party state* any child for placement in foster care or as a preliminary to a possible adoption unless the sending agency shall comply with each and every requirement set forth in this article and with the applicable laws of the receiving state governing the placement of children therein.

W. Va.Code § 49–2A–1, art. III(a) (emphasis added). Moreover, though not cited by the parties or the court, Article X, which discusses the manner of construing the compact, requires such construction to be consistent with the constitutions of the individual party states:

> The provisions of this compact shall be liberally construed to effectuate the purposes thereof. The provisions of this compact shall be severable and if any phrase, clause, sentence or provision of this compact is declared to be contrary to the constitution of *any party state* or of the United States or the applicability thereof to any government, agency, person or circumstance is held invalid, the validity of the remainder of this compact and the applicability thereof to any government, agency, person or circumstance shall not be affected thereby. If this compact shall be held contrary to the constitution of *any state party thereto*, the compact shall remain in full force and effect as to the remaining states and in full force and ef-

fect as to the state affected as to all severable matters.

W. Va.Code § 49–2A–1, art. X (emphasis added).

█ From this common thread, we ascertain that the drafters of the ICPC specifically intended the compact to govern adoptive placements involving party states. Perhaps most telling of the drafters' intent in this regard is the statement of enactment introducing the compact's provisions: "The interstate compact on the placement of children is hereby enacted into law and entered into with *all other jurisdictions legally joining therein* in form substantially as follows[.]" W. Va.Code § 49–2A–1 (emphasis added). We frequently have held that

> [w]hen interpreting a statute, " '[t]he primary object in construing a statute is to ascertain and give effect to the intent of the Legislature.' " Syllabus of *Snider v. West Virginia Department of Commerce*, 190 W.Va. 642, 441 S.E.2d 363 (1994), *quoting Smith v. State Workmen's Comp. Com'r*, 159 W.Va. 108, 219 S.E.2d 361 (1975). To determine the true intent of the legislature, courts are to examine the statute in its entirety and not select "any single part, provision, section, sentence, phrase or word." Syllabus Point 3, in part, *Pristavec v. Westfield Ins. Co.*, 184 W.Va. 331, 400 S.E.2d 575 (1990).

Syl. pt. 2, *Mills v. Van Kirk*, 192 W.Va. 695, 453 S.E.2d 678 (1994). *See also* Syl. pt. 4, *State ex rel. Hechler v. Christian Action Network*, 201 W.Va. 71, 491 S.E.2d 618 (1997) (" ' "In ascertaining legislative intent, effect must be given to each part of the statute and to the statute as a whole so as to accomplish the general purpose of the legislation." Syl. Pt. 2, *Smith v. State Workmen's Compensation Commissioner*, 159 W.Va. 108, 219 S.E.2d 361 (1975).' Syl. pt. 3, *State ex rel. Fetters v. Hott*, 173 W.Va. 502, 318 S.E.2d 446 (1984)."). As we have noted, we find the intent of the drafters in composing and the Legislature in adopting the ICPC to be the regulation of adoption proceedings among those jurisdictions which have subscribed to the policies and procedures delineated therein so as to become party states thereto.

■ Having determined the legislative intent to be plain, we next must determine the effect the provisions of the ICPC have on the underlying adoption proceedings. Once we have ascertained a clear and manifest legislative intent, we next proceed to review the language of the statutory enactment. In this regard, " '[a] statutory provision which is clear and unambiguous and plainly expresses the legislative intent will not be interpreted by the courts but will be given full force and effect.' Syl. Pt. 2, *State v. Epperly,* 135 W.Va. 877, 65 S.E.2d 488 (1951)." Syl. pt. 1, *State v. Jarvis,* 199 W.Va. 635, 487 S.E.2d 293 (1997). *See also* Syl. pt. 2, *West Virginia Department of Health and Human Resources ex rel. Wright v. David L.,* 192 W.Va. 663, 453 S.E.2d 646 (1994) (" ' "Courts always endeavor to give effect to the legislative intent, but a statute that is clear and unambiguous will be applied and not construed." Syllabus Point 1, *State v. Elder,* 152 W.Va. 571, 165 S.E.2d 108 (1968).' Syllabus Point 1 of *State v. Boatright,* 184 W.Va. 27, 399 S.E.2d 57 (1990).").

■ Applying the Compact's plain language to the circumstances surrounding Baby Boy Conaty's pre-adoptive placement into Canada, we conclude that the circuit court erred in ruling that the ICPC applied to these proceedings. The plain language of the Compact, as evidenced by the inherent intent, is to govern adoption proceedings between jurisdictions that have specifically and affirmatively adopted and incorporated the provisions of the compact into their own bodies of law. Accordingly, we hold that the Interstate Compact on the Placement of Children (ICPC), set forth in W. Va.Code § 49–2A–1, *et seq.,* does not govern pre-adoptive or adoptive placements into a state or nation which is not a party state to the ICPC.

While it is apparent that the drafters openly contemplated the possibility of Canada becoming a party state under the compact and deliberately facilitated such a result, *see* W. Va.Code § 49–2A–1, art. IX, we can locate no authority to indicate that Canada, as a whole, or Alberta, Canada, in particular, had adopted the provisions of the ICPC at the time of the 1991 adoptive placement.[72] As the Compact clearly regulates adoptive placements involving only party states, the provisions of the ICPC do not govern the Canadian adoption of Baby Boy Conaty.[73]

■ Finding that the instructions rendered by the circuit court pertaining to the applicability and statutory language of the ICPC were erroneous, we next resolve whether such error so prejudiced the defendants as to constitute reversible harmful error. We decide it did not. As the circuit court very astutely noted, the primary purpose of the ICPC is not to provide notice of potential adoption proceedings to biological parents or to protect such parents' rights to

---

**72.** While Canada is not precisely a "state," as we commonly employ this term, such an elementary distinction does not conclusively exclude Canada from becoming a "party state," as contemplated by the ICPC, as the language of the Compact indicates that the drafters specifically intended to permit other jurisdictions, including foreign nations, to adopt and utilize the compact provisions if they so desired. *See* W. Va.Code § 49–2A–1, art. IX ("This compact shall be open to joinder by any state, territory or possession of the United States, the District of Columbia, the Commonwealth of Puerto Rico, and, with the consent of Congress, *the government of Canada or any province thereof.*" (emphasis added)).

**73.** We wish to note that, although we have examined the applicability of the West Virginia ICPC to the Canadian adoption proceedings, we are quite certain that a similar finding of inapplicability would result from a detailed examination of California's ICPC provisions.

In deeming the ICPC to be inapplicable, we also deem it necessary to address the authorities relied upon by the parties and the circuit court in support of their positions on this issue. The defendants rely primarily upon the case of *Yopp · v. Batt,* 237 Neb. 779, 467 N.W.2d 868 (1991), whereas the circuit court and John base their stance upon the June 30, 1986, Secretariat Opinion 49. We find both of these authorities distinguishable from the circumstances of the case *sub judice* in that they both contemplated adoptive placements involving two jurisdictions, each of which had adopted the ICPC. *See, e.g.,* Iowa Code Ann. §§ 232.158 to 232.166 (West 1985) (West Main Vol.1994); Neb.Rev.Stat. § 43–1101 (1974) (Reissue Vol.1993). By contrast, the instant appeal involves a situation wherein one jurisdiction, either West Virginia or California, had enacted the ICPC, but the other jurisdiction participating in the adoptive placement, Alberta, Canada, had not. As such, the holdings of these authorities are not instructive to our resolution of the matter at hand.

establish or maintain relationships with their children. Rather, the main objective of the ICPC is to protect the children involved in multi-jurisdictional adoptive placements to ensure that they will be placed into safe, secure, and suitable adoptive families. To facilitate this goal, the ICPC establishes distinct guidelines to be followed in such interstate placements. While the ICPC may also impliedly protect parents from the wrongful adoption or pre-adoptive placement of their children, it does not specifically enumerate any such rights enjoyed by parents. Thus, the circuit court's erroneous instructions reciting the provisions of the California and West Virginia ICPC enactments and informing the jury as to their applicability to the underlying adoption proceedings do not rise to the level of reversible harmful error. Any inference of the defendants' fraud or tortious conduct affecting John's rights that the jury could have deduced from these instructions would have been slight given the ICPC's primary concern with the welfare and well-being of adopted and pre-adoptive children.

Moreover, even if the jury based its determination of liability for fraud, in part, on these instructions, such reliance does not mandate reversal. Much as we noted with respect to the *ex parte* preliminary injunction, the voluminous record is replete with evidence of fraud, exclusive of these instructions, upon which the jury could have based its liability findings. In addition to the evidence of wrongdoing by defendants Leavitt and Anne discussed above, the evidence indicates the remaining defendants participated in the fraudulent concealment of information pertaining to Baby Boy Conaty's birth and pre-adoptive whereabouts, and that there existed a concerted mass effort to interfere with John's parental rights. Furthermore,

given the extremely lengthy jury charge in this case, we cannot find, nor do we have any reason to believe, that either the circuit court or the jury placed undue emphasis on these particular instructions. Finding no reversible harmful error with respect to the ICPC instructions, we now shift our focus to the defendants' assignment of error regarding the circuit court's UCCJA instructions.

### b. Uniform Child Custody Jurisdiction Act (UCCJA)

■ The defendants also assert that the circuit court should not have permitted the jury to consider portions of the UCCJA [74] as this law is inapplicable to the facts and circumstances of this case. The circuit court based its decision that the UCCJA pertained to Anne's adoptive placement of Baby Boy Conaty into Canada upon W. Va.Code § 48–10–15(a)(2) (1981) (Repl.Vol.1996), which provides "[i]f a court of another state has made a custody decree, a court of this State shall not modify that decree unless ... (2) the court of this State has jurisdiction." Explaining its reasoning, the court stated as follows:

I found that it [the UCCJA] applied because it was in the best interest of the child and the parents, because they had a significant connection with West Virginia and that there was available in West Virginia substantial evidence concerning the child's present or future care, protection, training and personal relationships.

In accord with this ruling, the circuit court granted, as amended, Plaintiff's Instructions Numbers 56 and 57 which quoted extensively from the California and West Virginia enactments of the UCCJA. [75] While the record reflects the defendants' specific objection to

---

**74.** The Uniform Child Custody Jurisdiction Act [hereinafter UCCJA], contained in W. Va.Code §§ 48–10–1 to –26 (1981) (Repl.Vol.1996), has as its primary purpose the efficient resolution of child custody disputes where the involved parties reside in more than one jurisdiction. In this manner, the UCCJA facilitates the decision of child custody matters by the state having the most recent and prolonged contacts with the child; the most complete knowledge of his/her "future care, protection, training and personal relationships"; or the best opportunity to safeguard his/her health or well-being. *See* W. Va.

Code § 48–10–3. *See also* W. Va.Code § 48–10–1 (describing purposes of UCCJA).

**75.** The California version of the UCCJA effective in 1991 is codified in Cal. Family Code §§ 5150 to 5174 (Family Code Appendix to Main Vol. 1994) [current Cal. Family Code §§ 3400 to 3425 (1992) (Main Vol.1994)]. The West Virginia UCCJA, which contains substantially the same statutory language as the California legislation, is located at W. Va.Code §§ 48–10–1 to –26.

certain language in Plaintiff's Instruction Number 56, pertaining to the California UCCJA, the circuit court excised this challenged language from the amended instruction given to the jury. No other objection by the defendants to these two instructions appears on the record of the circuit court's decision to grant the same. The circuit court also granted, over the defendants' specific objection, Plaintiff's Instruction Number 55 (as amended), which defined the term "home state" pursuant to the UCCJA construction thereof and instructed the jury that it could find that either West Virginia or California was the home state of Baby Boy Conaty:

> The Court instructs the jury that for purposes of the UCCJA, a state remains the "home state" [76] of a child for a reasonable period of time even if the child has been concealed in another state by one of the parents.

> Accordingly, if you find that John Kessel and Anne Conaty had significant ties with the State of West Virginia, and that evidence regarding the child's future care, protection, training, and personal relationships, which normally comes from the child's parents, from other persons who might be entrusted with the care of the child, and from persons who can testify about the competence of the parent as custodian, were located in West Virginia, the fact that the child was present in California is of no consequence, and West Virginia was still the "home state" under the Uniform Child Custody Jurisdiction Act.

> On the other hand, if you find by a preponderance of the evidence that John Kessel and Anne Conaty had significant ties with the State of California, and that evidence regarding the child's future care, protection, training, and personal relationships, which normally comes from the child's parents, from other persons who might be entrusted with the care of the child, and from persons who can testify about the competence of the parent as custodian, were located in California, then you may find that California was the "home state" under the UCCJA.

The defendants suggest to this Court that the circuit court erred in so instructing the jury given the inapplicability of the UCCJA to the Canadian adoption proceedings. They propose that because the adoption was finalized in Canada, and because Canada has not adopted the UCCJA, the UCCJA does not apply to the Canadian adoption proceedings. The defendants also contend, as they did with respect to the ICPC instructions, that the court's decision to give the UCCJA instructions could have created a question in the jury's mind as to the propriety of the Canadian adoption despite the decision of the Alberta court to ratify the proposed adoptive placement.

Furthermore, the defendants complain that the UCCJA simply does not apply to the proceedings at hand as there was no interstate or interjurisdictional custody dispute. In support of this position, the defendants indicate that all of our prior decisions concerning the applicability of the UCCJA concerned custody disputes wherein the contestants resided in two different jurisdictions. *Citing Rock v. Rock,* 197 W.Va. 448, 475 S.E.2d 540 (1996); *In re Brandon L.E.,* 183 W.Va. 113, 394 S.E.2d 515 (1990); *Escudero v. Henry,* 183 W.Va. 370, 395 S.E.2d 793 (1990); *Brockman v. Hegner,* 173 W.Va. 431, 317 S.E.2d 516 (1984). Furthermore, the defendants suggest that the UCCJA only governs custody disputes pertaining to living children, not those who have not yet been born. *Citing In re Wilner,* 158 Misc.2d 579, 582, 601 N.Y.S.2d 518, 521 (1993) ("The key definition, of 'home state', makes it clear that the Uniform [Child Custody Jurisdiction] Act was designed to apply only to children who have been born."). The defendants thus contend that since defendant Anne had the right to unilaterally place her child for adoption, once the adoptive placement had been com-

---

**76.** For purposes of the UCCJA,

"[h]ome state" means the state in which the child immediately preceding the time involved lived with his parents, a parent or a person acting as parent for at least six consecutive months and, in the case of a child less than six months old, the state in which the child lived from birth with any of the persons named. Periods of temporary absence of any of the named persons are counted as part of the six-month or other period[.]

W. Va.Code § 48–10–2(5) (1981) (Repl.Vol.1996).

pleted, Anne was no longer a proper party to any custody proceedings brought by John. Therefore, the defendants contend that the circuit court erred in finding the UCCJA applicable to this case.

John responds by claiming that the circuit court properly determined the UCCJA to be applicable to the proceedings underlying this appeal. He asserts that once Anne decided to relinquish her parental rights to Baby Boy Conaty, he, as the child's other biological parent, had a superior right to his son's custody as against all third parties. *Citing Caruso v. Superior Court*, 100 Ariz. 167, 412 P.2d 463 (1966). Thus, John claims that Anne's pre-adoptive placement of their child with the Canadian couple entitled him to maintain interjurisdictional custody proceedings, to which the UCCJA applied. Accordingly, John contends that his inverse paternity action, instituted in the Circuit Court of Cabell County, West Virginia, constituted such a custody proceeding.

John also maintains that, pursuant to the UCCJA, West Virginia was the home state of Baby Boy Conaty given that both of his parents were West Virginia residents and West Virginia had significant other contacts with the child. John additionally suggests that a jurisdiction may remain the home state of a child even where he/she has been absent from that jurisdiction by way of abduction or concealment therefrom. *Citing* W. Va.Code §§ 48–10–2(5) (1981) (Repl.Vol. 1996), 48–10–3(a)(1) (1981) (Repl.Vol.1996); *Sams v. Boston*, 181 W.Va. 706, 717, 384 S.E.2d 151, 162 (1989). *See also McAtee v. McAtee*, 174 W.Va. 129, 136, 323 S.E.2d 611, 618 (1984) (stating that "the UCCJA was designed to cover situations ... where a child is surreptitiously removed to another state prior to any custody litigation" (citation omitted)); *Lemley v. Barr*, 176 W.Va. 378, 385, 343 S.E.2d 101, 108 (1986) ("The resolution of cases must not provide incentives for those likely to take the law into their own hands. Thus, those who obtain custody of children unlawfully, particularly by kidnaping, violence, or flight from the jurisdiction of

the courts, must be deterred." (internal quotations and citation omitted)).

John urges that West Virginia, as the home state, retained jurisdiction to determine all custody issues regarding the boy. Because Anne fled with the child to another jurisdiction, John claims the appropriate remedy, which was not observed here, would have been for the other jurisdiction to decline to entertain the custody suit.[77] *Citing* W. Va.Code § 48–10–8(a) (1981) (Repl.Vol.1996) ("If the petitioner for an initial decree has wrongfully taken the child from another state or has engaged in similar reprehensible conduct, the court [in the asylum state] may decline to exercise jurisdiction if this is just and proper under the circumstances."); *Sams v. Boston*, 181 W.Va. 706, 716, 384 S.E.2d 151, 161 (1989) ("We are not persuaded by the suggestion that a court in the state to which the children were abducted should be allowed to try the custody case solely because the children's welfare is the controlling guide. 'The court in State A [from which the children were abducted] knows as well as the court in State B [to which the children were abducted] that the child's welfare is the controlling guide.'" (quoting *Reed v. High*, 254 Pa.Super. 367, 370, 385 A.2d 1384, 1385 (1978))).

Moreover, John argues that the UCCJA is applicable to adoption proceedings because such proceedings affect the custody of the child's parents by permanently terminating such custodial rights. Finally, John asserts that the fact that Canada has not enacted or otherwise adopted the provisions of the UCCJA does not render this body of law inapplicable to the underlying custody dispute. W. Va.Code § 48–10–24 (1981) (Repl.Vol.1996) and the corresponding California provision, Cal. Family Code § 5172 (1973) (Family Code Appendix to Main Vol.1994) [current Cal. Family Code § 3424 (1992) (Main Vol. 1994) ], specifically anticipate the international applicability of the UCCJA to multinational custody disputes. In the same manner, John contends that, despite the nonexistence of the precise language of the UCCJA in Canadian law, defendants Anne and Leavitt

---

77. It is unclear from John's brief whether he suggests that California or Canada should have

declined to permit litigation concerning the custody of Baby Boy Conaty.

were required to comply with the law's mandate to report to the court any information pertaining to custody litigation pending in another jurisdiction. *Citing* W. Va.Code § 48–10–9 (1981) (Repl.Vol.1996). *Accord* Cal. Family Code § 5158 (1973, amended 1992) (Family Code Appendix to Main Vol. 1994) [current Cal. Family Code § 3409 (1993) (Main Vol.1994)]. In sum, John states that the failure of the defendants to provide such information to the court further warranted the circuit court's ruling that the UCCJA governed the underlying custody dispute and its decision to instruct the jury accordingly.

In reviewing the defendants' challenges to the UCCJA instructions, we note at the outset that although a " 'trial court ... has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law,' " *Parham v. Horace Mann Ins. Co.*, 200 W.Va. 609, 619, 490 S.E.2d 696, 706 (1997) (quoting *State v. Bradshaw*, 193 W.Va. 519, 543, 457 S.E.2d 456, 480 (1995)), we review *de novo* the "legal correctness of a jury instruction," *Parham, id.* (citing *Skaggs v. Elk Run Coal Co., Inc.*, 198 W.Va. 51, 63, 479 S.E.2d 561, 573 (1996)). Thus, as we did above with respect to the ICPC instructions, we look first to the plain language of the UCCJA before mechanically applying its provisions to the facts and circumstances of the adoption proceedings in an effort to determine the propriety of the UCCJA instructions.

An examination of the UCCJA provisions suggests that the Act is designed primarily to regulate interstate or interjurisdictional child custody disputes. In W. Va.Code § 48–10–1, the Act's purpose is explained as including the "[a]void[ance of] jurisdictional competition and conflict with courts of other states in matters of child *custody*"; the "[a]ssur[ance] that litigation concerning the *custody* of a child takes place ordinarily in the state with which the child and his family have the closest connection"; the "[d]iscourage[ment of] continuing controversies over child *custody*"; and the "[d]eter[rence of] abductions and other unilateral removals of children undertaken to obtain *custody*

awards." W. Va.Code § 48–10–1(a)(1,3,4,5) (emphasis added).

Facilitating the implementation of its provisions, the UCCJA supplies definitions of terms crucial to the process of child custody litigation. The term "custody determination" contemplates "a court decision and court orders and instructions providing for the custody of a child, including visitation rights; it does not include a decision relating to child support or any other monetary obligation of any person." W. Va.Code § 48–10–2(2). Likewise, the phrase " '[c]ustody proceeding' includes proceedings in which a custody determination is one of several issues, such as an action for divorce or separation, and includes child neglect and dependency proceedings[.]" W. Va.Code § 48–10–2(3). Similarly, the words "decree" or "custody decree" as they are employed by the UCCJA denote "a custody determination contained in a judicial decree or order made in a custody proceeding and include[ ] an initial decree and a modification decree." W. Va.Code § 48–10–2(4).

Throughout the remainder of the UCCJA, references in the various provisions to "custody determinations," "custody proceedings," and the like, further indicate the plain legislative intent of the drafters to limit the applicability of the Act to the facile and orderly resolution of interjurisdictional custody disputes. *See, e.g.,* W. Va.Code §§ 48–10–3 (describing a court's "jurisdiction to make a child custody determination"); 48–10–6 (1981) (Repl.Vol.1996) (prohibiting a court from assuming jurisdiction where "a proceeding concerning the custody of the child was pending in a court of another state"); 48–10–7 (1981) (Repl.Vol.1996) (defining circumstances in which court may decline to exercise jurisdiction where "it finds that it is an inconvenient forum to make a custody determination"); 48–10–9 (specifying information that "[e]very party in a custody proceeding" must incorporate in his/her first pleading). Determining the intent of the drafters to be plain, we proceed to an application of the Act's plain language.

As is evidenced by our review of the UCCJA in ascertaining the legislative intent, we find the language of the UCCJA to be clear

and unambiguous in its delineation and regulation of the procedures to be followed when child custody disputes cross jurisdictional boundaries. "Where the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation." Syl. pt. 5, in part, *Walker v. West Virginia Ethics Comm'n,* 201 W.Va. 108, 492 S.E.2d 167 (1997) (internal quotations and citations omitted).

Applying the UCCJA to the facts of John's underlying inverse paternity action and the circumstances concerning Baby Boy Conaty's pre-adoptive placement and ensuing adoption, we are unable to find any indication that a custody dispute or proceeding was in place to which the UCCJA would have applied. John launched his efforts to ascertain whether he had any parental rights vis-a-vis Anne's then-unborn child by filing an inverse paternity action in the Circuit Court of Cabell County. W. Va.Code § 48A–6–1(a) (1989) (Cum.Supp.1991), which was in effect at the relevant time, permitted the maintenance of "[a] civil action to establish the paternity of a child and to obtain an order of support for the child[.]"[78] Consistent with this statute, John's "Petition to Establish Paternity" requested the following judicial relief:

1. An Order compelling the parties and the child to submit to medical testing to confirm the paternity of [John];

2. A finding of fact based upon the medical testing which reflects whether or not he is the natural father of the child;

3. An Order establishing his paternity of the child, if such paternity is confirmed through medical testing, and establishing his rights flowing from such a determination; and

4. Such other relief as the Court deems just.

Thereafter, John requested the circuit court to enter a default judgment of his paternity of Baby Boy Conaty. In its order, the circuit court "ORDERED that John Woodruff Kessel is legally determined pursuant to West Virginia Code Section 48A–6–1(c) to be the natural father of the infant child born to Anne Gilmore Conaty on or about July 24, 1991 with all the rights and obligations flowing therefrom." The effect of such a paternity establishment is discussed in W. Va.Code § 48A–6–4 (1989) (Cum.Supp. 1991): "if after a trial on the merits, the court or jury shall find, by clear and convincing evidence that the man is the father of the child, the court shall order support in accordance with the provisions of this chapter."[79]

■ Both the statute granting initial permission to request a paternity determination, W Va.Code § 48A–6–1(a), and the provision which attaches an order of support to the establishment of paternity, W. Va.Code § 48A–6–4, suggest that the purpose of a paternity action is to determine whether a certain man is legally obligated to provide support for a particular child. In this respect, rather than pertaining to a custody determination or decree, a paternity action is more in the nature of an action for support. In describing the proceedings contemplated to be within the province of the UCCJA, W. Va.Code § 48–10–2(2) specifically excludes from the Act's jurisdiction "a decision relating to child support or any other monetary obligation of any person." We therefore hold that the Uniform Child Custody Jurisdiction Act (UCCJA), W. Va.Code § 48–10–1, *et seq.,* does not govern actions whose main purpose is the establishment of paternity as such actions are generally in the nature of support proceedings which are specifically excluded from the governance of the UCCJA. W. Va.Code § 48A–6–4 (1989) (Cum.Supp.1991); § 48–10–2 (1981) (Repl.Vol.1996). Thus, we conclude that the UCCJA did not apply or otherwise govern the paternity or adoption proceedings concerning Baby Boy Conaty.[80]

---

**78.** W. Va.Code § 48A–6–1 has been amended since the time of the events underlying the instant appeal. However, the above quoted portion of 48A–6–1(a) has not been changed.

**79.** W. Va.Code § 48A–6–4 has been amended several times, most recently in 1995. However, the language quoted above remains substantially the same.

**80.** Although we have examined and resolved this issue pursuant to the West Virginia UCCJA, we opine that a similar result would be achieved through an application of the California UCCJA to the facts and circumstances of this case.

Accordingly, we find that the circuit court erred by instructing the jury as to the provisions of the UCCJA.[81]

■ While we have determined that the circuit court incorrectly instructed the jury with respect to the UCCJA, we nonetheless find that no reversible error attended these improper instructions. As we noted above with respect to the ICPC, the primary purpose of the UCCJA is to protect the subjects of child custody disputes, i.e., the children whose custody is to be determined. The primary emphasis being the children, the rights of parents to the custody of their children is given substantially less emphasis in the language of the individual UCCJA provisions. Therefore, permitting the jury to consider the quoted text from the West Virginia and California UCCJA enactments would engender, primarily, a determination that the defendants' conduct had infringed upon the rights of Baby Boy Conaty to receive an expedient determination of his custody, more so than a finding that such conduct had impermissibly violated John's rights to establish and maintain a parental relationship with his son.

Furthermore, as we have noted previously, even if the jury did derive from these instructions some basis upon which to hold the defendants accountable for fraud, the record is filled with other evidence on which such liability could have been grounded. Moreover, reviewing the jury charge in its entirety, "the instructions given as a whole [were] accurate and fair to both parties." Syl. pt. 6, *Tennant v. Marion Health Care Found., Inc.*, 194 W.Va. 97, 459 S.E.2d 374 (1995). Finally, we note that the jury instructions given with respect to the UCCJA were much less onerous than were those instructive of the ICPC in that the UCCJA instructions did not contain any specific directions indicating that the court determined these provisions to be applicable to the parties' controversy.

### 3. Parent's Right to Custody

■ The defendants additionally maintain that the circuit court erred by instructing the jury that a parent has a natural right to the custody of his/her child absent a finding that the parent is unfit to have such custody.[82] In granting this instruction, the circuit court presumably referred to this Court's prior holding in Syllabus point 2 of *Hammack v. Wise*, 158 W.Va. 343, 211 S.E.2d 118 (1975):

"A parent has the natural right to the custody of his or her infant child and, unless the parent is an unfit person because of misconduct, neglect, immorality, abandonment, or other dereliction of duty, or has waived such right, or by agreement

---

81. We note further that, although we can locate no indication that the nation of Canada or its province of Alberta has adopted the UCCJA, the fact that another nation is involved in a custody dispute does not automatically preclude the UCCJA from governing such proceedings. From W. Va.Code § 48–10–24 (1981) (Repl.Vol.1996) it is apparent that the Act's drafters contemplated the international application of these procedures:

The general policies of this article extend to the international area. The provisions of this article relating to the recognition and enforcement of custody decrees of other states apply to custody decrees and decrees involving legal institutions similar in nature to custody institutions rendered by appropriate authorities of other nations if reasonable notice and opportunity to be heard were given to all affected persons.

Nevertheless, as we have already determined that John's inverse paternity action did not constitute a "custody determination," a "custody proceeding," or a "custody decree" within the meaning of the UCCJA, the international scope of the Act does not alter our conclusion that the Act's provisions did not apply to the proceedings underlying this appeal.

82. The instruction at issue, Plaintiff's Instruction Number 75, which was granted over the defendants' objections, reads as follows:

The Court instructs the jury that under the law of the United States a parent has a natural right to the custody of his or her infant child and that he or she cannot be deprived of that right unless upon cogent and convincing proof of misconduct, negligent [sic], immorality, abandonment or other dereliction of duty reflecting unfitness as a parent. The right of a parent to have the custody of his or her child is founded on natural law and, while not absolute, such right will not be taken away unless the parent has committed an act or is guilty of an omission which proves his or her unfitness.

Furthermore, the fact that a child was born out of wedlock is of no consequence. A father of an illegitimate child must receive the same treatment and consideration as that received by any parent with respect to the termination of his parental rights.

or otherwise has permanently transferred, relinquished or surrendered such custody, the right of the parent to the custody of his or her infant child will be recognized and enforced by the courts." Syllabus, *State ex rel. Kiger v. Hancock*, 153 W.Va. 404[,] 168 S.E.2d [798] (1969).

Although the instruction accurately reflects the law of this State, the defendants urge that *Hammack* does not apply to this case because *Hammack* involved a situation in which the father had developed a parent-child relationship with his child, whereas John never established such a relationship with Baby Boy Conaty. The defendants stress that the existence of a parent-child relationship is essential to the protection of an unwed biological father's right to the custody of his child. *See, e.g., Lehr v. Robertson*, 463 U.S. 248, 262–63, 103 S.Ct. 2985, 2993–94, 77 L.Ed.2d 614, 627 (1983) (requiring biological father to "grasp[ the] opportunity" to develop relationship with his child in order to receive constitutionally protected custodial rights); Syl. pt. 2, *State ex rel. Roy Allen S. v. Stone*, 196 W.Va. 624, 474 S.E.2d 554 (1996) ("Although an unwed father's biological link to his child does not, in and of itself, guarantee him a constitutional stake in his relationship with that child, such a link combined with a substantial parent-child relationship will do so. When an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, his interest in personal contact with his child acquires substantial protection under the Due Process Clause in Section 10 of Article III of the West Virginia Constitution." [83]). Because John did not establish a parent-child relationship with Baby Boy Conaty, the defendants argue he cannot enforce his custodial rights. Hence, the circuit court's decision to give this instruction was erroneous.

John maintains that the circuit court properly instructed the jury as to the custodial rights of a parent. This instruction informed the jury that John had a natural right to the custody of his child provided he had not waived his right to custody or been determined to be unfit to have custody. Thus, absent a finding of unfitness, John possessed an enforceable custodial right. *Citing* Syl. pt. 2, *Simmons v. Comer*, 190 W.Va. 350, 438 S.E.2d 530 (1993) (quoting Syl. pt. 2, *Hammack*, 158 W.Va. 343, 211 S.E.2d 118). John also acknowledges that various cases require an unwed biological father to have "grasped the opportunity" to establish a parent-child relationship with his child as a prerequisite to asserting his custodial rights. *See, e.g., Lehr v. Robertson*, 463 U.S. at 262–63, 103 S.Ct. at 2993–94, 77 L.Ed.2d at 627; Syl. pt. 2, *State ex rel. Roy Allen S. v. Stone*, 196 W.Va. 624, 474 S.E.2d 554. However, John insists such precedents do not render improper the instruction here challenged. Rather, the record evidence suggests that John's efforts to establish a parent-child relationship with Baby Boy Conaty were frustrated by the defendants' concerted actions to prevent such a relationship. John contends that because he was precluded from achieving a meaningful relationship with his son, the circuit court properly instructed the jury as to the custodial rights he would have been entitled to assert had he been allowed by the defendants to do so. *Citing Jermstad v. McNelis*, 210 Cal.App.3d 528, 533, 258 Cal.Rptr. 519, 520 (1989) (recognizing that a "natural father [has] a parental preference to the custody of his child where ... the father has diligently pursued an opportunity to establish a protected custodial relationship"); *In re Adoption of B.G.S.*, 556 So.2d 545, 559 (La.1990) (finding unwed biological father had satisfied requirement of establishing parent-child relationship with his newborn daughter where he had "grasped the opportunity to *commence* a relationship with his child" (emphasis added)).

Traditionally, the biological mother of a child born out of wedlock had superior rights to the child's custody as against every other person claiming such custodial rights, including the child's biological father. 3A Michie's Jur. *Bastardy* § 8, at 174 (1996). *See also* B. Finberg, Annotation, *Right of Mother to Custody of Illegitimate Child*, 98 A.L.R.2d 417, § 4[b], at 431 (1964). Where the child's

---

**83.** Article III, Section 10, of the West Virginia Constitution provides "[n]o person shall be deprived of life, liberty, or property, without due process of law, and the judgment of his peers."

mother was unable or unwilling to assume the child's custody, though, typically the child's father was viewed as the person to whom custody next would be awarded. 3A Michie's Jur. *Bastardy* § 8, at 175; Finberg, 98 A.L.R.2d 417, § 4[b], at 431.

Nevertheless, the jurisprudential history of this State indicates that we have abandoned these gender preferences and have long recognized the rights of both parents, mothers and fathers alike, to the custody of their children, provided the parents are fit to have custody and have not otherwise transferred or abandoned their custodial rights.[84]

▉ Superior to any rights of parents to the custody of their own children, however, is the overriding consideration of the child's best interests. Thus, the natural right of parents to the custody of their children is always tempered with the courts' overriding concern for the well-being of the children involved. Syl. pt. 7, *Matter of Brian D.*, 194 W.Va. 623, 461 S.E.2d 129 (1995) ("Cases involving children must be decided not just in the context of competing sets of adults' rights, but also with a regard for the rights of the child(ren)."); Syl. pt. 8, in part, *In re*

*Willis*, 157 W.Va. 225, 207 S.E.2d 129 ("[T]he welfare of the infant is the polar star by which the discretion of the court is to be guided in making its award of legal custody."); Syl. pt. 2, *State ex rel. Lipscomb v. Joplin*, 131 W.Va. 302, 47 S.E.2d 221 (same); Syl., in part, *Reynolds v. Reynolds*, 109 W.Va. 513, 155 S.E. 652 (1930) (same); *Pierce v. Jeffries*, 103 W.Va. 410, 413–14, 137 S.E. 651, 652 (1927) ("It is well settled in this state that the welfare of the child is of paramount importance in determining who is entitled to its custody, and that the welfare of the child is to be regarded more than the technical rights of the parent."); *State ex rel. Neider v. Reuff*, 29 W.Va. 751, 757, 2 S.E. 801, 803 (1887) ("[T]his right to the custody of children, given by nature and by God to parents, must give way to the permanent interest of the child[.]" (citation omitted)).

The issue presented by the jury instruction challenged in this particular assignment of error is somewhat novel. While we have determined that unwed biological fathers, standing alone, have certain protected rights vis-a-vis their minor children,[85] we have not yet addressed the situation presented by this

84. *See, e.g.*, Syl. pt. 1, *Honaker v. Burnside*, 182 W.Va. 448, 388 S.E.2d 322 (1989) (" 'A parent has the natural right to the custody of *his or her* infant child and, unless *the parent* is an unfit person because of misconduct, neglect, immorality, abandonment or other dereliction of duty, or has waived such right, or by agreement or otherwise has transferred, relinquished or surrendered such custody, the right of *the parent* to the custody of *his or her* infant child will be recognized and enforced by the courts.' Syl. Pt., *Whiteman v. Robinson*, 145 W.Va. 685, 116 S.E.2d 691 (1960)." (emphasis added)); Syl. pt. 2, *Hammack v. Wise*, 158 W.Va. 343, 211 S.E.2d 118 (same); Syl. pt. 1, *In re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973) ("In the law concerning custody of minor children, no rule is more firmly established than that the right of *a natural parent* to the custody of *his or her* infant child is paramount to that of any other person; it is a fundamental personal liberty protected and guaranteed by the Due Process Clauses of the West Virginia and United States Constitutions." (emphasis added)); Syl. pt. 3, in part, *State ex rel. Harmon v. Utterback*, 144 W.Va. 419, 108 S.E.2d 521 (1959), *overruled on other grounds by* Syl. pt. 3, *Overfield v. Collins*, 199 W.Va. 27, 483 S.E.2d 27 (1996) ("The right of *a parent* to the custody of *his or her* child, being founded in nature and wisdom and recognized and declared by statute, will be respected unless such right is transferred, relinquished or abandoned[.]" (emphasis added)); Syl. pt. 3, in part, *State ex rel. Lipscomb v.*

*Joplin*, 131 W.Va. 302, 47 S.E.2d 221 (1948) (same); *Pierce v. Jeffries*, 103 W.Va. 410, 414, 137 S.E. 651, 652 (1927) ("In the absence of evidence of abandonment or transfer of his rights, *a natural parent* who is of good character and a proper person to have the custody of the child and reasonably able to provide for it is entitled to the custody as against other persons[.]" (emphasis added) (internal quotations and citation omitted)); Syl. pt. 4, *State ex rel. Neider v. Reuff*, 29 W.Va. 751, 2 S.E. 801 (1887) ("The right of *the father or mother* to the custody of their minor child, is not an absolute right, to be accorded to them under all circumstances, for it may be denied to either of them, if it appears to the court, that *the parent* otherwise entitled to this right, 'is unfit for the trust.' " (emphasis added)).

85. Our prior decisions defining an unwed biological father's rights include, Syllabus point 2 of *State ex rel. Roy Allen S. v. Stone*, 196 W.Va. 624, 474 S.E.2d 554 (1996) ("Although an unwed father's biological link to his child does not, in and of itself, guarantee him a constitutional stake in his relationship with that child, such a link combined with a substantial parent-child relationship will do so. When an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, his interest in personal contact with his child acquires substan-

appeal: the rights enjoyed by both an unwed biological mother and an unwed biological father where they have conflicting views as to their minor child's best interests and ultimate custodial placement. Further complicating our resolution of this issue is the convoluted factual scenario of this case. Despite our prior recognition of a precise standard by which an unwed biological father must fully accept and assume the parental responsibilities of raising his child in order to establish a protected custodial right to his child, *see* Syl. pt. 2, *State ex rel. Roy Allen S. v. Stone*, 196 W.Va. 624, 474 S.E.2d 554, the facts presently before us do not fit neatly into this procedural framework. While the evidence presented below suggests that John attempted to assert his parental rights by opposing the adoption of Baby Boy Conaty and by trying to ascertain his child's whereabouts, the evidence also reflects, as noted above, the defendants' actions endeavoring to prevent John from asserting his rights or from obtaining crucial information about his son.

Faced with this unique situation, we reiterate our decision, stated above, that once a child has been born, both of the child's unwed biological parents enjoy a right to establish a parent-child relationship with their child. Associated with this right, as the jurisprudential history of this state suggests, is the right of either unwed biological parent to seek the custody of his/her child. In order to

protect his parental rights, though, an unwed biological father must demonstrate his commitment to parenting his child by participating in his/her care, rearing, and support, and by establishing a meaningful relationship with him/her. From the evidence, the jury could have concluded that John did, in fact, take steps toward assuming these responsibilities and commencing a relationship with his son by searching for Anne prior to their child's birth; attempting to prevent Anne's adoptive placement of their child; undertaking to locate his son soon after his birth; and intervening in his son's Canadian adoption proceedings. Perhaps more compelling than John's initial steps to establish a relationship with his son, though, is the evidence indicating that John's attempts to form such a relationship and to assert his custodial rights were often hindered by the defendants' actions opposing any participation by John in his child's life.

Given John's efforts to assume his parental duties and to commence a relationship with Baby Boy Conaty in order to assert his custodial rights, we find that the circuit court did not err in instructing the jury as to the natural right of a parent to the custody of his/her child. The language of the contested jury instruction correctly informed the jury of the law governing the custodial rights of parents [86] and was not inconsistent with our prior decisional law regarding parental rights. Hence, the instruction not being er-

tial protection under the Due Process Clause in Section 10 of Article III of the West Virginia Constitution."); Syllabus point 1 of *McGuire v. Farley*, 179 W.Va. 480, 370 S.E.2d 136 (1988) ("'A circuit court has jurisdiction to award or deny visitation rights to a father of an illegitimate child.' Syllabus, *J.M.S. v. H.A.*, 161 W.Va. 433, 242 S.E.2d 696 (1978)."); and Syllabus point 1 of *Hammack v. Wise*, 158 W.Va. 343, 211 S.E.2d 118 ("The father of an illegitimate child must receive the same treatment and consideration as that received by any parent with respect to the termination of his parental rights."). *See generally* David E. Thompson, Comment, *McGuire v. Farley: The West Virginia Supreme Court of Appeals Takes a Step Toward Equal Protection for the Unwed Father*, 91 W. Va. L.Rev. 617 (1989).

86. This jury instruction also made clear that "[t]he right of a parent to have the custody of his or her child is ... not absolute." Although we recognize the importance of a parent's right to the custody of his/her child, we cannot emphasize enough the contingent nature of this right.

Throughout our evaluation of this case, we constantly have been reminded of Anne's undeniable right to make decisions regarding her pregnancy and John's qualified right, as an unwed biological father, to the custody of his child. However, we must not forget that, regardless of the parents' custodial rights, the child's best interests are also entitled to due consideration. *See, e.g.,* Syl. pt. 7, *Matter of Brian D.*, 194 W.Va. 623, 461 S.E.2d 129 (1995) ("Cases involving children must be decided not just in the context of competing sets of adults' rights, but also with a regard for the rights of the child(ren)."); Syl. pt. 8, in part, *In re Willis*, 157 W.Va. 225, 207 S.E.2d 129 (1973) ("[T]he welfare of the infant is the polar star by which the discretion of the court is to be guided in making its award of legal custody."); *Pierce v. Jeffries*, 103 W.Va. at 413–14, 137 S.E. at 652 ("It is well settled in this state that the welfare of the child is of paramount importance in determining who is entitled to its custody, and that the welfare of the child is to be regarded more than the technical rights of the

roneous, we defer to the trial court's discretion in granting the instruction.

### 4. Due Process and Equal Protection Considerations

■ The defendants assert further that the circuit court erred by instructing the jury[87] as to John's constitutional rights to due process[88] and equal protection[89] of the law. During the proceedings below, the circuit court granted summary judgment to the defendants with regard to John's civil rights claims.[90] Despite this ruling, the circuit court subsequently, and inconsistently, instructed the jury, over the specifically stated

parent."); *State ex rel. Neider v. Reuff,* 29 W.Va. at 757, 2 S.E. at 803 ("[T]his right to the custody of children, given by nature and by God to parents, must give way to the permanent interest of the child[.]" (citation omitted)). While the fate of Baby Boy Conaty has long ago been sealed by the Canadian judiciary, we cannot ignore that in future cases where parents assert their rights to custody, the child's interests, too, must be regarded.

87. Upon a review of the challenged instructions, see *infra* notes 88 and 89, it appears that although these instructions concern John's federal due process and equal protection rights, similar rights secured by the West Virginia Constitution might also be implicated. However, given the limited language of these instructions, we decline to review them with respect to analogous due process and equal protection rights guaranteed by the Constitution of the State of West Virginia as neither party has framed the issue in terms of state constitutional protections.

88. The circuit court instructed the jury as to John's right to due process of law in Plaintiff's Instruction Number 64(a), which was granted as amended:

The Court further instructs the jury that the interest of a parent in having a relationship with his child is a liberty interest protected by the Fourteenth Amendment's Due Process Clause. The Fourteenth Amendment provides that no state shall deprive any person of life, liberty or property without due process of law.

The Court further instructs the jury that where an unwed father demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child, his interest in personal contact with this child requires substantial protection under the Due Process Clause, including a right to notice of any adoption of that child and an opportunity to be heard prior to the termination of his parental rights to that child.

Accordingly, if you find that John Kessel demonstrated a full commitment to the responsibilities of parenthood by coming forward to attempt to participate in the rearing of his child, you may find that John Kessel had a right to notice of any adoption of that child and a right to an opportunity to a hearing prior to the termination of his parental rights to his son.

If you find by a preponderance of the evidence that a defendant, or defendants, set about with the intention to deprive plaintiffs [sic] of their [sic] rights to the child by depriving John Kessel of notice and right to be heard concerning the adoption of his child, then you may consider such conduct in determining the motive, intent and state of mind of the defendants in determining whether defendants are liable for fraud or interference.

At this juncture, we decline to address the propriety of that portion of the trial court's instruction suggesting that John had a right to be notified of the adoption of Baby Boy Conaty because the parties do not contend that this particular statement constituted an erroneous instruction. Rather, our discussion of the above-quoted instruction will be limited to the appropriateness of instructing the jury as to John's constitutional rights and as to the possibility that the defendants violated these rights. For a discussion of the existence of a duty to notify John of the pending adoption, see *supra* Section II.B.1.

89. With respect to John's right to equal protection of the law, the circuit court granted, as amended, Plaintiff's Instruction Number 65(a):

The Court instructs the jury that according to the Fourteenth Amendment, equal protection and security should be given to all persons under like circumstances in the enjoyment of their personal and civil rights, and all persons should be equally entitled to pursue their happiness and acquire and enjoy property. Under this principle, no person should be denied the same protection of the law which is enjoyed by other persons in like circumstances. There is to be equality of opportunity afforded to all persons.

Therefore, if you find by a preponderance of the evidence that defendants, or any of them, set about with the intent and purpose of terminating plaintiffs' [sic] right to the child by not permitting them [sic] an opportunity to be heard or have any rights whatsoever, then you may consider any such finding as evidence of intent, motive and state of mind in determining whether defendants, or any of them, are liable for fraud or interference.

90. John originally attempted to prosecute a civil rights claim against the defendants pursuant to 42 U.S.C. § 1983 (1979) (1994 ed.). By dismissing this claim, the trial court impliedly determined that the defendants were not state actors and that their conduct did not rise to the level of state action.

objections of the defendants, that it could consider the defendants' intent to deprive John of his constitutional rights to due process and equal protection in assessing the defendants' motive, intent, and state of mind to commit fraud and tortious interference.

John responds that the defendants effectively deprived him of the protections of the United States Constitution by placing Baby Boy Conaty for adoption in Canada. Thus, he asserts that the circuit court properly instructed the jury that it could consider such deprivations in ascertaining the defendants' intention to commit the alleged torts. John contends further that the court also properly cautioned the jury that it could not base its findings of liability upon the defendants' violation of John's constitutional rights.

As noted above, we review for an abuse of discretion when deciding challenges to the giving of a specific jury instruction by a trial court. With respect to these particular instructions, we note at the outset that prior jurisprudence in this arena has generally required, as a prerequisite to finding a violation of an individual's federal due process or equal protection rights,[91] some form of state action performed by a state actor. *See generally Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 936, 102 S.Ct. 2744, 2753, 73 L.Ed.2d 482, 495 (1982) (noting that Fourteenth Amendment to United States Constitution protects only against deprivations by the State and "offers no shield" against private conduct (internal quotations and citation omitted)). For example, in *Imperial Colliery Co. v. Fout,* 179 W.Va. 776, 781 n. 13, 373 S.E.2d 489, 494 n. 13 (1988), we noted:

> It is now settled law that the[ ] [Fourteenth] Amendment[ ] [to the United States Constitution] protect[s] only against "state action", and not against "[i]ndividual invasion of individual rights." *Civil Rights Cases,* 109 U.S. 3, 11, 3 S.Ct. 18, 2[1], 27 L.Ed. 835, 839 (1883)[.] Where the conduct is that of a private entity, "state action" may be found only where the acts

in question may fairly be attributed to the state.

(Additional citations omitted). More specifically, we have recognized that " 'private conduct is not controlled by the Fourteenth Amendment due process clause unless significantly intertwined with state involvement.' " *Dennison v. Jack,* 172 W.Va. 147, 153, 304 S.E.2d 300, 306 (1983) (quoting *Kennebec, Inc. v. Bank of the West,* 88 Wash.2d 718, 721, 565 P.2d 812, 814 (1977) (en banc)). Similarly, in the realm of equal protection we have indicated that "[t]he violation of the equal protection standard usually arises from state action[.]" *Pauley v. Kelly,* 162 W.Va. 672, 712, 255 S.E.2d 859, 880 (1979) (citations omitted). *See also* Syl. pt. 2, *Israel v. West Virginia Secondary Sch. Activities Comm'n,* 182 W.Va. 454, 388 S.E.2d 480 (1989) (same).

Having established a requirement of state action, we are unable to say that the due process and equal protection instructions given in this case constituted a proper exercise of the trial court's discretion. First, as indicated above, none of the defendants was a state actor. In Syllabus point 3, of *West Virginia Trust Fund, Inc. v. Bailey,* 199 W.Va. 463, 485 S.E.2d 407 (1997), we held: "[t]o determine if an entity is a state actor subject to constitutional duties or restrictions, the nature and extent of state involvement must be evaluated so as to determine if its actions are fairly attributable to the state." *See also* Syl. pt. 8, *Queen v. West Virginia Univ. Hosp., Inc.,* 179 W.Va. 95, 365 S.E.2d 375 (1987) (limiting determination of state actor status to due process issues). Under the facts of the case presently before us, we cannot find that the defendants were state actors within the contemplation of our holding in *West Virginia Trust Fund, Inc. v. Bailey.* On appeal to this Court, John does not indicate and the record does not evidence that any of the defendants' actions were so closely intertwined with state interests as to render them state actors conducting themselves in accordance with the State.

**91.** The Fourteenth Amendment to the United States Constitution, referenced by the trial court in its due process and equal protection instructions, provides, in pertinent part: "No State shall ... deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

As no state actors were involved in this controversy, neither can we find a violation of the above-mentioned constitutional rights as a result of state action. Typically, state action connotes some type of activity performed directly by the state or by an entity so closely affiliated with the state so as to necessitate a finding of state action. *See, e.g.,* 21A Michie's Jur. *Words and Phrases* 380 (1987) (defining "state action" as " 'action taken by the State or a political subdivision, or by a person or persons acting for the State or political subdivision, or pursuant to their authority or direction, or in obedience to their requirement' " (quoting *Brown v. City of Richmond,* 204 Va. 471, 479, 132 S.E.2d 495, 500 (1963) (citations omitted))). Given the facts before us, we can find no evidence tending to indicate that the defendants' conduct amounted to state action, or from which the jury could have found such state action. Each of the defendants acted in his/her own individual capacity. None of the defendants' conduct suggested an association or involvement with the State in carrying out his/her individual activities. Accordingly, the instructions alleging that the defendants violated John's due process and equal protection rights are unsupported by any applicable law and constitute an abuse of the trial court's discretion.

■ This conclusion, though, is not the end of our inquiry. An erroneous jury instruction necessitates a reversal of the entire jury verdict only if such error rises to the level of harmful error. *See supra* Section II.C. In the present case, we find the error to be harmless as the remainder of the jury instructions, viewed in their entirety, correctly instructed the jury on the applicable law, and no special emphasis was placed upon these two instructions by the trial court or the parties. Moreover, the defendants were not prejudiced by the giving of these erroneous instructions since the instructions merely indicated that the jury could infer from these alleged constitutional violations that the defendants had committed the tortious acts of which they were accused, rather than directly stating that a finding that the defendants committed such constitutional violations necessitated a finding that they also had acted tortiously. As we have stated above, the record is replete with evidence from which the jury could have found the defendants liable for fraud. Thus, the effect of the erroneous instructions was relatively minimal given the voluminous incriminating evidence of record.

## 5. Contempt of Court Orders and Legal Ethics Rules

■ Finally, the defendants contend that it was error for the circuit court to give the jury various instructions defining "contempt of court" [92] and reciting numerous ethical standards governing the conduct of attorneys.[93] The defendants challenge the propri-

---

**92.** The defendants complain of the following Plaintiff's Instructions, pertaining to contempt, which the circuit court granted over the defendants' objections. Plaintiff's Instruction Number 36 provided: "Contempt is defined as an act in disrespect of the court or its processes, or which obstructs the administration of justice or tends to bring the Court into disrepute. It is a disobedience to the court, or an opposing or despising the authority, justice or dignity thereof." Similarly, the court instructed in Plaintiff's Instruction Number 38, as amended:

When a Court has jurisdiction in the sense of power to decide whether an injunction or other writ shall be awarded, the party against whom it issues is bound to obey it, although the awarding of it may have been erroneous, and, in that sense, improper or improvident, and it may operate unreasonably and unjustly; he must obey it until vacated or dissolved. Even though an injunction may have been erroneously granted, unless it is absolutely void, it is the duty of the parties enjoined to obey it

scrupulously, and they will be held to a strict observance of it.

Lastly, Plaintiff's Instruction Number 40, as amended, directed:

An attorney who conspires with his client to obstruct the due administration of the law and to bring the authority of a court of justice into contempt by resisting and obstructing the execution of its lawful decrees, by whatever contrivance, is as guilty of an offense against public justice and of a contempt of court as his client.

**93.** The circuit court, over the defendants' objections, instructed the jury, in Plaintiff's Instruction Number 26, as amended, as to certain ethical standards that attorneys must follow. (Quoting portions of the West Virginia Rules of Professional Conduct: "Rule 1.2. Scope of Representation"; "Rule 1.4. Communication"; "Rule 1.6. Confidentiality of Information"; "Rule 3.3. Candor Toward the Tribunal"; "Rule 3.4. Fairness to Opposing Party and

ety of the contempt instructions, noting particularly the fact that all of the defendants who earlier had been found to be in contempt later purged themselves of these charges. During the course of the inverse paternity litigation, the circuit court held defendant Anne to be in contempt for refusing to sign authorizations to release her California medical records and found defendants Dr. and Mrs. Conaty to be in contempt for failing to appear for their depositions.[94] Because each of these defendants subsequently purged him/herself of contempt and because John cannot base his monetary recovery upon these contempt charges, the defendants maintain that these instructions were erroneous. *Citing Larson v. Dunn*, 460 N.W.2d 39, 46 (Minn.1990) (refusing to recognize claim for tortious interference with parental rela-

tionship and suggesting that appropriate remedy for defendants' actions in violating court order would be to hold defendants in contempt of court, rather than permitting plaintiff to recover damages).

The defendants also challenge the propriety of the circuit court's instructions which provided the jury with various ethical standards governing the conduct of attorneys. In this regard, the defendants claim that these instructions were erroneous because neither defendant Leavitt nor defendant Brian have been charged with ethical violations arising from the adoption of Baby Boy Conaty and because, even if ethics charges had been brought against these defendants, John could not use these charges as a basis for recovery. *Citing* W. Va. R. Prof. Conduct,

Counsel"; "Rule 4.1. Truthfulness in Statements to Others"; "Rule 4.4. Respect for Rights of Third Persons"; and "Rule 8.4. Misconduct"). Likewise, Plaintiff's Instruction Number 27, as amended, recited excerpts from the Rules of Professional Conduct of the State Bar of California ("Rule 1–100. [Rules of Professional Conduct, in General]"; "Rule 3–200. Prohibited objective[s] of Employment"; "Rule 3–210. Advising the Violation of Law"; "Rule 3–500. Communication"; "Rule 5–200. Trial Conduct"; "Rule 3–300. Avoiding Adverse Interests [sic]"; "Rule 3–310. Avoiding the Representation of Adverse Interests"; "Rule 5–310. Prohibited Contact With Witnesses"; "Rule 5–220. Suppression of Evidence"; and "Rule 5–210. Member as Witness") and quoted portions of the State Bar Act chapter of the California Business and Professions Code ("Section 6067. Oath" and "Section 6068. Duties of Attorney"). The circuit court further instructed the jury, over the defendants' objections, regarding the extent to which the jury could consider any alleged ethical violations by the defendants:

> The Court instructs the jury that you will be instructed of statutes and laws and ethical rules which may apply to defendants in this case. If you find by a preponderance of the evidence that defendants, or any defendant, violated any of these laws or rules, then you may consider such violation as evidence of their state of mind, intent or malice in your determination of whether the defendant, or defendants, are liable to plaintiffs [sic] for fraud, [sic] interference with rights to child.
> In your deliberations, however, with respect to whether defendants are liable for fraud, plaintiffs [sic] must prove the element [sic] of fraud by clear and convincing evidence.

Plaintiff's Instruction No. 26(a) (as amended). In addition to the lower court's instructions regarding the ethical standards to which an attorney must conform his/her conduct, the defen-

dants also challenge the circuit court's ruling granting Plaintiff's Instruction Number 40(a), as amended, over the defendants' objections, regarding an attorney's liability for intentional torts:

> The Court instructs the jury that an attorney has no immunity from liability for fraudulent or intentional acts that the attorney takes on his own behalf or shares with his client. An attorney does not possess any immunity from liability for his own intentional misconduct.
> Therefore, if you find by a preponderance of the evidence in this case that defendant Leavitt or defendant Brian Conaty were acting as an attorney in any of the conduct complained of by plaintiffs [sic], if you further find, pursuant to the other instructions of the Court and the evidence in this case that they knowingly became an instrumentality for the perpetration of a fraud, conspired with others, including their clients, to defraud or injure plaintiffs [sic] or engaged in intentional conduct such as intentional interference with the plaintiffs' [sic] rights to the child, then you may find attorney Leavitt and attorney Brian Conaty to be liable the same as you would any other person.

94. The record indicates further that, during the inverse paternity case, plaintiff John sought a ruling from the circuit court compelling defendant Brian to respond to deposition questioning. Brian asserted the attorney-client privilege in response to questioning about the whereabouts of Anne and Baby Boy Conaty despite the fact that he earlier had represented to the court that he had not served as Anne's attorney in this matter. Although the circuit court did not hold Brian in contempt for his initial assertion of the attorney-client privilege where no such privilege existed, the court did order him to submit to a second deposition and to refrain from asserting this privilege under these circumstances.

*Scope* ("Violation of a Rule should not give rise to a cause of action nor should it create any presumption that a legal duty has been breached.... The[ ] [Rules] are not designed to be a basis for civil liability.").

John agrees with the defendants' position that neither a finding of contempt of court nor a violation of a legal ethics standard can provide a basis for money damages. Nevertheless, John submits that these instructions were not erroneously given because they correctly stated the applicable law and properly limited the jury's consideration of the alleged violations to a determination of the defendants' "state of mind, intent or malice," thereby ensuring that the jury would not consider such violations as a basis for imposing liability. *Citing United States v. Kelly*, 888 F.2d 732, 744 (11th Cir.1989) (recognizing "the relevance of ethical and professional standards of behavior for lawyers in evaluating criminal intent" (citation omitted)); *United States v. Machi*, 811 F.2d 991, 1000–02 (7th Cir.1987) (permitting rules of ethical conduct governing attorneys to be introduced into evidence as indicative of defendant attorney's state of mind and interest in criminal scheme; noting with approval efforts during trial to caution jury against inferring that defendant attorney was guilty of criminal offense simply because he may have violated ethical rules governing conduct of attorneys); *United States v. DeLucca*, 630 F.2d 294, 301 (5th Cir.1980) (ruling "it is appropriate to consider the canons of professional responsibility as a factor in determining [a defendant attorney's] willing participation in crime" (footnote omitted)).

As we noted above, a trial court has broad discretion in formulating its charge to the jury "so long as the instructions given as a whole are accurate and fair to both parties." Syl. pt. 6, in part, *Tennant v. Marion Health Care Found., Inc.*, 194 W.Va. 97, 459 S.E.2d 374 (1995). Still, the jury instructions "must be a correct statement of the law and supported by the evidence." Syl. pt. 4, in part, *State v. Guthrie*, 194 W.Va. 657, 461 S.E.2d 163 (1995). Accordingly, when determining whether the lower court abused its discretion in instructing the jury, we examine "whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not mislead [sic] by the law." *Id.*

Reviewing the record before us and the parties' arguments, we find that the circuit court did not err in giving the challenged contempt and ethics instructions. First, the contempt instructions did nothing more than correctly instruct the jury as to the legal definitions of contempt. *See State v. Hansford*, 43 W.Va. 773, 28 S.E. 791 (1897) (defining contempt (Plaintiff's Instruction No. 36)); *Eastern Assoc. Coal Corp. v. Doe*, 159 W.Va. 200, 220 S.E.2d 672 (1975) (explaining enjoined party's duty to obey injunction until it has been invalidated by court (Plaintiff's Instruction No. 38 (as amended))); *State v. Ralphsnyder*, 34 W.Va. 352, 12 S.E. 721 (1890) (recognizing manner in which attorney may be held in contempt (Plaintiff's Instruction No. 40 (as amended))). The inclusion of these instructions defining contempt thus permitted the jury to evaluate the evidence of contempt presented at trial and to place such evidence in the proper perspective when assessing the defendants' motivation for their actions.

Second, the ethics instructions accurately restated certain standards of ethical behavior with which defendants Leavitt and Brian, as a result of their stature as attorneys, are required to comply. *See generally* Cal. R. Prof. Conduct, Rule 1–100(A) ("These rules together with any standards adopted by the Board of Governors pursuant to these rules shall be binding upon all members of the State Bar."); W. Va. R. Prof. Conduct, *Preamble* ("Every lawyer is responsible for observance of the Rules of Professional Conduct."). Moreover, the ethics instructions properly limited the jury's consideration of any alleged unethical behavior as being indicative only of the defendant attorneys' "state of mind, intent or malice." In this manner, the circuit court sought to prevent the jury from improperly considering such evidence as a basis for imposing liability upon these defendants for fraud or tortious interference. *See* W. Va. R. Prof. Conduct, *Scope* (stating that professional rules "are not designed to be a basis for civil liability"); *First Nat'l Bank in Marlinton v. Blackhurst*, 176 W.Va.

472, 478, 345 S.E.2d 567, 574 (1986) (recognizing that "the usual remedy for a violation of the *West Virginia Code of Professional Responsibility* is a disciplinary proceeding against the attorney"). *See also In re Palumbo Family Ltd. Partnership,* 182 B.R. 447, 468 (Bankr.E.D.Va.1995) (memorandum opinion) (determining that attorney's violation of Virginia Code of Professional Responsibility does not give rise to private cause of action). For these reasons, we find that the circuit court did not abuse its discretion in formulating its jury charge so as to include the contempt and ethics instructions.

### D.

#### Attorney–Client Privilege and Crime or Fraud Exception

 The defendants next argue that the circuit court erred by ruling that the crime or fraud exception applied to extinguish the attorney-client privilege in this case. During pre-trial discovery, the circuit court ruled that the attorney-client privilege between defendants Leavitt and Anne did not apply because the plaintiffs had alleged a cause of action for fraud against these defendants with respect to their actions in placing Baby Boy Conaty for adoption. As a result of this ruling, defendant Leavitt was required to give John his client file regarding his representation of Anne in the adoption of Baby Boy Conaty. The defendants contend that the circuit court erroneously required such

disclosure because John failed to state a valid cause of action for fraud.

Additionally, the defendants contest the West Virginia circuit court's ruling as being inconsistent with an earlier ruling by a California superior court, in "California case 1," finding that the fraud alleged to have been committed by defendants Leavitt and Anne did not disable the attorney-client privilege with respect to legal proceedings in California. Accordingly, the defendants urge that the circuit court should have adopted the ruling of the California court finding the attorney-client privilege to be applicable.[95]

John responds that the circuit court correctly held that the crime or fraud exception negates the defendants' ability to assert the attorney-client privilege in this case because this exception applies, in cases such as this one, whenever a client seeks the aid of an attorney in committing a crime or fraud. Thus, because John demonstrated that fraud had been committed by defendants Anne and Leavitt, the circuit court properly found the privilege to be inapplicable and permitted discovery of Leavitt's client files pertaining to his representation of Anne in the adoption of Baby Boy Conaty. Moreover, John claims that the defendants failed to preserve for appeal their assignment of error charging that the West Virginia circuit court should have adopted the ruling of the California superior court because they did not argue to the circuit court that it should give deference to the California court's ruling. *Citing* 1

**95.** The circumstances surrounding the ruling of the California court in "California case 1" are distinguishable from those underlying the instant appeal. John instituted "California case 1" as a companion case to his West Virginia inverse paternity proceeding, "West Virginia case 1," in order to secure deposition testimony from attorney Leavitt and Anne's California doctors concerning the birth and subsequent whereabouts of Baby Boy Conaty, with the ultimate purposes of this action being the location of his son and the assertion of his parental rights. By contrast, the instant appeal is the direct result of proceedings had in "West Virginia case 2," which John filed in an attempt to collect money damages arising from the defendants' allegedly fraudulent and tortious conduct in preventing him from establishing a relationship with his son. Nevertheless, we decline to further address this particular argument as we find that the defendants' attempted assignment of error on this basis has been inade-

quately briefed. In furtherance of their claim that the West Virginia circuit court should have adopted the ruling of the California superior court, the defendants offer no authority other than bald assertions that "since the attorney-client relationship was formed in California, California law governed the issue of whether the privilege was waived.... The ruling by the California Superior Court should have been given deference, since California law was controlling and the same attorney-client relationship is involved in both cases." This lack of supporting authority directly contravenes our rules which specifically require a party to provide the legal basis upon which his/her argument rests. *See* W. Va. R.App. P. Rule 10(d) (stating "[t]he appellant's brief shall follow the same form as the petition for appeal") and Rule 3(c)(4) (describing contents of petition for appeal and requiring the inclusion of "[p]oints and authorities relied upon [and] a discussion of law").

Franklin D. Cleckley, Handbook on Evidence for West Virginia Lawyers § 1–7(B)(6)(a), at 50 (3d ed.1994) [hereinafter 1 Cleckley] ("Failure to complain of an alleged error during the course of trial constitutes waiver of the defect and ordinarily precludes appellate review." (citations omitted)). Therefore, John contends that the circuit court properly applied the crime or fraud exception because the defendants failed to present a compelling reason as to why the exception should not apply.[96]

The attorney-client privilege is a widely recognized and solemnly respected privilege, the purpose of which is to protect confidential communications between a client and his/her counsel. 81 Am.Jur.2d *Witnesses* § 337, at 314 (1992) ("It is a long-established rule of common law that an attorney or counselor at law is not permitted, and cannot be compelled, to testify as to communications made to him in his professional character by his client, unless the client consents." (footnotes omitted)). *See also* W. Va. R. Evid. Rule 501 (recognizing common law privileges); *State v. Fisher*, 126 W.Va. 117, 121, 27 S.E.2d 581, 583 (1943) ("It is settled law in this State that a communication to an attorney by a client or former client dealing with relation as attorney and client is privileged." (citations omitted)).

While this privilege is scrupulously guarded, an exception to its ironclad rule of nondisclosure of client confidences exists where a client engages an attorney's assistance in engineering or perpetrating a crime or fraud. 81 Am.Jur.2d *Witnesses* § 393, at 356 ("The attorney-client privilege does not generally exist where the representation is sought to further criminal or fraudulent conduct either past, present, or future." (footnote omitted)). *See also State v. Beard*, 194 W.Va. 740, 753, 461 S.E.2d 486, 499 (1995) (stating "[t]he purpose of the crime-fraud exception to the attorney/client privilege" is " 'to assure that the "seal of secrecy," between lawyer and client does not extend to communications "made for the purpose of getting advice for the commission of a fraud" or crime' " (quoting *United States v. Zolin*, 491 U.S. 554, 563, 109 S.Ct. 2619, 2626, 105 L.Ed.2d 469, 485 (1989) (additional citations omitted))). *See generally A.B. Dick Co. v. Marr*, 95 F.Supp. 83, 102 (S.D.N.Y.1950) ("[I]t is quite clear that the privilege disappears if it is invoked merely to cloak a fraudulent scheme, and that when a client consults an attorney as to how to concoct or perpetrate a fraud the privilege is unavailing." (citations omitted)); *Fellerman v. Bradley*, 99 N.J. 493, 504, 493 A.2d 1239, 1245 (1985) ("[A]ttorney-client communications that constitute 'a fraud on a court' are not privileged. Misleading, inconsistent, or deceitful actions directed at the court itself denote a species of deceptive conduct that may fall short of civil or criminal fraud. If that form of deceit, however, directly interferes with the judicial process, it

**96.** John further proposes that the defendants could more efficiently have argued the applicability of the crime or fraud exception by petitioning this Court for a writ of prohibition prior to disclosing the allegedly privileged material. We agree with John. Indeed, we have suggested this course to parties embroiled in disputes regarding material sought to be protected from disclosure under the attorney-client privilege. *See, e.g.*, Syl. pt. 2, *State ex rel. United Hosp. Ctr., Inc. v. Bedell*, 199 W.Va. 316, 484 S.E.2d 199 (1997) (" 'When a discovery order involves the probable invasion of confidential materials that are exempted from discovery under Rule 26(b)(1) [privileged matter] and (3) [materials "prepared in anticipation of litigation or for trial"] of the West Virginia Rules of Civil Procedure, the exercise of this Court's original jurisdiction is appropriate.' Syl. pt. 3, *State ex rel. U[nited] S[tates] F[idelity] & G[uar. Co.] v. Canady*, 194 W.Va. 431, 460 S.E.2d 677 (1995)."); Syl. pt. 2, *State ex rel. Doe v. Troisi*, 194 W.Va. 28, 459 S.E.2d 139 (1995) ("In situations where the refusal of a motion to quash a subpoena based on the attorney-client privilege could result in imminent and irreparable harm, petitioning for a writ of prohibition is the appropriate method for challenging the subpoena."). *See also* Syl. pt. 3, *State ex rel. McCormick v. Zakaib*, 189 W.Va. 258, 430 S.E.2d 316 (1993) (" 'A writ of prohibition is available to correct a clear legal error resulting from a trial court's substantial abuse of its discretion in regard to discovery orders.' Syllabus Point 1, *State Farm Mutual Automobile Insurance Co. v. Stephens*, 188 W.Va. 622, 425 S.E.2d 577 (1992)."). *See generally State ex rel. United States Fidelity & Guar. Co. v. Canady*, 194 W.Va. at 437 n. 8, 460 S.E.2d at 683 n. 8 ("If [a party] wrongfully [is] compelled to produce records protected by either the attorney-client privilege and/or the work product doctrine, the damage will occur upon disclosure, and a later appeal would be uneventful. In the area of communication privileges, 'once the cat is out of the bag, it cannot be put back in.' ").

can constitute a fraud on the court." (citation omitted)).

■ It is important to note, though, that the crime or fraud exception is traditionally a narrow one. In this manner, only a crime or a fraud upon the court will suffice to overcome the attorney-client privilege. Thus, when the fraud alleged bespeaks of tortious fraudulent conduct, rather than a true fraud upon the court, the crime or fraud exception does not operate to compel disclosure of the privileged communications. *See* 1 Cleckley, § 5–4(E)(6)(a), at 579 (3d ed. 1994) (stating specifically "[t]he term 'fraud' as used [in reference to crime or fraud exception] refers to a fraud on the judicial process perpetrated by a client"). *See also* Syl. pt. 5, *Savas v. Savas*, 181 W.Va. 316, 382 S.E.2d 510 (1989) ("A claim of fraud upon the court is reserved for only the most egregious conduct on the part of attorneys, court officials, or judges which causes the judicial process to be subverted. It ordinarily does not relate to misrepresentation or fraudulent conduct between the parties themselves.").

■ To determine whether the attorney-client privilege may properly be exercised to protect a particular communication, the party seeking to assert the privilege bears the burden of proving that confidential communications between the party client and his/her attorney render the privilege applicable. Syl. pt. 3, *State ex rel. United Hosp. Ctr., Inc. v. Bedell*, 199 W.Va. 316, 484 S.E.2d 199 (1997) (" 'The burden of establishing the attorney-client privilege or the work product exception, in all their elements, always rests upon the person asserting it.' Syl. pt. 4, *State ex rel. U[nited] S[tates] F[idelity] & G[uar. Co.] v. Canady*, 194 W.Va. 431, 460 S.E.2d 677 (1995)."). By contrast, when a party attempts to overcome the applicability of the privilege by employing the crime or fraud exception, the discovering party, and not the party asserting the privilege, bears the burden of establishing, by *prima facie* evidence, that a crime or fraud has tarnished the allegedly privileged communications thereby authorizing their disclosure. 2A Michie's Jur. *Attorney and Client* § 34, at 618 (1993) ("To succeed, the [party seeking to overcome the privilege] must make a prima facie showing that the lawyer was consulted and employed for the purpose of facilitating or concealing an ongoing, or future, criminal or fraudulent scheme.").

■ Before ordering disclosure of the privileged material, though, the court also must find that the privileged communications were related to the purported crime or fraud. Syl. pt. 2, *Thomas v. Jones*, 105 W.Va. 46, 141 S.E. 434 (1928) ("In order to admit in evidence confidential communications between attorney and client under the exception to the general rule that if such communications were made in order to perpetrate a fraud on justice they are not privileged, it must clearly appear that such communications were made by the client with that intent and purpose."). The party asserting the privilege may also have an opportunity to demonstrate why, in light of the discovering party's *prima facie* case, the privilege should remain intact. 1 Cleckley, § 5–4(E)(6)(a), at 85 (Cum.Supp.1998) (citation omitted).

■ Appellate review of a circuit court's decision to apply the crime or fraud exception and to compel the disclosure of materials otherwise protected by the attorney-client privilege is for an abuse of discretion. Syl. pt. 4, *State ex rel. United Hosp. Ctr., Inc. v. Bedell*, 199 W.Va. 316, 484 S.E.2d 199 (" 'When a circuit court's discovery ruling with respect to privileged materials will result in the compelled disclosure of those materials, a hard and more stringent examination will be given on appeal to determine if the circuit court abused its discretion.' Syl. pt. 5, *State ex rel. U[nited] S[tates] F[idelity] & G[uar. Co.] v. Canady*, 194 W.Va. 431, 460 S.E.2d 677 (1995).").

■ Prior to reaching the merits of the parties' arguments and reviewing the ruling of the circuit court, however, we must first determine the nature of the attorney-client privilege in this case and the applicability of any exceptions to that privilege. Both parties indicate, and the circuit court alluded, that because the attorney-client relationship between defendants Leavitt and Anne was created in the state of California, California law should govern the applicability of the privilege and any exceptions thereto. In the

realm of conflicts of laws, we previously have held that "[m]atters relating to the substantive rights of the parties are governed by the law of the place where the injury occurred, while matters pertaining to remedial rights are controlled by the law of the forum." Syl. pt. 2, *Forney v. Morrison,* 144 W.Va. 722, 110 S.E.2d 840 (1959). With specific regard to conflicts involving evidentiary matters, we have noted that "[t]he admissibility or inadmissibility of evidence pertains to the remedy and is governed by the law of the forum." Syl. pt. 3, *Forney, id. See generally* 4A Michie's Jur. *Conflict of Laws, Domicile and Residence* § 38 (1990). More precisely, in *Gebr. Eickhoff Maschinenfabrik Und Eisengieberei mbH v. Starcher,* we recognized that "'[t]he local law of the forum governs ... pre-trial practice, including the taking and use of depositions, discovery and penalties for refusal to comply with proper request for information[.]'" 174 W.Va. 618, 623 n. 8, 328 S.E.2d 492, 498 n. 8 (1985) (quoting Restatement (Second) of Conflict of Laws § 127 cmt. a(5) (1969)). Accordingly, we find that the law of the State of West Virginia, as the forum state of this case, governs the nature of the attorney-client privilege and the applicability of the crime or fraud exception thereto at issue in this appeal.

Turning now to the ruling of the circuit court, we note that, by order entered August 14, 1995, the circuit court determined that

the attorney client privilege does not apply to the communications between defendants David Keene Leavitt and Anne Gilmore Conaty pertaining to the adoption of the son of Anne Conaty and John Kessel for the reason that the 'complaint alleges causes of action against both the attorney and client, including fraud, and therefore, the attorney client privilege does not apply.

On the face of this order, it appears that the circuit court properly applied the crime or fraud exception to the underlying proceedings, finding that the communications between Anne and Leavitt were not privileged on the basis of fraud. Looking to the transcript of the hearing resulting in this order, however, we may discern the circuit court's reasoning behind its ruling: "I subscribe to the theory that this is an intentional tort, if it exists, and that the attorney-client privilege—This is one of the exceptions to it. . . . I think that th[e] privilege exists except as to where it may apply to the intentional tort." As we discussed above, the jurisprudence of this State has not expanded the scope of the crime or fraud exception .to include the commission of a tort as a basis for extinguishing the attorney-client privilege. Because such an exception does not exist in this jurisdiction, the circuit court abused its discretion in relying upon this modified exception to require the disclosure of material protected by the attorney-client privilege.

Nevertheless, while we find that the circuit court abused its discretion in citing the wrong reason for its decision, this error does not constitute reversible error as the correct result ultimately was attained. In this manner, the record before this Court indicates that John made a *prima facie* showing that the basis for the attorney-client relationship between defendants Leavitt and Anne was the commission of a fraud upon the court and that the confidential communications ordinarily protected by the attorney-client privilege were made in furtherance of this fraudulent scheme. The record presented to us indicates that, without a doubt, Anne consulted Leavitt in order to subvert John's attempts to oppose the adoption of their child and to obtain an adoptive placement in a judicially inaccessible forum. Moreover, the purportedly privileged communications transpiring between defendants Leavitt and Anne were not only related to the alleged fraud, but indeed constituted an integral part of the planning and performance of the fraudulent scheme. Examples of this fraud upon the court orchestrated and perpetrated through Leavitt's legal representation of Anne include, but are not limited to, the failure of both Anne and Leavitt to notify the Cabell County Circuit Court of the contemplated Canadian adoption proceedings upon learning of the pendency of John's inverse paternity action; Leavitt's facsimile communication to Brian cautioning him to prevent John from learning anything more about Baby Boy Conaty's pre-adoptive placement thereby thwarting John's judicial efforts in West Virginia to assert his parental rights

and to establish a relationship with his infant son; and Anne's repeated renunciation of medical releases which the Cabell County, West Virginia, Circuit Court had ordered her to execute in furtherance of John's attempts to locate his child.[97] Therefore, we find that the crime or fraud exception extinguished the attorney-client privilege in this case thereby permitting John to access Leavitt's files pertaining to his legal representation of Anne in the adoption of Baby Boy Conaty.

### E.

### Excessiveness of Damages Awards

The defendants' final contentions on appeal are that the damages awarded by the jury and ratified by the trial court were excessive. In reviewing challenges to damages awards generally, a deferential standard is employed: "in the absence of any specific rules for measuring damages, the amount to be awarded rests largely in the discretion of the jury, and courts are reluctant to interfere with such a verdict...." 22 Am.Jur.2d *Damages* § 1021, at 1067 (1988) (footnotes omitted). This judicial hesitance stems from the "strong presumption of correctness assigned to a jury verdict assessing damages." *Reel v. Ramirez,* 243 Va. 463, 466, 416 S.E.2d 226, 228 (1992). Accordingly,

[a] jury verdict ... may not be set aside as excessive by the trial court merely because the award of damages is greater than the trial judge would have made if he had been charged with the responsibility of determining the proper amount of the award. This Court cannot set aside a verdict as excessive ... merely because a majority or all members of the Court would have made an award of a lesser amount if initially charged with the responsibility of determining the proper amount of the award.

*Sargent v. Malcomb,* 150 W.Va. 393, 401, 146 S.E.2d 561, 566 (1966). *See also Keiffer v. Queen,* 155 W.Va. 868, 873, 189 S.E.2d 842, 845 (1972) ("The courts usually state that though they might have awarded a greater or lesser amount than that contained in the

jury verdict, they will not substitute their views for that of the jury."); *Sargent v. Malcomb,* 150 W.Va. at 396, 146 S.E.2d at 564 ("[A] mere difference of opinion between the court and the trial jury concerning the proper amount of recovery will not justify either the trial court or this Court in setting aside the verdict on the ground of inadequacy or excessiveness." (citation omitted)). Nevertheless, " '[a] verdict of a jury will be set aside where the amount thereof is such that, when considered in the light of the proof, it is clearly shown that the jury was misled by a mistaken view of the case.' Syllabus, Point 3, *Raines v. Faulkner,* 131 W.Va. 10[, 48 S.E.2d 393 (1947) ]." Syl. pt. 2, *Keiffer v. Queen,* 155 W.Va. 868, 189 S.E.2d 842. Furthermore, " '[c]ourts [may] set aside jury verdicts as excessive [if] they are monstrous, enormous, at first blush beyond all measure, unreasonable, outrageous, and manifestly show jury passion, partiality, prejudice or corruption.' Syl. Pt. [1], [in part,] *Addair v. Majestic Petroleum Co., Inc.,* 160 W.Va. 105, 232 S.E.2d 821 (1977)." Syl. pt. 5, in part, *Roberts v. Stevens Clinic Hosp., Inc.,* 176 W.Va. 492, 345 S.E.2d 791 (1986). With these principles in mind, we proceed to review the defendants' assignments of error.

### 1. Compensatory Damages Award

The defendants first contest as excessive the amount of compensatory damages awarded by the jury and approved by the circuit court. Following the trial underlying this appeal, the jury awarded compensatory damages as follows:

1. The reasonable costs and expenses John Kessel expended in legal fees, investigator fees and other fees in his attempt to locate the child and gain custody of him: $150,000

2. Any mental pain and suffering, anguish and anxiety that plaintiff has undergone to date as a proximate result of the defendants' conduct: $500,000

3. John Kessel's loss of the solace, society, companionship and services of the child that were proximately caused by the conduct of the defendants: $1,000,000

---

97. For further discussion of the fraud attending the attorney-client relationship between defendants Leavitt and Anne see *Kessel v. Leavitt,* 75 Cal.Rptr.2d 639 (Cal.Ct.App.1998).

4. If you believe with reasonable certainty that John Kessel will suffer mental pain and suffering, anguish or anxiety in the future, then future mental pain and suffering, anguish or anxiety may be taken into consideration and you may award an amount to compensate plaintiff for said elements: $350,000[.]

Thereafter, the defendants filed a post-trial motion to alter or amend the judgment pursuant to Rule 59(e) of the West Virginia Rules of Civil Procedure.[98] The circuit court, reviewing the evidence introduced by John at trial, determined that the damages awarded for the first element of compensatory damages, "reasonable costs and expenses" associated with John's attempts to locate and obtain custody of Baby Boy Conaty, did not comport with the evidence presented. Thus, the court reduced this portion of the compensatory damages award from $150,000 to $116,687.47, commensurate with the record evidence of these expenditures. With respect to the three remaining compensatory damages figures, though, the court determined that the evidence supported these calculations and affirmed the jury's award.

Before this Court, the defendants complain that the compensatory damages awarded by the jury were excessive. The defendants assert that, in examining the propriety of a damages award, the reviewing court must determine whether a particular compensatory damages award is, in fact, excessive.

Before a verdict may be reversed on the basis of excessiveness, the trial court must make a detailed appraisal of the evidence bearing on damages. Because the verdict below is entitled to considerable deference, an appellate court should decline to disturb a trial court's award of damages on appeal as long as that award is supported by some competent, credible evidence going to all essential elements of the award.

Syl. pt. 4, *Reed v. Wimmer*, 195 W.Va. 199, 465 S.E.2d 199 (1995). Continuing this analysis, the defendants next propose that once a damages award has been determined to be excessive, the court must determine whether such excessiveness requires reversal of the award:

> " ' "Courts must not set aside jury verdicts as excessive unless they are monstrous, enormous, at first blush beyond all measure, unreasonable, outrageous, and manifestly show jury passion, partiality, prejudice or corruption." Syl. Pt. [1], *Addair v. Majestic Petroleum Co., Inc.*, 160 W.Va. 105, 232 S.E.2d 821 (1977).' Syl. pt. 5, *Roberts v. Stevens Clinic Hosp. Inc.*, 176 W.Va. 492, 345 S.E.2d 791 (1986)." Syl. Pt. 2, *Capper v. Gates*, 193 W.Va. 9, 454 S.E.2d 54 (1994).

Syl. pt. 5, *Tanner v. Rite Aid of West Virginia, Inc.*, 194 W.Va. 643, 461 S.E.2d 149 (1995).

Under the facts and circumstances of this case, the defendants contend that the compensatory damages award is excessive. They suggest that the only concrete evidence of damages tendered by John was the recitation of amounts he expended for legal and investigatory services in furtherance of his efforts to regain his son. Apart from this proof, the defendants intimate that John failed to provide sufficient evidence to justify the remainder of the compensatory damages. They charge that the expert psychiatric witness testifying on John's behalf failed to indicate that John, personally, had sustained any definite psychiatric problems from the Canadian adoption of his son. Citing *Heldreth v. Marrs*, 188 W.Va. 481, 425 S.E.2d 157 (1992) (defining requirements for recovery under claim of negligent infliction of emotional distress.) The defendants also state that John did not present any evidence as to the value of Baby Boy Conaty's services lost to him by virtue of their conduct.

Finally, the defendants propose that the jury awarded the excessive compensatory damages in this case based upon passion and prejudice. In support of this argument, the defendants cite *Roberts v. Stevens Clinic Hospital, Inc.*, 176 W.Va. 492, 345 S.E.2d 791 (1986), wherein this Court upheld a $3 million award for the wrongful death of a toddler. Given that the child at issue in the instant

---

**98.** The West Virginia Rules of Civil Procedure provide, in Rule 59(e), that "[a] motion to alter or amend the judgment shall be served not later than 10 days after entry of the judgment."

case is not deceased, but rather living with "loving" adoptive parents, the defendants urge that the jury improperly sought to punish the defendants for their actions by awarding John exorbitant compensatory damages.

By contrast, John disputes the defendants' argument that the compensatory damages awarded by the jury were excessive because the award is supported both by the evidence and the applicable law. Further, John represents that, based upon the $3 million damage award in *Roberts*, which was decided over ten years ago, the jury's verdict in the present case was not excessive. *Citing Roberts v. Stevens Clinic Hosp., Inc.*, 176 W.Va. 492, 345 S.E.2d 791.

 Primarily, the aim of compensatory damages is to restore a plaintiff to the financial position he/she would presently enjoy but for the defendant's injurious conduct. In this manner, "[c]ompensatory damages indemnify the plaintiff for injury to property, loss of time, necessary expenses, and other actual losses. They are proportionate or equal in measure or extent to plaintiff's injuries, or such as measure the actual loss, and are given as amends therefor." 5C Michie's Jur. *Damages* § 7, at 46–47 (1998) (footnotes omitted). "[T]he general rule in awarding damages is to give compensation for pecuniary loss; that is, to put the plaintiff in the same position, so far as money can do it, as he would have been [in] if . . . the tort [had] not [been] committed." 5C Michie's Jur. *Damages* § 18, at 63 (footnote omitted). Generally, in an action grounded in tort, a prevailing plaintiff may recover compensatory damages for, among other things, expenses actually incurred in repairing or redressing the injury occasioned by the defendant's conduct and sums necessary to compensate the plaintiff for his/her injuries and his/her present and/or future physical or mental pain and suffering resulting from the defendant's tortious behavior. *Id.* § 7, at 47; § 25, at 78–79; § 42, at 116; § 43, at 116–17, 119, 123–26. Furthermore, "[i]t is axiomatic that the plaintiff's measure of damages in a cause of action in fraud would be *any injury* incurred as a result of the defendant's fraudulent conduct." *Per-*

*singer v. Peabody Coal Co.*, 196 W.Va. 707, 719, 474 S.E.2d 887, 899 (1996) (emphasis added). *See also* Syl. pt. 4, *Bowling v. Ansted Chrysler–Plymouth–Dodge, Inc.*, 188 W.Va. 468, 425 S.E.2d 144 (1992) ("Where it can be shown by clear and convincing evidence that a defendant has engaged in fraudulent conduct which has injured a plaintiff, recovery of reasonable attorney's fees may be obtained in addition to the damages sustained as a result of the fraudulent conduct.").

Where a parent seeks recovery for injuries regarding his/her minor child, a prevailing plaintiff parent may also recover remuneration for the value of the child's services and/or future earnings impaired and/or lost as a result of the defendant's wrongful actions. 22 Am.Jur.2d *Damages* § 193, at 166 (1988); 5C Michie's Jur. *Damages* § 28, at 85–86. Thus, under the facts of this case, John properly sought, and received, recovery for the various elements of compensatory damages considered by the jury.

With this assignment of error, the defendants urge this Court to reverse the compensatory damages award based upon its alleged excessiveness. As we have noted, a review of a purportedly excessive jury verdict commands a deferential standard of appellate review. Stated otherwise, "courts are most reluctant to set aside jury verdicts as to damages . . . ." *Keiffer v. Queen*, 155 W.Va. 868, 873, 189 S.E.2d 842, 845 (1972). Consequently, a jury verdict will not be set unless it is unsupported by the evidence or otherwise appears to be " 'monstrous, enormous, at first blush beyond all measure, unreasonable, outrageous, and manifestly [demonstrative of] jury passion, partiality, prejudice or corruption.' " Syl. pt. 5, in part, *Roberts v. Stevens Clinic Hosp., Inc.*, 176 W.Va. 492, 345 S.E.2d 791 (quoting Syl. pt. 1, in part, *Addair v. Majestic Petroleum Co., Inc.*, 160 W.Va. 105, 232 S.E.2d 821). *See also* Syl. pt. 2, in part, *Keiffer v. Queen*, 155 W.Va. 868, 189 S.E.2d 842 (mandating reversal of jury verdict where "it is clearly shown that the jury was misled by a mistaken view of the case" (internal quotations and citation omitted)).

Upon a review of the proceedings below, we cannot find that the compensatory damages awarded by the jury to recompense John's expenditures occasioned by the defendants' fraudulent conduct were either unsupported by the evidence or improperly based upon the jury's passion and prejudice.[99] Claiming that the compensatory damages lacked evidentiary support, the defendants seize upon John's perceived failure to provide sufficient proof of his claims for mental pain and suffering. However, "[w]e have not required plaintiffs who have suffered emotional distress damages to buttress such claims by corroborative evidence at the peril of having their claims dismissed as a matter of law." *Slack v. Kanawha County Hous. & Redev. Auth.*, 188 W.Va. 144, 152, 423 S.E.2d 547, 555 (1992). Therefore, a plaintiff's failure to introduce expert witness testimony specifically describing his/her mental anguish, pain, and suffering is not necessarily fatal to a recovery of emotional distress damages if there exists in the record evidence to support the award. We find the evidentiary record to be such that the jury properly could have concluded that John had sustained mental, emotional, or psychiatric difficulties as a result of the defendants' fraudulent participation in the Canadian adoption of his son. Therefore, we affirm the circuit court's order upholding this portion of the jury's verdict.

The defendants also cite the lack of evidentiary support for John's recovery of sums for the value of Baby Boy Conaty's services lost to him by virtue of their fraudulent conduct. Again, though, we agree with the circuit court's affirmance of the compensatory damages award based upon the fact that the "jury's award in this case . . . was within the bounds of the evidence. . . ." Throughout the trial of this case, John was permitted to present, and the defendants were permitted to rebut, evidence of the defendants' fraudulent conduct which prevented him from commencing a parent-child relationship with his son or from otherwise enjoying the privileges of parenthood. Not only could the jury have found that the de-

fendants intentionally and fraudulently secreted from John the whereabouts of Baby Boy Conaty until his Canadian adoption had been finalized, but it could also have concluded that, but for the defendants' actions, John would at least have had an opportunity to seek custody of, or visitation with, his child. As a result of the defendants' efforts to facilitate and expedite the international custody proceedings, John did not even have a realistic possibility of seeking, much less obtaining, custody of, or visitation with, his son. In light of these facts, the jury properly could have determined the value to John of his son's "solace, society, companionship and services" to have approximated $1 million as a result of the defendants' complete and utter deprivation of John's parental relationship with his son.

Lastly, the defendants suggest that the compensatory damages awarded by the jury were excessive as compared to the damages awarded for the wrongful death of a young child in *Roberts v. Stevens Clinic Hospital, Inc.*, 176 W.Va. 492, 345 S.E.2d 791. With this characterization of the compensatory damages award, however, we disagree. In *Roberts* we acknowledged "[t]hat a damage award is 'precedent shattering' is of little moment when the damages are in fact supported by the record." 176 W.Va. at 511, 345 S.E.2d at 811 (quoting *Pippen v. Denison Div. of Abex Corp.*, 66 Mich.App. 664, 677, 239 N.W.2d 704, 709–10 (1976) (citation and footnote omitted)). Because we have concluded that the damages awarded by the jury to compensate John for his losses occasioned by the defendants' fraudulent conduct were supported by the record evidence, the mere fact that an award of such an amount has not previously been upheld by this Court is not determinative of the award's propriety. Accordingly, we affirm the circuit court's decision upholding as proper the compensatory damages awarded by the jury in this case.

### 2. Punitive Damages Award

The defendants also argue the excessiveness of the punitive damages award. At the conclusion of the underlying trial, the

---

**99.** See *supra* Section II.B.2 for an explanation of John's ability to recover from the defendants under only one of his two alternative theories of liability.

jury assessed the following punitive damages: "David Leavitt $5,000,000[;] Brian Conaty $500,000[;] Anne Conaty [ ] $250,000[;] Dr. Thomas Conaty $50,000[; and] Eleanor Conaty $50,000[.]" The defendants then filed a motion to alter or amend the judgment, pursuant to W. Va. R. Civ. P. Rule 59(e),[100] and a motion to review the punitive damages award, as required by *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991).[101] The circuit court, employing the factors enumerated by this Court for reviewing awards of punitive damages,[102] determined that all of the punitive damage awards were proper and that none of the punitive awards was excessive. From this affirmance by the circuit court, the defendants appeal to this Court the perceived excessiveness of the punitive damages award.

Initially, the defendants suggest a two-step inquiry to determine the propriety of the circuit court's punitive damages award: (1) whether, upon considering the nature of the defendant's conduct, an award of punitive damages is appropriate and (2) if a punitive damages award is permissible, whether the amount of punitive damages actually assessed is excessive. *Citing* Syl. pt. 7, *Alkire v. First Nat'l Bank of Parsons*, 197 W.Va. 122, 475 S.E.2d 122 (1996) ("Our punitive damage jurisprudence includes a two-step paradigm: first, a determination of whether the conduct of an actor toward another person entitles that person to *a* punitive damage

---

**100.** *See supra* note 98 for the text of W. Va. R. Civ. P. Rule 59(e).

**101.** Syllabus point 2 of *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897 (1991), mandates:

Under our system for an award and review of punitive damages awards, there must be: (1) a reasonable constraint on jury discretion; (2) *a meaningful and adequate review by the trial court using well-established principles* : and (3) a meaningful and adequate appellate review, which may occur when an application is made for an appeal.

(Emphasis added).

**102.** Syllabus point 4 of *Garnes v. Fleming Landfill, Inc.*, 186 W.Va. 656, 413 S.E.2d 897, requires:

When the trial court reviews an award of punitive damages, the court should, at a minimum, consider the factors given to the jury as well as the following additional factors:

(1) The costs of the litigation;

(2) Any criminal sanctions imposed on the defendant for his conduct;

(3) Any other civil actions against the same defendant, based on the same conduct; and

(4) The appropriateness of punitive damages to encourage fair and reasonable settlements when a clear wrong has been committed. A factor that may justify punitive damages is the cost of litigation to the plaintiff.

Because not all relevant information is available to the jury, it is likely that in some cases the jury will make an award that is reasonable on the facts as the jury know them, but that will require downward adjustment by the trial court through remittitur because of factors that would be prejudicial to the defendant if admitted at trial, such as criminal sanctions imposed or similar lawsuits pending elsewhere against the defendant. However, at the option of the defendant, or in the sound discretion of the trial court, any of the above factors may also be presented to the jury.

Additionally, Syllabus point 3 of *Garnes* directs:

When the trial court instructs the jury on punitive damages, the court should, at a minimum, carefully explain the factors to be considered in awarding punitive damages. These factors are as follows:

(1) Punitive damages should bear a reasonable relationship to the harm that is likely to occur from the defendant's conduct as well as to the harm that actually has occurred. If the defendant's actions caused or would likely cause in a similar situation only slight harm, the damages should be relatively small. If the harm is grievous, the damages should be greater.

(2) The jury may consider (although the court need not specifically instruct on each element if doing so would be unfairly prejudicial to the defendant), the reprehensibility of the defendant's conduct. The jury should take into account how long the defendant continued in his actions, whether he was aware his actions were causing or were likely to cause harm, whether he attempted to conceal or cover up his actions or the harm caused by them, whether/how often the defendant engaged in similar conduct in the past, and whether the defendant made reasonable efforts to make amends by offering a fair and prompt settlement for the actual harm caused once his liability became clear to him.

(3) If the defendant profited from his wrongful conduct, the punitive damages should remove the profit and should be in excess of the profit, so that the award discourages future bad acts by the defendant.

(4) As a matter of fundamental fairness, punitive damages should bear a reasonable relationship to compensatory damages.

(5) The financial position of the defendant is relevant.

*Id.*

award under *Mayer v. Frobe,* 40 W.Va. 246, 22 S.E. 58 (1895); second, if a punitive damage award is justified, then a review is mandated to determine if *the* punitive damage award is excessive under *Garnes v. Fleming Landfill, Inc.,* 186 W.Va. 656, 413 S.E.2d 897 (1991).").

The defendants first assert that punitive damages cannot properly be assessed against them as they were acting in conformity with the then-applicable law of the State of California. They then rely upon the case of *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 572, 116 S.Ct. 1589, 1597, 134 L.Ed.2d 809, 824 (1996) (plurality opinion), for the proposition that punitive damages are improper to punish the doing of an act that was lawful at the time or in the place that it was performed. They suggest that because their actions were not violative of the governing California law, presumably pertaining to adoptions, they cannot be charged with punitive damages based upon this conduct.

Next arguing that the punitive damages assessed against them were excessive, the defendants complain that the circuit court improperly removed from the jury's contemplation "the wealth of [the d]efendants" in instructing them upon the appropriate factors to consider in awarding punitive damages.[103] They indicate that this element has been found by this Court to be relevant to a jury's assessment of punitive damages, *citing* Syl. pt. 3, in part, *Garnes v. Fleming Landfill, Inc.,* 186 W.Va. 656, 413 S.E.2d 897 ("(5) The financial position of the defendant is relevant."), and that John's failure to introduce such evidence at trial improperly removed this criterion from the jury's consideration. The defendants also complain that the punitive damages awarded against them far exceed their net worth and that the jury should have been permitted to consider their

financial position before assessing such excessive damages.

Finally, defendants Brian and Dr. and Mrs. Conaty intimate that the punitive damages assessed them were exorbitantly excessive in that the amount of these damages "far exceeds any alleged wrongdoing committed by [them]." They represent that they are guilty of no wrongdoing other than providing familial support to their sister and daughter, Anne. Because, they claim, they committed no unlawful or improper acts, the punitive damages assessed against them are both improper and excessive.

John responds by stating that the punitive damages awarded by the jury and approved by the circuit court are proper given the defendants' fraudulent conduct. *Citing* Syl. pt. 1, *Wells v. Smith,* 171 W.Va. 97, 297 S.E.2d 872 (1982) (" 'In actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear, or where legislative enactment authorizes it, the jury may assess exemplary, punitive[,] or vindictive damages....' Syllabus Point 4, in part, *Mayer v. Frobe,* 40 W.Va. 246, 22 S.E. 58 (1895)."), *overruled in part on other grounds by Garnes v. Fleming Landfill, Inc.,* 186 W.Va. 656, 413 S.E.2d 897. Because, John contends, the jury conclusively found the defendants had fraudulently interfered with his efforts to assert his parental rights and to establish a relationship with his son, they were permitted to consider and to award punitive damages.

Additionally, John suggests that the amount of punitive damages awarded by the jury is proper and not excessive. Relying upon this Court's standard for determining an appropriate amount of punitive damages set forth in *TXO Production Corp. v. Alli-*

---

**103.** In ruling upon the parties' punitive damages instructions, the circuit court eliminated from the jury's consideration that portion of John's instruction relating to the defendants' financial status: "[t]he financial position of the defendant[s] is relevant inasmuch as the wealthier the defendant[s] [are,] the greater the amount of punitive damages should be in order to achieve the desired effect of punishing the defendant[s] and discouraging the defendant[s] from engaging in the same or similar acts in the future[.]" Plaintiff's Instruction No. 71 (as offered). The court determined that there was no evidence in the case of the "financial position of each of the defendants." Although the court noted generally that the defendants objected to this instruction and although the defendants objected specifically to various portions of this instruction, it is not apparent from the record that the defendants objected specifically to the above-excised portion of this instruction pertaining to the relevance of the defendants' wealth.

*ance Resources Corp.,* John represents that the amount of punitive damages actually awarded by the jury was well within the amount held to be permissible by this Court. *Citing* Syl. pt. 15, *TXO Prod. Corp. v. Alliance Resources Corp.,* 187 W.Va. 457, 419 S.E.2d 870 ("The outer limit of the ratio of punitive damages to compensatory damages in cases in which the defendant has acted with extreme negligence or wanton disregard but with no actual intention to cause harm and in which compensatory damages are neither negligible nor very large is roughly 5 to 1. However, where the defendant has acted with actual evil intention, much higher ratios are not *per se* unconstitutional."), *cert. granted, in part,* 506 U.S. 997, 113 S.Ct. 594, 121 L.Ed.2d 532 (1992), *aff'd,* 509 U.S. 443, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993).

Lastly, John urges that the fact that the circuit court removed the defendants' financial position from the jury's consideration does not warrant reversal of the punitive damages award. Rather, John represents that his efforts to obtain the defendants' financial information were thwarted by their failure to comply with several pre-trial discovery requests regarding their financial condition and that the circuit court did not preclude either party from introducing such evidence at trial. Accordingly, John indicates that the defendants have now waived their right to complain of this alleged defect because they neither cooperated with John's efforts to secure such information nor presented such evidence on their own behalf.

 With this assignment of error, the defendants request us to determine whether their conduct warranted an award of punitive damages and whether the punitive damages awarded by the jury and ratified by the trial court were excessive. Thus, we first must examine the circumstances under which a punitive damages award is proper. Generally,

> " '[p]unitive or exemplary damages are such as, in a proper case, a jury may allow against the defendant by way of punishment for wilfulness, wantonness, malice, or other like aggravation of his wrong to the plaintiff, over and above full compensation for all injuries directly or indirectly result-

ing from such wrong.' Syllabus Point 1, *O'Brien v. Snodgrass,* 123 W.Va. 483, 16 S.E.2d 621 (1941)." Syllabus point 4, *Harless v. First Nat'l Bank,* 169 W.Va. 673, 289 S.E.2d 692 (1982).

Syl. pt. 5, *Coleman v. Sopher,* 201 W.Va. 588, 499 S.E.2d 592 (1997). In this vein, we have determined punitive damages awards to be permissible to achieve a myriad of important objectives.

> "[P]unitive damages serve several purposes. Among the primary ones are: (1) to punish the defendant; (2) to deter others from pursuing a similar course; and, (3) to provide additional compensation for the egregious conduct to which the plaintiff has been subjected.".... Furthermore, " '[[p]unitive damages] encourage a plaintiff to bring an action where he might be discouraged by the cost of the action or by the inconvenience of a criminal proceeding.... [They also] provide a substitute for personal revenge by the wronged party.' "

*Coleman v. Sopher,* 201 W.Va. at 603 n. 22, 499 S.E.2d at 607 n. 22 (quoting *Harless v. First Nat'l Bank in Fairmont,* 169 W.Va. at 691 & n. 17, 289 S.E.2d at 702–03 & n. 17 (additional citations omitted)). Thus, " '[i]n actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear,' " a jury may properly consider and assess punitive damages against the defendants based upon the facts and circumstances surrounding the defendants' wrongful conduct. Syl. pt. 4, in part, *Alkire v. First Nat'l Bank of Parsons,* 197 W.Va. 122, 475 S.E.2d 122 (1996) (quoting Syl. pt. 4, in part, *Mayer v. Frobe,* 40 W.Va. 246, 22 S.E. 58).

 Upon the appeal to this Court of a punitive damages assessment, we review awards of punitive damages in the first instance to determine whether the facts and circumstances of the case at issue are sufficient to permit an award of such damages. Syl. pt. 7, *Alkire,* 197 W.Va. 122, 475 S.E.2d 122 (describing two-part judicial review of punitive damages awards). In conducting a review of the propriety of punitive damages,

we employ the criteria set forth above describing the situations in which punitive damages are proper. We next review such awards to ascertain whether the amount of punitive damages actually awarded by the jury is proper or whether such an award is excessive. Syl. pt. 7, *Alkire, id.* For this undertaking, we "apply[ ] the standard specified in Syllabus Point 5 of *Garnes.*" Syl. pt. 5, in part, *Alkire, id.* This canon directs:

> Upon petition, this Court will review all punitive damages awards. In our review of the petition, we will consider the same factors that we require the jury and trial judge to consider, and all petitions must address each and every factor set forth in Syllabus Points 3 and 4 of this case [104] with particularity, summarizing the evidence presented to the jury on the subject or to the trial court at the post-judgment review stage. Assignments of error related to a factor not specifically addressed in the petition will be deemed waived as a matter of state law.

Syl. pt. 5, *Garnes v. Fleming Landfill, Inc.,* 186 W.Va. 656, 413 S.E.2d 897. With these standards in mind, we turn now to the defendants' assignment of error.

The defendants first charge that the assessment of punitive damages against them is improper, relying upon the case of *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) (plurality opinion). They contend that because their actions were in conformity with the then-applicable law of California, presumably governing adoptions, they cannot now be assessed with punitive damages. While their argument facially appears to be valid, we cannot set aside the punitive damages award on this basis. It is true that the United States Supreme Court in the *Gore* decision

prohibits "a State [from] impos[ing] economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." 517 U.S. at 572, 116 S.Ct. at 1597, 134 L.Ed.2d at 824 (footnote omitted). However, before we can make an automatic declaration that punitive damages are improper in this case, we must first determine whether, in fact, then-existing law in California permitted the defendants' conduct of which the plaintiff now complains.

In presenting their argument to this Court, the defendants intimate that their actions complied with the law governing adoptions in the State of California in 1991.[105] As we alluded to in note 32, *supra,* though, the law governing the underlying adoption of Baby Boy Conaty would more appropriately be the law of Alberta, Canada, where the adoption was finalized, as opposed to the law of California. *See Marr v. Superior Court,* 114 Cal.App.2d 527, 250 P.2d 739 (1952) (suggesting that consent to adoption must comply with *laws of jurisdiction in which adoption petition is filed*); *Estate of Johnson,* 100 Cal.App.2d 73, 223 P.2d 105 (1950) (indicating that validity of adoption is determined by *laws of state or foreign country in which adoption is finalized*). As the defendants do not assert that their actions either complied with or violated the adoption laws of Alberta, Canada, we need not further address this matter. *See* Syl. pt. 6, *Addair v. Bryant,* 168 W.Va. 306, 284 S.E.2d 374 (1981) ("Assignments of error that are not argued in the briefs on appeal may be deemed by this Court to be waived."). *See also* W. Va. R.App. P. Rule 10(d) ("The appellant's brief shall follow the same form as the petition for appeal.") and Rule 3(c) ("A petition for appeal shall state the following . . .: 3. The assignments of error relied upon on ap-

---

**104.** *See supra* note 102 for the text of Syllabus points 3 and 4 of *Garnes,* 186 W.Va. 656, 413 S.E.2d 897.

**105.** We surmise that the defendants intend to rely upon the laws applicable to adoption proceedings in California in 1991, but we are unable to state with certainty that this is, in fact, the law upon which the defendants base the legality of their conduct as their appellate brief does not clearly phrase this argument or provide supportive authority:

> As applied to the present case, Defendants complied with the law of California at the time Defendant Anne's baby was placed for adoption. Thus, even if this Court were to hold that a mother does not have the right to preclude an unwed father from developing a relationship with his child, such a holding could not be used to punish Defendants because Defendants acted in accordance with existing California law.

peal.... [and] 4. Points and authorities relied upon [and] a discussion of law....").

Giving the defendants the benefit of the doubt, however, we also will examine whether their conduct complied with the law governing such behavior in the State of California in 1991. The defendants' fraudulent concealment of information regarding Baby Boy Conaty's whereabouts, in response to John's requests for such information, directly contravened the law of California providing a cause of action for "intentional concealment of a material fact". *See Stevens v. Superior Court,* 180 Cal.App.3d 605, 608–09, 225 Cal.Rptr. 624, 626 (1986) (citations omitted). Accordingly, we find that the award of punitive damages in this case was not precluded by the decision of the United States Supreme Court in *BMW of North America, Inc. v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809.

■■■■■ The defendants next ask us to examine the amount of the punitive damages awarded by the jury and to ascertain whether this amount is excessive. The defendants assert that because their financial position was removed from the jury's consideration, the punitive damages awarded against them were excessive and should be set aside for this reason. As we described in note 103, *supra,* the circuit court removed this factor from the jury's consideration finding that "[t]here [wa]s just no evidence" of the defendants' financial position in the evidence submitted at trial. While the defendants objected generally to John's instruction enumerating the various criteria the jury could consider in deciding whether to assess and award punitive damages, we are unable to locate in the record any indication that the defendants objected specifically to the circuit court's omission of the defendants' financial position portion of this instruction. Thus, we are compelled to repeat our oft-stated cautionary:

> " 'To preserve an issue for appellate review, a party must articulate it with such sufficient distinctiveness to alert a circuit court to the nature of the claimed defect. The rule in West Virginia is that parties must speak clearly in the circuit court[,] on pain that, if they forget their lines, they

will likely be bound forever to hold their peace.... [sic] [I]t must be emphasized that the contours for appeal are shaped at the circuit court level by setting forth with particularity and at the appropriate time the legal ground upon which the parties intend to rely.' "

*Hanlon v. Logan County Bd. of Educ.,* 201 W.Va. 305, 315, 496 S.E.2d 447, 457 (1997) (quoting *State v. Browning,* 199 W.Va. 417, 425, 485 S.E.2d 1, 9 (1997) (quoting *State ex rel. Cooper v. Caperton,* 196 W.Va. 208, 216, 470 S.E.2d 162, 170 (1996) (citation omitted))). *See also* W. Va. R. Civ. P. Rule 46 ("Formal exceptions to rulings or orders of the court are unnecessary; but for all purposes for which an exception has heretofore been necessary *it is sufficient that a party, at the time the ruling or order of the court is made or sought, make known to the court the action which he desires the court to take or his objection to the action of the court and his grounds therefor* [.]" (emphasis added)). Hence, " '[w]here objections were not shown to have been made in the trial court, and the matters concerned were not jurisdictional in character, such objections will not be considered on appeal.' Syllabus point 1, *State Road Comm'n v. Ferguson,* 148 W.Va. 742, 137 S.E.2d 206 (1964)." Syl. pt. 2, *Coleman v. Sopher,* 201 W.Va. 588, 499 S.E.2d 592 (1997).

■■■■■ Nevertheless, even if we directly review the defendants' contention that the omission of their financial status resulted in an excessive award of punitive damages, we are not persuaded by their reasoning. The defendants correctly state that a jury may properly consider the wealth of the defendants in rendering a punitive damages award. *See, e.g.,* Syl. pt. 3, in part, *Garnes,* 186 W.Va. 656, 413 S.E.2d 897 (enumerating criteria to be considered by jury in awarding punitive damages and noting that "[t]he financial position of the defendant is relevant"); Syl. pt. 2, *Wells v. Smith,* 171 W.Va. 97, 297 S.E.2d 872 ("In assessing punitive damages, the trier of fact should take into consideration all of the circumstances surrounding the particular occurrence including the nature of the wrongdoing; the extent of harm inflicted, the intent of the party com-

mitting the act, *the wealth of the perpetrator,* as well as any mitigating circumstances." (emphasis added)).

Although a jury, and a reviewing court, may properly consider the financial posture of a particular defendant, we have yet to conclusively require consideration of this factor. Indeed, we specifically have recognized that

> [w]e have never ... mandated that a plaintiff must introduce evidence of the wealth of the defendant in order to recover punitive damages. In some cases, the defendant may wish to demonstrate its meager financial status as a way of holding down a punitive damage award. The failure of the plaintiff to introduce such evidence, however, does not preclude a punitive damage award.

*Slack v. Kanawha County Hous. & Redev. Auth.,* 188 W.Va. 144, 156, 423 S.E.2d 547, 559 (1992). Accordingly, we find that the punitive damages assessed by the jury in this case and approved by the trial court are not excessive solely because the jury was not permitted to consider the defendants' financial position in awarding such damages.[106]

The defendants lastly contend that the punitive damages awarded against defendants Brian and Dr. and Mrs. Conaty were exorbitantly excessive considering they did little more than act as "loving, supportive family members [who] tr[ied] to help Defendant Anne through a difficult period in her life." To resolve this issue we need only articulate that other jurisdictions faced with cases arising under similar circumstances have, without hesitation, permitted punitive damages to be assessed against the "helpful" family member found to have wrongfully interfered with the complaining parent's parent-child relationship. *See, e.g., Fenslage v. Dawkins,* 629 F.2d 1107, 1109, 1111 (5th Cir. 1980) (upholding, under Texas law, punitive damages award against paternal grandparents, paternal uncle, and paternal aunt); *Kajtazi v. Kajtazi,* 488 F.Supp. 15, 19–20, 21–22 (E.D.N.Y.1978) (finding punitive damages award against paternal grandfather and paternal uncle to be proper under New York law); *Kramer v. Leineweber,* 642 S.W.2d 364, 366, 369–70 (Mo.Ct.App.1982) (affirming award of punitive damages against paternal grandmother); *Silcott v. Oglesby,* 721 S.W.2d 290, 291 (Tex.1986) (permitting recovery of punitive damages from maternal grandfather).

More importantly, though, is the fact that the named defendants did not just provide familial support to their sister and daughter. Rather, the jury weighing the evidence in this case specifically found that each of these defendants, Brian and Dr. and Mrs. Conaty, had actively committed fraud in order to prevent John from asserting his parental rights and to ultimately preclude him from ever establishing a parent-child relationship with his son. Thus, we do not find that the punitive damages assessed against defendants Brian and Dr. and Mrs. Conaty are disproportionately excessive given their participation in the Canadian adoption of Baby Boy Conaty and the consequent permanent deprivation of John's parental rights. In sum, we affirm the circuit court's order upholding the jury's award of punitive damages against the defendants for their fraudulent conduct which usurped John's parental rights.

### F.

### *Cross–Appeal: Rights of Paternal Grandfather*

In addition to the errors raised by the defendants, Dr. Ray Kessel cross-appeals the circuit court's decision to direct a verdict in favor of the defendants with respect to his claims for intentional infliction of emotional distress; intentional deprivation of his right to visitation with his grandson, Baby Boy Conaty; fraud; and tortious interference with his grandparental relationship with his grandson. Dr. Kessel argues that the circuit court erroneously determined that his limited rights as a grandparent would not support the further prosecution of his claims. In support of his contention that he should have

---

**106.** Having resolved this issue on other grounds, we decline to address John's complaint that he was effectively precluded from introducing evidence at trial of the defendants' financial position because they allegedly refused to comply with his pre-trial financial discovery requests.

been permitted to present his claims to a jury, Dr. Kessel cites W. Va.Code § 48–2B–1, *et seq.*, which sets forth a grandparent's rights vis-a-vis his/her grandchild. He contends further that, because his son John would have permitted him to visit with Baby Boy Conaty if John had had custody of the child, Dr. Kessel should be permitted to hold the defendants accountable for their interference with his expectation of a grandparental relationship with his grandson.

The defendants counter that because John has failed to state a valid cause of action, the claims of Dr. Kessel, which are based upon John's claims, are similarly invalid. They further adopt the circuit court's ruling finding that, as a grandfather, Dr. Kessel has no basis for a cause of action against them.

This cross-appeal arises from the circuit court's entry of a directed verdict in favor of the defendants, which dismissed Dr. Kessel's claims against them. In this regard, the circuit court, upon the conclusion of John's case at trial, evaluated the evidence that had been presented and determined:

> The statute in effect for grandparents' visitation at the time of this incident is five lines. "Upon the verified petition of [sic] a parent of a deceased child seeking visitation rights with grandchildren of the petitioner, the Court [sic] may order that the grandparent shall have [sic] reasonable and seasonable visitation rights with said grandchild or grandchildren as the Court [sic] may deem proper in the best interest of the child or children." [W. Va.Code § 48–2B–1 (1980) (Repl.Vol.1986).]

> . . . . .

> [T]he Court would find that any rights that Mr. [sic] Ray Kessel [has] derive from statutory law. There is no common law historical right for a grandparent to have a relationship with a grandchild. This area of the law is evolving.... The [West Virginia Supreme] Court [has] stated that the rights of ... grandparents relating to grandchildren have been expanding over the past 20 years. However, those rights are limited in the main to rights of visitation.

> When we look at what was the right of visitation for Ray Kessel at the time of the alleged tortuous [sic] conduct in this case, Ray Kessel had no statutory right to visitation.... I find that, in this case, Ray Kessel, in fact, cannot maintain any cause of action against any of the defendants, because at the time of the tortuous [sic] conduct alleged in this case, he had no statutory right. That is opposed to his son where our court [sic] has clearly said—and that began in the early '70s—that a biological parent in fact has a constitutional right not to be deprived of a parental right without notice and some appropriate due process hearing. That being *In Re: Willis*, a 1973 case. [157 W.Va. 225, 207 S.E.2d 129 (1973).]

> . So the Court would grant the motion of the defense as to the claims of the plaintiff Ray Kessel....

▪▪▪▪ Rule 50(a) of the West Virginia Rules of Civil Procedure permits a party to move for a directed verdict. When a defendant makes such a motion, a circuit court should direct a verdict in the defendant's favor if " 'the plaintiff's evidence, considered in the light most favorable to him, fails to establish a prima facie right to recovery[.]' " Syl. pt. 1, in part, *Brannon v. Riffle,* 197 W.Va. 97, 475 S.E.2d 97 (1996) (quoting Syl. pt. 3, in part, *Roberts ex rel. Roberts v. Gale,* 149 W.Va. 166, 139 S.E.2d 272 (1964)). In this regard, "every reasonable and legitimate inference fairly arising from the testimony, when considered in its entirety, must be indulged in favorably to plaintiff; and the court must assume as true those facts which the jury may properly find under the evidence." Syl. pt. 2, in part, *Brannon,* 197 W.Va. 97, 475 S.E.2d 97 (internal quotations and citations omitted). Upon the appeal of a circuit court's entry of a directed verdict, we apply a *de novo* standard of review:

> The appellate standard of review for the granting of a motion for a directed verdict pursuant to Rule 50 of the West Virginia Rules of Civil Procedure is de novo. On appeal, this court [sic], after considering the evidence in the light most favorable to the nonmovant party, will sustain the granting of a directed verdict when only

one reasonable conclusion as to the verdict can be reached. But if reasonable minds could differ as to the importance and sufficiency of the evidence, a circuit court's ruling granting a directed verdict will be reversed.

Syl. pt. 3, *Brannon, id.*

Examining the record of the proceedings before the circuit court, we find that the lower court did not err in directing a verdict in favor of the defendants with respect to Dr. Kessel's claims. While we have determined, above, that John presented valid causes of action, contrary to the arguments urged by the defendants, it does not necessarily follow that Dr. Kessel has stated a claim upon which relief can be granted. The circuit court based its decision primarily upon the statutory rights accorded to grandparents at the time of the events underlying this appeal. In 1991, W. Va.Code § 48–2B–1 (1980) (Repl. Vol.1986) expressly permitted a grandparent to request visitation with a grandchild where the grandchild's parent, the grandparent's own child, was deceased. Likewise, W. Va. Code § 48–2–15(b)(1) (1991) (Repl.Vol.1992) provided for a limited right of grandparental visitation where the grandchild's parent, the grandparent's own child, had been named as a party to a divorce, separate maintenance, or annulment action, but his/her whereabouts were unknown or he/she had otherwise failed to answer, appear, or defend such action. Beyond these two very specific scenarios, however, a grandparent had no definitely expressed statutory rights to either form a relationship with his/her grandchild or to continue a previously established relationship.

Turning to judicially recognized rights of grandparents in existence at the time of the underlying events, we are faced with a slightly broader, albeit still narrow, scope of grandparental rights. Prior to the legislative creation of a statutory right to request visitation with one's grandchild in 1980, "[a] grandparent who ha[d] no legal right to custody of his or her grandchild ha[d] no legal right to visit and communicate with such grandchild over the parents' objection." Syl. pt. 1, *Brotherton v. Boothe,* 161 W.Va. 691, 250 S.E.2d 36 (1978), *superseded by statute*

as noted in *Petition of Nearhoof,* 178 W.Va. 359, 359 S.E.2d 587 (1987). In this regard, we explained that:

> A parent who has legal custody of his or her child has the right to determine when such minor child may visit, or may be visited by the grandparents of the child, and a court has no authority to decree visitation rights to a grandparent where such rights have not been agreed to by the parent.

Syl. pt. 2, *id.*

Enforcing the grandparental rights acknowledged by the legislature in the 1980s, this Court determined that "[a] trial court, in considering a petition of a grandparent for visitation rights with a grandchild or grandchildren pursuant to W. Va.Code, 48–2–15(b)(1) [1986] or W. Va.Code, 48–2B–1 [1980], shall give paramount consideration to the best interests of the grandchild or grandchildren involved." Syl. pt. 1, *Petition of Nearhoof,* 178 W.Va. 359, 359 S.E.2d 587. Despite the relatively narrow scope of the two above-referenced statutes securing a grandparent's right to visit with his/her grandchild, we held further in *Nearhoof* that:

> Upon the petition of a grandparent, pursuant to W. Va.Code, 48–2B–1 [1980], seeking visitation rights with a grandchild or grandchildren, who is the child or are the children of the grandparent's deceased child, a trial court may order that the grandparent shall have reasonable and seasonable visitation rights with the grandchild or grandchildren provided such visitation is in the best interest of the grandchild or grandchildren involved, even though the grandchild or grandchildren has or have been adopted by the spouse of the deceased child's former spouse.

Syl. pt. 2, *id. But see* W. Va.Code § 48–4–11(a) (1984) (Repl.Vol.1996) (directing, in pertinent part, that "[u]pon the entry of such order of adoption, any person previously entitled to parental rights ... and the lineal or collateral kindred of any such person, parent or parents ... shall be divested of all legal rights" with respect to the adopted child, thereby suggesting, in light of *Nearhoof,* that an adoption of a child by one who is not that child's step-parent would divest the child's

grandparent of his/her statutory visitation rights).

In recent years, the recognized rights of grandparents have continued to expand through both statutory definition and judicial interpretation. Today, West Virginia statutory law permits a grandparent to seek visitation not only when his/her own child, the grandchild's parent, is deceased, *see* W. Va. Code § 48–2B–4 (1992) (Repl.Vol.1996), but also where the grandparent's child has not appeared or defended a divorce, annulment, or separate maintenance action, *see* W. Va. Code § 48–2B–2 (1992) (Repl.Vol.1996); where the grandparent's own child has abandoned or abrogated his/her visitation rights or there exists judicial preclusion of such visitation rights, *see* W. Va.Code § 48–2B–3 (1992) (Repl.Vol.1996); when the grandchild has previously resided with the grandparent seeking visitation for at least six months in the preceding two years, *see* W. Va.Code § 48–2B–5 (1992) (Repl.Vol.1996); and where the grandchild's parents are not married, *see* W. Va.Code § 48–2B–6 (1992) (Repl.Vol. 1996). In the majority of these circumstances, though, the grandparent derives his/ her rights through his/her own child, the parent of the subject grandchild. Additionally, each instance of possible visitation rights is conditioned upon the fulfillment of numerous prerequisites.

As these statutory amendments pertain to the instant case, it is apparent that Dr. Kessel today might enforce his grandparental rights under W. Va.Code § 48–2B–6, which permits "[g]randparent visitation where [the grandchild's] parents [are] unwed." [107] However, Dr. Kessel's success under even this provision is questionable given the ambiguous requirement that "[t]he parent of the minor child through whom the grandparent is related is precluded by court order from visitation with the minor child ...," W. Va. Code § 48–2B–6(a)(2), since it is unclear whether judicial preclusion via termination of parental rights incident to an adoption satisfies this element, or whether this criterion contemplates the preservation of parental rights but the denial of visitation due to

various circumstances, *e.g.*, inability to provide appropriate care, abusive or neglectful behavior, and the like.

Likewise, the West Virginia judiciary, following the Legislature's trend, has continued to recognize the expanding rights accorded grandparents. Most recently, in Syllabus point 2 of *Elmer Jimmy S. v. Kenneth B.*, 199 W.Va. 263, 483 S.E.2d 846 (1997), we recognized that:

> W. Va.Code § 48–2B–1 *et seq.* affords circuit courts jurisdiction to consider grandparent visitation under the limited circumstances provided therein, even though the parental rights of the parent through whom the grandparent is related to the grandchild or grandchildren have been terminated. Generally, those circumstances, as contemplated by W. Va.Code § 48–2B–2 to –6 (1992) (Repl.Vol.1996), are: (1) where divorce or separate maintenance is ordered and the parent has not appeared, etc.; (2) upon abandonment or abrogation of visitation rights by the grandchild's parent or judicial preclusion of such visitation; (3) when the parent through whom the grandparent is related is deceased; (4) when the minor child has resided with the grandparent for six consecutive months or more within the past two years; and (5) under certain circumstances when the parents of the child are unwed....

In addition, this Court, in 1997, adopted the West Virginia Rules of Procedure for Child Abuse and Neglect Proceedings, Rule 15 of which defines the scope of grandparent visitation in the context of abuse and neglect proceedings. *See also* W. Va. R.P. for Child Abuse & Neglect Proceedings n. 1 (accompanying Rule 15) (same). Nevertheless, it appears that while "[t]he rights of grandparents relating to grandchildren have been expanding over the past twenty years, ... those rights are limited in the main to rights of visitation." *State ex rel. David Allen B. v. Sommerville,* 194 W.Va. 86, 90, 459 S.E.2d 363, 367 (1995). Even under the rubric of

---

**107.** We emphasize, though, that Dr. Kessel is essentially powerless to seek actual visitation under W. Va.Code § 48–2B–6 (1992) (Repl.Vol. 1996) following the finalization of the Canadian adoption and the attendant termination of John's parental rights.

expanded grandparents' visitation rights, though, such statutory and judicial protections are "in no measure a guarantee of the right to visitation." *Mary Jean H. v. Pamela Kay R.*, 198 W.Va. 690, 693, 482 S.E.2d 675, 678 (1996) (per curiam). .

Despite the increased scope of grandparents' visitation rights contained in recent statutory and common law, we cannot expand our recognition in this case of a parent's cause of action for interference with his/her parental rights to encompass alleged interference with one's grandparental rights as urged by Dr. Kessel. In his arguments before this Court, Dr. Kessel does not cite any authority permitting a grandparent to maintain a cause of action for tortious interference with his/her grandparental rights and, in fact, has conceded that such a claim is novel and unprecedented. Likewise, we can locate no authority to support the recognition of such a cause of action.[108] Although, as discussed above, this State has broadened the realm of grandparents' rights, when compared with the rights accorded a child's parents, grandparents' rights continue to be rather limited.[109] Accordingly, we are reluctant to expand grandparental rights in a manner that has not previously been contemplated by either this Court or the West Virginia Legislature.[110] Therefore, we find that the circuit court did not err in directing a

verdict for the defendants with respect to Dr. Kessel's claims.

## III.

## CONCLUSION

Throughout our review of the facts of this case and the various authorities which helped to shape our decision, we have come to appreciate the real problems plaguing the general process by which adoptions are commenced and consummated.[111] As evidenced by the instant appeal, frequently at odds are the competing interests of the biological mother, who wishes to promptly secure an appropriate home for her child; the biological father, who may hope to participate in his child's upbringing; the adoptive parents, who desire an adoption procedure that, emotional though it may be, is as quick and painless as possible; and the child, who is entitled to live in a stable, loving, and caring environment. Unfortunately, though, the child, whose interests should be paramount, often is the innocent victim of his/her parents' conflicting interests.

Several cases receiving national prominence and involving the trampling, or unintentional ignorance, of a biological father's rights have resulted in the wrenching of children from their adoptive families, a particularly traumatic event for a young child who has known no other family and regards his/

108. Indeed, our research indicates that at least one court has actually denied the claim of grandparents alleging interference with their relationship with their grandchildren. *See Cage v. Wood,* 484 So.2d 850 (La.Ct.App.1986) (rejecting grandparents' claim for interference with grandparental relationship). *See also Renaud v. St. Lawrence County,* 233 A.D.2d 710, 711 & n. 3, 650 N.Y.S.2d 367, 368 & n. 3 (1996) (noting that lower court dismissed grandparents' claims of custodial interference but declining to address issue on appeal because grandparents "elected not to proceed with their appeal"). *Cf. Ellis v. Hamilton,* 669 F.2d 510 (7th Cir.1982) (denying adoptive grandmother relief on federal due process claim because state remedies had not been adequately exhausted); *Mecke v. Grubbs,* 278 S.W.2d 404 (Tex.Civ.App.1954) (denying grandparents relief upon claim of interference with custody of grandchild by child's father where grandparents had custody of grandchild by agreement of father but record did not indicate that father was unfit to have custody). *But cf. Clark v. Bayer,* 32 Ohio St. 299 (1877) (permitting

grandfather to recover for custodial interference with his grandchildren where grandfather previously had been granted sole custody of grandchildren).

109. *See* Sections II.B.1. and II.C.3., *supra,* for a discussion of recognized parental rights.

110. Though substantially broadening the rights of grandparents to visit with their minor grandchildren, the 1998 Legislative amendments to the grandparent visitation statutes, codified in W. Va.Code §§ 48–2B–1 to 48–2B–12 (1998) (Supp. 1998), do not apply to the resolution of the instant appeal as these new laws were not in effect at the time of the underlying events.

111. Assisting with our appreciation of these difficulties attending adoption are the numerous briefs filed by Amici Curiae during the presentation of this appeal describing these participants' varied interests in this matter. We wish to thank these organizations for their concerns and contributions toward the resolution of this case.

her biological father as a comparative stranger. *See, e.g., In re B.G.C.,* 496 N.W.2d 239 (Iowa 1992) and *In re Clausen,* 442 Mich. 648, 502 N.W.2d 649 (1993) (per curiam) (case of "Baby Jessica"); *In re Doe,* 159 Ill.2d 347, 202 Ill.Dec. 535, 638 N.E.2d 181 (1994) and *In re Kirchner,* 164 Ill.2d 468, 208 Ill.Dec. 268, 649 N.E.2d 324 (1995) (case of "Baby Richard"). *See also* Julie Evans, *"Please Don't Take Our Child,"* Woman's Day, Mar. 14, 1995, at 83; Mark Hansen, *Fears of the Heart,* A.B.A. J., Nov., 1994, at 58. *Cf. Honaker v. Burnside,* 182 W.Va. 448, 388 S.E.2d 322 (1989) (recognizing that child had strong familial relationship with her stepfather and half-brother, but returning custody of child to her biological father following death of her biological mother).

The instant appeal, though not precisely a case of this nature, also involves the competing interests of the child's parents, but incorporates an additional element as well: the intercountry placement of a child for adoption. For whatever reasons, Anne placed Baby Boy Conaty into Canada for adoption. These facts are not those of an isolated occurrence. Rather, it has been suggested that such intercountry placements are increasingly common as a method by which to thwart a biological father's parental rights. *See* Alexandra Maravel, *Intercountry Adoption and the Flight From Unwed Fathers' Rights: Whose Right is it Anyway?,* 48 S.C. L.Rev. 497 (1997).

While today's decision is not an appropriate forum in which to dissect and repair all of the ailments of existing adoption procedures, which, in fact, have been remedied to some degree by various legislative amendments enacted subsequent to the facts underlying this case,[112] we have been able to redress, in part, the intentional deprivation of a biological father's right to establish a relationship with his child. By today's decision, we do not intend to haphazardly intrude upon a biological mother's right to conduct her pregnancy in the manner in which she, herself, chooses. Nevertheless, we recognize with equal importance the right of a biological

father, who has "grasped the opportunity," to establish a relationship with his child, and the corresponding, albeit limited, right of a child to associate with his/her biological father. *See, e.g., In re Adoption of B.G.S.,* 556 So.2d 545, 551 (La.1990) ("[A] parent has a natural right to his biological child and ... a child likewise has a right to his parent." (citations omitted)). We hope by our decision to deter future conduct that would unfairly and inequitably infringe upon such associational rights.

Finally, though of no consequence to our final resolution of this appeal, we are mindful of the prophylactic effect today's decision undoubtedly will have with respect to the rights of a child who is the subject of adoption proceedings. Through greater respect for the biological mother's and biological father's parental rights, we hope to achieve greater consideration of the child's rights, both to enjoy a prompt resolution of conflicting custodial claims (*e.g.,* by the child's preadoptive parents and his/her biological father), and to be assured of the opportunity to associate with his/her biological father, if he has demonstrated a sufficient interest in establishing and maintaining a parent-child relationship and if such an arrangement is in the child's best interests. *See, e.g., State Dep't of Health & Human Resources, Child Advocate Office ex rel. Cline v. Pentasuglia,* 193 W.Va. 621, 624, 457 S.E.2d 644, 647 (1995) (" 'The child also has a fundamental right, not shared by the mother, to establish the father-child relationship, and in exercising that right there clearly is potential for conflict between the mother's interest and the child's interest.' " (quoting *Commonwealth, Dep't of Social Serv., Div. of Child Support Enforcement ex rel. Gray v. Johnson,* 7 Va.App. 614, 622, 376 S.E.2d 787, 791 (1989)) (footnote omitted)); *In the Interest of Brandon L.E.,* 183 W.Va. 113, 121, 394 S.E.2d 515, 523 (1990) ("A child has rights too, some of which are of a constitutional magnitude.") (internal quotations and citations omitted).

---

**112.** See *supra* note 37, discussing recent legislative amendments to adoption laws in West Virginia and California.

For the reasons expressed in the body of this opinion, the final order of the Circuit Court of Cabell County, upholding the jury verdict rendered in the trial underlying this appeal, is hereby affirmed.

Affirmed.

Retired Justice McHUGH sitting by temporary assignment.

Justice McCUSKEY not participating.

WORKMAN, Justice, concurring, in part, and dissenting, in part:

This case focuses our attention not only upon new and novel issues of law, but a compelling human tragedy as well. It is about a family faced with a great personal dilemma and the difficult choices that were made. It is also about a legal system that is ill-equipped to sort out and bring resolution to the complex human and moral issues it is with increasing frequency being required to address.

It could be a television mini-series, and the skillful script-writer could make any of the parties extremely empathetic characters or heartless villains. Under our system, it was left to a jury of six average people to make the judgments we now review, under legal instructions given by a competent and thoughtful judge, governing many new issues never previously presented in West Virginia, or in some cases, even in the United States. But with the exception of the California lawyer whose own state supreme court found his conduct in this case to be "immoral, reprehensible, and dishonest,"[1] there are no real villains here. There is, however, a $7.85 million judgment facing one family; a man who may never see his son; difficult legal issues not capable of easy resolution; and a dissertation of law that will have long-range implications on future situations.

I commend Justice Davis on this thorough and lengthy opinion. Its completion obviously involved an immense amount of research and a conscientious effort to fairly consider numerous difficult issues.

I concur with the majority whole-heartedly in its ringing pronouncement of the rights of every parent to a relationship with his or her child. That is not new law but it is important that it be reiterated clearly. The United States Supreme Court held in *Lehr v. Robertson*, 463 U.S. 248, 103 S.Ct. 2985, 77 L.Ed.2d 614 (1983) that "[w]hen an unwed father demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child,' his interest in personal contact with his child acquires substantial protection under the Due Process Clause." *Id.* at 261, 103 S.Ct. 2985 (citation omitted). Similarly, in West Virginia, this Court has held that this State's Due Process Clause extends "substantial protection" to an "unwed father [who] demonstrates a full commitment to the responsibilities of parenthood by coming forward to participate in the rearing of his child." Syl. pt. 2, in part, *State ex rel. Roy Allen S. v. Stone*, 196 W.Va. 624, 474 S.E.2d 554 (1996). We have also enunciated the right to that parent-child relationship in the context of the child's right. *In re Brian D.*, 194 W.Va. 623, 461 S.E.2d 129 (1995); *In re Christina L.*, 194 W.Va. 446, 460 S.E.2d 692 (1995); *Honaker v. Burnside*, 182 W.Va. 448, 388 S.E.2d 322 (1989) (recognizing a child's right to continued association with one with whom there is an emotional bond); *see also In re Jonathan G.*, 198 W.Va. 716, 482 S.E.2d 893 (1996) (recognizing child's right in some circumstances to continued association with foster parents).

I concur also with the majority's holding that, "to preserve his parental interest vis-a-vis his newborn child, an unwed biological father must, upon learning of the existence of his child, demonstrate his commitment to assume the responsibilities of parenthood by coming forward to participate in the care, rearing, and support of his newborn child by commencing to establish a meaningful parent-child relationship with his child."

I dissent, however, in several other significant respects:

The numerous instructional errors that the majority concludes were made are so substantial and numerous that cumulatively they must be considered so unfairly prejudicial as

---

1. *Kessel v. Leavitt,* 75 Cal.Rptr.2d 639, 650 (Cal. Ct.App.1998).

to justify retrial for Anne and her parents. Only where trial errors are determined not to have affected the merits of the case and not to have prejudiced the appellants should such error be determined to be harmless. *See* 1B *Michie's Jurisprudence,* Appeal and Error § 285 (1995). Given both the significance of individual instructional errors as well as the cumulative effect of such error,[2] it appears that the jury's verdict in this case likely may have been affected by such incorrect instructions of law.

Although extensive and detailed instructions were given concerning the requirements of both the ICPC and the UCCJA,[3] and advising the jury that these statutes applied to the facts here, the majority correctly concludes that neither of these two compacts were applicable to the instant case and that such instructions were therefore erroneously given. Since the central emphasis of these two acts is providing for the welfare and best interest of children and because their requirements were presented in great detail, it is certainly likely that the jury could have looked to the provisions of these acts for guidance in determining liability and assessing damages. Any determination of liability made with reference to the provisions of these inapplicable laws would constitute reversible error. To simply say, as the majority does, that because the overall jury charge was lengthy there is no reason to believe that the jury placed undue emphasis on such erroneous instructions of law is short-sighted. If the jury was left with an overall impression of legal directives that both delineated and required procedural compliance under the facts of this case, it stands to reason that the jury's verdict could have been affected by such improper instructions.

Another instructional error to which the majority attaches only minor significance concerns the failure of the trial court to give an instruction offered by Appellants regard-ing the fact that despite the validity of the ex parte injunction, no violation of such injunction could be found until proof of service on Anne or her personal appearance before the court was shown. The majority takes the view that no error occurred because the trial court remained silent, in effect, by not giving an instruction one way or the other on this issue. Since the jury was instructed, however, that the injunction was valid, the issue once again becomes whether the jury could have placed undue emphasis on the perceived violation of the injunction. The nuances of service and jurisdiction clearly are not within the average juror's realm of experience. Unlike the majority, I find the failure of the trial judge to have given this instruction to constitute reversible error, at least when viewed cumulatively with the other instructional errors.

Furthermore, the majority determined that the instructions governing the issue of whether the defendants violated John's due process and equal protections rights were unsupported by any applicable law and constituted an abuse of the trial court's discretion. Here again, the majority concluded that the use of instructions addressing John's due·process and equal protection rights which were unsupported by law constituted harmless error because such error was "relatively minimal," and I must disagree. An obvious inconsistency was presented to the jury by virtue of the fact that the trial judge separately instructed the jury that Anne had no duty to notify John of the adoption and then by giving the due process instruction, the trial court simultaneously instructed the jury that John's rights as an unwed father may include "a right to notice of any adoption of that child and an opportunity to be heard prior to the termination of his parental rights to that child." Especially given the fact that the jury apparently took the jury instructions with them during their deliberations, this incorrect statement regarding the violation of John's constitutional rights likely contributed to the verdict reached.

2. *See* Syl. Pt. 8, *Tennant v. Marion Health Care Foundation, Inc.,* 194 W.Va. 97, 459 S.E.2d 374 (1995) (applying cumulative error doctrine to civil cases).

3. The majority observes that "the jury instructions given with respect to the UCCJA were much less onerous than were those instructive of the ICPC in that the UCCJA instructions did not contain any specific instructions indicating that the court determined these provisions to be ap-. plicable to the parties' controversy."

The majority acknowledges that no other jurisdiction has recognized "a claim based in tort and sounding in fraud in circumstances fairly analogous to those underlying the instant appeal" suggests a pressing need to closely examine the parameters of a cause of action predicated on principles of fraud under the facts of this case. Appellants stress that fraud based on concealment or silence cannot be proven absent a *duty* to disclose. *See Sabet v. Eastern Virginia Medical Auth.*, 775 F.2d 1266, 1270 (4th Cir.1985). Based on the facts of this case, Appellants argue that John cannot identify any duty to disclose that they in turn violated. On this issue, Appellants had the trial court instruct the jury that Anne was not obligated "to keep the plaintiffs or either of them apprised of her whereabouts; the progress of her pregnancy or to provide them with any information concerning the birth of her child." In addition, Appellants emphasize that no order was ever entered by the circuit court which would have required Anne to reveal this information. Based on Appellants' instruction, the trial court also instructed the jury that Anne did not have a duty to provide notice to John regarding the adoption itself.

Furthermore, the majority states very clearly that the rights of the plaintiff father began at the moment of birth. Thus, pre-birth conduct obviously could not be the basis for an award of civil damages. However, the jury was permitted to hear a massive amount of evidence regarding pre-birth conduct of all of the defendants. Although such evidence might be admissible with a proper limiting instruction (to show motive or state of mind), no such limiting instruction was given. Thus, all of this evidence was heard by the jury without proper legal instruction with respect to the proper purposes for which they could consider the evidence.[4] Cumulatively, such evidence together with the in-structional error should be the basis for re-trial of the liability issues with respect to the relatives.[5]

Furthermore, although John enjoyed substantial rights with respect to his child, and although the defendants had no right to engage in affirmative conduct to violate those rights, neither did they have any fiduciary or other legal obligation to engage in affirmative acts to protect or ensure his rights. Furthermore, the majority acknowledges that fraud can only be established with regard to acts or omissions committed subsequent to the birth of the child. When the record in this case is scrutinized for affirmative acts on the part of Anne's parents that could constitute fraud, all that can even be suggested is that they *may* have known the whereabouts of Anne when they were deposed, although there has been no proof of this, and that they *may* have known the Canadian residence of the adoptive parents, but again there was no proof of this. Even if a theory of fraud properly applies to a case such as this one, the evidence presented at trial with regard to Anne's parents does not demonstrate that they violated any alleged duty of disclosure. Similarly, while the evidence certainly demonstrates that Anne knew John was looking for her and that she kept on the move, and although a reasonable trier of fact could conclude that she was purposely evading him, there is nothing in our law that places upon her any *duty* to keep John apprised of her whereabouts.

Finally, the enunciation for the first time in this context of the availability of the affirmative defense of justification for Anne and her parents seems to dictate that this matter should be retried so that they might avail themselves of such defense if they so choose.[6]

As courts are called upon with ever-increasing frequency to resolve difficult social and moral issues, I wish to strike a cautionary note. These are questions of immense

---

4. Although ordinarily if a party does not raise an instructional error, then it is deemed waived, here the parties once again did not have the benefit of the majority's holding that John's rights did not begin until the time the child was born.

5. Lawyer Leavitt did not post an appeal bond, his appeal was dismissed, thus his verdict is final.

6. The verdict against lawyer Leavitt, however, would not be subject to such retrial, since he did not post an appeal bond and his appeal was therefore dismissed. Furthermore, because there is a far more substantial amount of evidence against Anne's brother, Brian, his inability to utilize the defense of justification does not appear to be a substantial enough error to warrant retrial when compared to the weight of evidence against him.

moral magnitude that are not capable of easy answers, or susceptible to the facile application of clear-cut rules. Courts must very carefully scrutinize new causes of action calling into question difficult personal decisions human beings face and the role of family and loved ones in those decisions. I am troubled that, whatever conclusions are made on a legal or moral basis, as to the conduct of these two individuals, John and Anne—and all the other Johns and Annes there are still to come—that the family members of such individuals put themselves at risk of permanent financial ruin because of the human support they may give. As judges, we must to some extent look not only at the legal issues inherent in these situations, but also figuratively put ourselves into the human shoes of the litigants. This observation is in no way intended to denigrate the obligation of any person in our society to speak truthfully when placed under oath in a court proceeding, and this separate opinion has carefully excluded any objection to the majority's conclusion that our system cannot countenance perjury or subornation of perjury under any circumstance. Cases like the instant one will continue to require more wisdom than we mortals possess; thus we must tread carefully in enunciating the parameters of these new causes of action and contemplate fully the implications of our rulings in the many diverse factual situations yet to arise.